BRYAN CAVE LLP, #00145700
Robert W. Shely, #014261
Jonathan G. Brinson, #025045
William T. Luzader, III, #025607
Two North Central Avenue, Suite 2200
Phoenix, Arizona 85004-4406
Telephone: (602) 364-7000
rwshely@bryancave.com
jonathan.brinson@bryancave.com
willliam.luzader@bryancave.com
Attorneys for Defendants
Countrywide Financial Corporation;
Countrywide Home Loans, Inc.; Countrywide
Mortgage Ventures, LLC; Countrywide KB Home Loans,
a series of Countrywide Mortgage Ventures, LLC;
Landsafe, Inc.; and Landsafe Appraisal Services, Inc.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| NATHANIEL JOHNSON and KRISTEN PETRILLI; ABRAHAM NIETO; GLORIA and CHARLES LEWIS; FABIAN and MARIA PATRON, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>KB HOME, a Delaware corporation; COUNTRYWIDE FINANCIAL CORPORATION, a Delaware corporation, COUNTRYWIDE HOME LOANS, INC., a New York corporation; COUNTRYWIDE MORTGAGE VENTURES, LLC, a Delaware company; COUNTRYWIDE-KB HOME LOANS, an unincorporated association of unknown form; LANDSAFE, INC., a Delaware corporation; LANDSAFE APPRAISAL SERVICES, INC., a California corporation; and DOES 1 through 1000,<br><br>Defendants. | CV-09-972-PHX-FJM<br><br><br><br><br><br>**DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT** |

BRYAN CAVE LLP
TWO NORTH CENTRAL AVENUE, SUITE 2200
PHOENIX, ARIZONA 85004-4406
(602) 364-7000

648998

BRYAN CAVE LLP
TWO NORTH CENTRAL AVENUE, SUITE 2200
PHOENIX, ARIZONA 85004-4406
(602) 364-7000

In their rhetoric filled[1] "blunderbuss"[2] First Amended Complaint ("FAC"), spanning over 56 pages, Plaintiffs allege that the Defendants, Countrywide Financial Corporation ("CFC"), Countrywide Home Loans, Inc. ("CHL"), Countrywide Mortgage Ventures, LLC ("CMV"), Countrywide KB Home Loans ("CKBHL"), Landsafe, Inc. ("Landsafe"), and Landsafe Appraisal Services, Inc. ("LSA") (collectively "Countrywide/Landsafe Defendants") and Defendant KB Home ("KB Home") violated the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c) & (d), California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 *et seq.,* and realized unjust enrichment.  Despite its hefty volume, the FAC sets out few facts about the named Plaintiffs to support their claims.[3]

Stripped to its core, the FAC alleges that Defendants "tricked" the falling housing market with inflated appraisals of their homes to prevent Plaintiffs from exercising their contractual right to refuse to pay the agreed sales price.

But the factual cornerstone of Plaintiffs is false.  Plaintiffs' purchase contracts contained no "contingency provisions" allowing them to back out of their obligation to

---

[1] For example, Plaintiffs repeatedly compare Defendants' alleged conduct to a "Madoff-like Ponzi scheme." FAC ¶¶ 14, 95, 96.  Under any scenario, the alleged scheme is neither a "Ponzi scheme" nor "Madoff-like."

[2] In *In re Actimmune Marketing Litigation*, 614 F. Supp. 2d 1037, 1051 (N.D. Cal. 2009), the same plaintiffs' counsel brought a similar class action alleging the same three causes of action: federal RICO, California consumer protection laws, and unjust enrichment. Judge Marilyn Hall Patel granted the defendants' motion to dismiss, finding "Plaintiffs' blunderbuss approach to pleading is ineffective here." *Id*. at 12.  Under the newer, tighter pleading standards developed in recent Supreme Court cases, District Court judges must look harder at what have become "off the rack" RICO actions.

[3] The FAC devotes excessive effort to discussing unproven and hearsay allegations in other cases brought against some of the defendants in other courts by other plaintiffs, relying on so called "confidential witnesses" (*e.g.*, FAC ¶¶ 98-99, 102), "anonymous letters," (*e.g.*, FAC ¶ 91), and unidentified hired gun appraisers to allege disagreements in judgment calls in the appraisals to support most of their allegations (*e.g.*, FAC ¶¶ 129, 130, 139, 144, 148, 149).  None of those allegations, however, address or concern alleged conduct occurring in this District or Arizona in general, let alone with respect to the named Plaintiffs in particular.

648998

purchase the home in the event an appraisal failed to meet or exceed the purchase price; to the contrary, the contracts obligated the buyers to purchase regardless of their ability to secure a loan, and regardless of the appraisal.  This fact alone is fatal to all of Plaintiffs' claims.  Further, Plaintiffs agreed to purchase their homes for a fixed price long before anyone commissioned or received an appraisal on the home.  Thus, the appraisal did not cause the Plaintiffs to purchase their homes, nor did it factor into the sale price.  At least three of the Plaintiffs dramatically and voluntarily inflated their home purchase prices well beyond the base prices offered by KB Home by selecting extensive and expensive upgrades that, in retrospect, and in a down economy, they probably could not afford.  The prices Plaintiffs agreed to pay for these upgrades were not tied to any appraisal, and did not change their purchase obligation.  Plaintiffs drove up their own home prices by adding features, under the illusion that house prices would never fall – and the appraisals reflected those added values.

In addition, three of the Plaintiffs – Johnson/Petrilli, Nieto and Patron – agreed to buy and closed escrow on their houses between April 2005 and June 2006, during what experts now recognize to have been the biggest housing market frenzy in Arizona history, where overheated buyer demand drove up the average and median prices of homes substantially.  The FAC itself recognizes the effect of such a "rising" market: "In a rising home value market, … the home purchaser may also benefit as the price he/she agrees to pay for a new home may be well under the value of such house 6-8 months later when the house is built and the escrow closes."  FAC ¶ 60.  As set out below, Johnson/Petrilli, Nieto and Patron all benefited from this exact market behavior, and the appraisals reflected the reality of the market.

The fourth Plaintiff – Lewis – bought in September 2005, and closed in September 2006 – just after the point at which the objective, government-provided market data shows the frenzied market began to pull back – and actually received the benefit of a $70,000 voluntary price reduction from KB Home in a falling market.  The FAC also predicts that "in an environment of falling home prices, market forces should drive home builders such

BRYAN CAVE LLP
TWO NORTH CENTRAL AVENUE, SUITE 2200
PHOENIX, ARIZONA 85004-4406
(602) 364-7000

BRYAN CAVE LLP
TWO NORTH CENTRAL AVENUE, SUITE 2200
PHOENIX, ARIZONA 85004-4406
(602) 364-7000

as KB Home to discount home prices, even below the then-current appraisal value, in order to ensure that the value at closing will be correlated to the contract price." FAC ¶ 6. Although KB Home had no obligation to lower the contract purchase price for any buyer, the Lewises benefited from exactly this market force. The markets, rather than an alleged illicit RICO scheme, controlled here as a matter of fact.

Plaintiffs' allegations fail as a matter of law to state a claim under RICO because, among other things, they lack Article III *or* RICO standing because they have failed to show any causal connection between the alleged misconduct and the alleged damages. The FAC also fails to satisfy the technical pleading requirements of a federal RICO cause of action.

Plaintiffs' California UCL claim fails because (a) Plaintiffs have no standing because they fail to allege or show injury in fact caused by any unfair competition because they do not demonstrate any reliance on any alleged wrongful conduct and fail to show any causal connection between the conduct and the alleged damages; (b) the statute does not extend to non-California residents such as Plaintiffs; and (c) Plaintiffs fail to allege any unlawful, unfair or fraudulent conduct.

Plaintiffs' unjust enrichment claim fails, too – the Defendants and Plaintiffs agreed to purchase prices for the homes, the Defendants delivered as promised, the buyers received and accepted their homes as obligated under their contracts, received loans to finance the purchase their homes, and lived in their homes. Even if an appraisal had been "inflated," none of the Plaintiffs paid an inflated appraisal price.

In short, the Plaintiffs agreed to purchase their respective homes at the then-going market price – that is, the price that a willing buyer and a willing seller agree upon to complete a transaction. *See* Black's Law Dictionary (9th ed. 2009) 1308. None of the parties purports to have seen or relied on an appraisal before reaching a binding agreement on the sale price. Plaintiffs cannot demonstrate a connection between their decision to purchase a home and an alleged after the fact inflated appraisal. For the reasons set forth below, the Countrywide/Landsafe Defendants move this Court to dismiss Plaintiffs' FAC

in its entirety, with prejudice, under Federal Rules of Civil Procedure 12(b)(1), 12(b)(6) and 9(b).  This Motion is supported by the accompanying Memorandum of Points and Authorities and the Court's file.

RESPECTFULLY SUBMITTED this 20th day of August, 2009.

BRYAN CAVE LLP

By:  /s/ Robert W. Shely
 Robert W. Shely
 Jonathan G. Brinson
 William T. Luzader, III
 Two North Central Avenue, Suite 2200
 Phoenix, AZ  85004-4406
 Attorneys for Countrywide/Landsafe Defendants

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.     FACTS

#### A.     Facts About the Phoenix Area and Arizona Housing Market

Plaintiffs contend that at some unknown time in 2006, "the value of newly built KB Home residences dropped relative to the pre-construction contract prices obtained in the preceding months."  FAC ¶ 83.  In light of Plaintiffs' introduction of market-based arguments and allegations, the Court may and should take judicial notice of the following statistics, derived entirely from documents available to the public through the Maricopa County Recorder's Office because "under Fed. R. Evid. 201, a court may take judicial notice of matters of public record."  *Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001); *accord Calderon v. Endres*, 2009 WL 1953400, *2 (S.D. Cal. July 7, 2009) (taking "judicial notice of the various documents filed with the San Diego County Recorder's Office"), *Jakemer v. Romano*, 2007 WL 704178, *3 (D. Ariz. March 5, 2007) (same).

Government statistics show that the average price of a new home in Maricopa and Pinal Counties in April 2005 was $249,698.  Exhibit 9 (RL Brown Decl. ¶ 6).  By April 2006, the average price had skyrocketed almost $95,000 (or 38%) to $344,210.  *Id.* at 8.  The median price of a new home in April 2005 was $209,552; by April 2006, the median price also had risen 38% to $290,173.  *Id.* at 11-12.

BRYAN CAVE LLP
TWO NORTH CENTRAL AVENUE, SUITE 2200
PHOENIX, ARIZONA 85004-4406
(602) 364-7000

648998

In September 2005, when Lewis entered into a purchase contract for his home, the average home price was $290,162. *Id.* at 7. By June 2006, the average home price had risen to $351,672, but within three months, in September 2006, the average price had dropped to $331,336. *Id.* at 9-10. By May 2006, the median price for new homes had climbed to $296,780, but had pulled back to $271,606 by September 2006. *Id.* at 13-14.

**B.    Relevant Common Purchase Agreement Terms**

Each of the Plaintiffs entered into standard KB Home form purchase contracts, which included a standard form of Purchase Agreement and Escrow Instructions (the "Purchase Agreements"), Purchase Agreement and Escrow Instructions Additional Terms and Conditions, and certain other Addenda. *See* Exhibit 1 (Johnson/Petrilli Purchase Agreement Package); Exhibit 2 (Nieto Purchase Agreement Package); Exhibit 3 (Lewis Purchase Agreement Package); Exhibit 4 (Patron Purchase Agreement Package.")[4] Those documents, collectively, share identical clauses and provisions, including:

1)   5.3   <u>Loan Approval; Disapproval</u>.  Buyer shall, in good faith, apply for a Loan and diligently pursue Loan approval. **Buyer acknowledges that Buyer's obligation to purchase the Property is not contingent upon Buyer obtaining Loan approval and that Buyer's Deposit shall become non-refundable to Buyer on the Non-Refundable Deposit Date, (as defined in the Key Date Addendum to Purchase Agreement) irrespective of whether the Loan is approved.** Additionally, if Buyer fails to obtain written notification from Lender of unconditional Loan approval within thirty (30) days after the "Original Sale Date" as set forth in the Key Date Addendum, or any other time period as agreed to by Buyer and Seller, in writing, then Buyer or Seller may, by written notice to the other and to Escrow holder, cancel this Agreement. In the event of such cancellation (a) Buyer shall have no right to purchase the Property and shall have no claim or interest in or to the Property, and (b) if such cancellation occurs before the Non-Refundable Deposit Date, all funds previously deposited by Buyer, less any escrow costs or Lender Fees (as defined in Affiliated Business Disclosure) incurred, shall be returned to Buyer, unless Seller is entitled to retain any such amounts pursuant to any

---

[4]   This Court may consider the Purchase Agreements, and other documents referenced in the FAC in ruling upon this Motion because these documents "form the basis of the plaintiff's claim[s]." *E.g.*, *U.S. v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003); FAC ¶¶ 59, 128-133, 139, 142-144, 146-149.

BRYAN CAVE LLP
TWO NORTH CENTRAL AVENUE, SUITE 2200
PHOENIX, ARIZONA 85004-4406
(602) 364-7000

BRYAN CAVE LLP
TWO NORTH CENTRAL AVENUE, SUITE 2200
PHOENIX, ARIZONA 85004-4406
(602) 364-7000

option/upgrade work orders/contracts.  If such cancellation occurs after the Non-Refundable Deposit Date, the Deposit shall be retained by Seller and all other funds previously deposited by Buyer, less any costs incurred, shall be returned to Buyer, unless Seller is entitled to retain any such amounts pursuant to any option/upgrade work order/contracts.  BUYER MUST OBTAIN WRITTEN UNCONDITIONAL LOAN APPROVAL WITHIN THIRTY (30) CALENDAR DAYS AFTER BUYER SIGNS THIS AGREEMENT.  SELLER MAY, BY WRITTEN NOTICE TO BUYER, EXTEND THE TIME FOR LOAN APPROVAL IN SELLER'S SOLE DISCRETION.  (Purchase Agreement and Escrow Instructions Additional Terms and Conditions (emphasis added).)

2) An addendum entitled "Model Home and Standard Features Addendum" ("Model Home Addendum") which stated, among other things,

Model Homes are not currently available for viewing in this Community and access to the Community may not be available prior to the time that Buyer executes a Purchase Agreement.  Seller will provide for Buyer's review conceptual renderings of home elevations available at the Community and depictions of the map of the Community.  The home built in the Community may vary in many respects from the renderings.

Exhibits 1-4, at Model Home and Standard Features Addendum.

Two of the Plaintiffs (Johnson/Petrilli and Nieto) purchased homes in the same subdivision – the Retreat at Santerra – in May and June 2005, respectively.  Exhibit 1; Exhibit 2.  Plaintiff Patron purchased property in a nearby subdivision also located in the Santerra development, the Preserve at Santerra, in April 2005.  Exhibit 4.  Plaintiff Lewis purchased a home in another KB subdivision, known as Mesquite Cove, in September 2005.  Exhibit 3.

Each of these Plaintiffs bought into a new neighborhood, sight unseen.  Indeed, the FAC recognizes that KB Home typically "built homes on the empty lots in a development only after a purchaser has entered into a contract specifying the price for the specific model home they desire and the particular lot in the development on which they want it built."  FAC ¶ 56.  By doing so, each Plaintiff assumed all risks – good or bad – associated with any subsequent market changes, including any occurring between the contract date and the close of escrow.  All of the appraisals occurred well after Plaintiffs had agreed to purchase their homes.  *See* FAC ¶¶ 128, 139, 142 and 147 (setting alleged dates of

BRYAN CAVE LLP
TWO NORTH CENTRAL AVENUE, SUITE 2200
PHOENIX, ARIZONA 85004-4406
(602) 364-7000

1  valuation); *see also* Exhibits 5, 6, 7 and 8 (setting out exact and correct appraisal dates.)

2  Plaintiffs never actually explain how an appraisal performed up to a year later had any

3  impact on their specific decisions to buy.

**C.    Relevant Allegations and Facts Regarding the Named Plaintiffs**

5      The facts about the named Plaintiffs in this case do not start until page 32 at ¶ 127.

6  The facts about the named Plaintiffs can be summarized as follows:

**1.    Plaintiffs Johnson/Petrilli**

8      Plaintiffs Nathaniel Johnson ("Johnson") and Kristen Petrilli ("Petrilli") entered

9  into a sales contract on May 14, 2005, to purchase their home for $293,950.  FAC ¶ 116;

10 Exhibit 1 at 1 (this amount included a Base Purchase Price of $268,690, a lot premium of

11 $15,000, and Upgrades of $10,260.00).[5]

12     Johnson and Petrilli "obtained an appraisal that was $40,000 below the contract

13 price" while seeking a VA Loan.  FAC ¶ 128.  When Johnson and Petrilli showed KB

14 Home the VA appraisal, KB Home "refused to lower the contract price."  *Id*.  In other

15 words, the Court can infer that KB believed that in the rising Phoenix housing market, the

16 house was appropriately priced and that KB Home saw no reason to, in a hot market, grant

17 a $40,000 price reduction in an arms-length deal.

18     Paragraph 11 of the KB Home standard purchase agreement, and particularly the

19 Johnson/Petrilli purchase agreement, states in pertinent part:

20     11.   FHA and VA Loans  If Buyer has timely applied to obtain an FHA or
       VA loan in accordance with the terms of this Agreement, it is expressly
21     agreed that notwithstanding any other provisions of this Agreement, the
       Buyer shall not incur any penalty by forfeiture of the Deposit or be
22     obligated to complete the purchase of the Property if the purchase price of
       the Property exceeds the appraised value of the Property for mortgage
23     insurance purposes for FHA or the Reasonable Value established by VA.
       The Buyer shall, however, have the privilege and option of proceeding with
24     the consummation of this contract without regard to the amount of the FHA
       appraisal or VA Reasonable Value.
25

26

27

────────────────────

28  [5]  Paragraph 116 of the FAC incorrectly alleges that the purchase price was $383,819.

BRYAN CAVE LLP
TWO NORTH CENTRAL AVENUE, SUITE 2200
PHOENIX, ARIZONA 85004-4406
(602) 364-7000

Purchase Agreement and Escrow Instructions Additional Terms and Conditions, Exhibit 1 at ¶ 11.

Johnson and Petrilli thus had two options if, in fact, the VA appraisal value fell below the agreed sales price: walk away from the sale without penalty, or close escrow despite the VA appraisal. *See* Exhibit 1 at ¶ 11. Johnson and Petrilli elected to close on the home with other financing (FAC ¶ 128) even though they knew: (1) that at least one appraiser thought their home was worth $40,000 less than the sale price; and (2) that as applicants for a VA loan, under the terms of their contract, they could walk away without penalty or loss of their escrow deposit.

Plaintiffs allege that Johnson's appraisal "did not reflect the true value" of the home due to certain "improper practices," as apparently provided by some anonymous hired gun appraiser, such as:

> the appraiser used a neighborhood that was not in a comparable area and was well beyond the definition of a neighborhood. . . . A more realistic neighborhood would include single family homes in subdivisions rather than a mix of single family, manufactured, farm and vacant property.

FAC ¶ 129. They also allege that the appraisal was also "suspect" for other reasons. *Id*. at ¶ 130.

### 2.    Plaintiff Abraham Nieto

The FAC alleges that the Nietos contracted to purchase their home for $303,812. FAC at ¶ 132. In fact, the Nietos' Purchase Agreement, dated June 17, 2005, shows that they originally agreed to purchase their home for a total of $362,887, comprised of a base purchase price of $326,190, a lot premium of $9,000 and an upgraded options package of $27,697. Purchase Agreement, Exhibit 2 at 1. In September 2005, KB Home and the Nietos amended the contract to reduce the purchase price to $361,391. *See* Exhibit 2. The parties amended the contract price again in March 2006, after the Nietos decided to add a pool for $22,421, making the total sales price $383,812. *Id*. at "Sales Summary." Over $57,000 of the purchase price is attributable to additions and upgrades selected by the Nietos.

BRYAN CAVE LLP
TWO NORTH CENTRAL AVENUE, SUITE 2200
PHOENIX, ARIZONA 85004-4406
(602) 364-7000

On April 10, 2006, the house appraised for $415,000.  FAC ¶ 135.  The Nietos contend, upon information and belief, that the $415,000 appraisal reflected an inflated value, and that KB Home, through Countrywide-KB and Landsafe, "was able to dictate and control the outcome of the Nieto appraisal such that it would disclose a value for the Nieto home sufficient to close the deal."  *Id*. at ¶ 137.

In any event, Nieto stopped making his payments and defaulted on his loan. The lender foreclosed on the property, which caused it to lose money and provided a debt forgiveness of Nieto's debt.

The Nietos contend that the appraisal was "improper" (per a review performed by an independent appraiser), FAC ¶ 139 (alleging that the appraisal on Nieto's property was "inflated" because, among other things, "going outside the subject area to more expensive areas caused the appraiser to, *in the reviewer's opinion*, overstate the subject value") (emphasis added).  FAC, *id*.

### 3.    Plaintiffs Gloria and Charles Lewis

The FAC contends, incorrectly, that Plaintiffs Gloria and Charles Lewis (the "Lewises") contracted with KB Home on September 24, 2005, to purchase their house for $347,998.00.  FAC ¶ 142.  In fact, the Lewises agreed to pay KB Home $328,690, including a base price of $321,190 and a lot premium of $7,500.  Exhibit 3 at 1.  At the same time, KB Home agreed to provide $2,000 in credit toward any costs, early interest rate lock, extended interest rate locks, and interest rate buy-downs if the Lewises decided to finance through Countrywide KB Home Loans.  *Id*. at Supp. Addendum to Purchase Agreement Revision to Total Purchase Price.

On October 27, 2005, the Lewises decided to install upgraded flooring valued at $15,410.  Exhibit 3 at "Flooring Contract."  Several days later, the Lewises added $42,914 in further upgrade options.  *Id*. at Options Contract.  The total of these additions raised the purchase price of the home from $328,690 to $387,014, with a $2,000 credit as set out above.  The Lewises then contracted with Pacific Pools and Spas, LLC to add a pool at a cost of $23,784, which they decided to incorporate into their first mortgage, for a total of

10

BRYAN CAVE LLP
TWO NORTH CENTRAL AVENUE, SUITE 2200
PHOENIX, ARIZONA 85004-4406
(602) 364-7000

over $80,000 in optional upgrades.  *Id*. at Pool Contract.  This raised the purchase price of the home to $410,798.

On or about June 24, 2006, KB Home agreed, because of market conditions, to reduce the purchase price of the Lewises' home by a net of $62,800.  *See id*. at KB Home Sales Summary.  In addition, KB agreed to provide a credit of $9,692 to assist with closing costs, reducing the net purchase price value to the Lewises to $338,306.  *Id.*

The house appraised just modestly over the final purchase price, at a value of $348,000.00.  FAC ¶ 142; Exhibit 7.  That value fell below the original full purchase price of $410,798, as would be expected in a declining market.  CKBHL loaned the Lewises $52,200 on one note and $278,390 on another, for a total of $330,390.  *Id.*

The Lewises allege that the "appraisal was false and overstated the value of the home.  A true value arrived at would have been $275,190 as of September 27, 2006."  FAC ¶ 144.

### 4.      Plaintiffs Fabian and Maria Patron

Plaintiffs Fabian and Maria Patron (the "Patrons") allege they contracted with KB Home on April 10, 2005 to purchase a house for $251,690.  FAC ¶ 146.  But actually the Patrons contracted to buy their home for $232,090, including a base home price of $220,490, a lot premium of $9,000 and upgrades worth $2,600.  The Purchase Agreement also offered an incentive valued at 1% of the base home price if the Patrons decided to finance their home through CKBHL.

The Patrons allege that their house appraised on February 26, 2006 for $282,000.00.  FAC ¶ 147.  In fact, the appraised value was $262,000 as of February 6, 2006.  *See* Exhibit 8, Patron appraisal.

The FAC alleges that the "Patron property was also subject to an improper appraisal," with numerous alleged defects along the allegations set forth for the other Plaintiffs, all again from some anonymous appraiser.  FAC ¶ 148.

648998

BRYAN CAVE LLP
TWO NORTH CENTRAL AVENUE, SUITE 2200
PHOENIX, ARIZONA 85004-4406
(602) 364-7000

### D.   Allegations Regarding Purported Damages to the Market

The Plaintiffs also contend that the Defendants designed the scheme to perpetrate a fraud on the market.  Specifically:

> The inflated sale prices resulting from the tainted appraisals, in turn, infected subsequent appraisals and valuations, allowing the KB-Countrywide Criminal Enterprise to continue to obfuscate falling values and/or set values at an artificially high price to begin with.  This allowed the KB-Countrywide Criminal Enterprise to obtain prices inflated well beyond where they would have been in the absence of their unfair and deceptive criminal enterprise even when using appraisals downstream of the original tainted appraisals which "accurately" reported those inflated sales as comparables.  In other words, this was a Madoff-like Ponzi scheme that depended upon the initial use of false appraisals to prop up early sales, but then was self-cleansing even while it continued to prop up the value and selling activity in entire KB Home subdivisions.

FAC ¶ 97.

## II.   APPLICABLE LAW AND ANALYSIS

### A.   The First Amended Complaint Fails to Meet Modern, Stricter Federal Pleading Requirements

#### 1.   Modern Federal Pleadings Standards Require Plaintiffs to Demonstrate the Facial Plausibility of their Claims

To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)) (reversing denial of motion to dismiss where plaintiff's scant factual allegations were more reasonably explained by innocent, rather than allegedly tortious, motives).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S. Ct. at 1949.  To determine whether a complaint states a plausible claim for relief, the court must rely on its "judicial experience and common sense." *Id.* at 1950.  The complaint cannot merely establish a "sheer possibility that the defendant has acted unlawfully." *Id.* at 1949.  Thus, "[w]here a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between

possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

Moreover, "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (citation omitted).  The Ninth Circuit has "consistently emphasized . . . that 'conclusory allegations of law and unwarranted inferences' will not defeat an otherwise proper motion to dismiss." *Vasquez v. L.A. County*, 487 F.3d 1246, 1249 (9th Cir. 2007) (quoting *Schmier v. U.S. Ct. of Appeals for the Ninth Cir.*, 279 F.3d 817, 820 (9th Cir. 2002)); *accord Doe v. Dickenson*, 2008 WL 4933964 at *4 (D. Ariz. Nov. 14, 2008) ("[L]egal conclusions couched as factual allegations are not given a presumption of truthfulness, and conclusory allegations of law and unwarranted inferences are not sufficient to defeat a motion to dismiss") (internal quotes and citation omitted); *Cholla Ready Mix, Inc. v. Civish*, 382 F.3d 969, 973 (9th Cir. 2004) ("[T]he court is not required to accept legal conclusions cast in the form of factual allegations if those conclusions cannot reasonably be drawn from the facts alleged.  Nor is the court required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences") (citations omitted).

"Although a complaint need not contain detailed factual allegations, the Court will not assume that the plaintiff can prove facts different from those alleged in the complaint." *Dickenson*, 2008 WL 4933964 at *4 (internal quotes and citation omitted).  Nor can a plaintiff meet its burden simply by contending that it "might later establish some 'set of [undisclosed] facts' to support recovery." *Twombly* at 561.  While the Court considers the sufficiency of a plaintiff's factual allegations, "[t]he court need not, however, accept as true allegations that contradict matters properly subject to judicial notice, are conclusory or mere legal conclusions, or unwarranted deductions of fact or unreasonable inferences, or contradicted by documents referred to in the complaint, or are internally inconsistent." *Pesci v. IRS*, 67 F. Supp. 2d 1189, 1191-92 (D. Nev. 1999), *aff'd*, 225 F.3d 663 (9th Cir. 2000) (citations omitted).  Further, where there is an "obvious alternative explanation" for

BRYAN CAVE LLP
TWO NORTH CENTRAL AVENUE, SUITE 2200
PHOENIX, ARIZONA 85004-4406
(602) 364-7000

BRYAN CAVE LLP
TWO NORTH CENTRAL AVENUE, SUITE 2200
PHOENIX, ARIZONA 85004-4406
(602) 364-7000

the conduct alleged, the complaint should be dismissed for failure to state a claim. *Iqbal*, 129 S. Ct. at 1951.

### 2. Plaintiffs' Claims are not Facially Plausible

In the language of the Supreme Court, the home sales activity described in the FAC can be explained away completely by "innocent" natural market forces. Plaintiffs essentially alleged that the Countrywide/Landsafe Defendants entered into a scheme with KB Home to inflate house appraisals so CKBHL could intentionally make bad loans. This "would be a ludicrous banking policy" that lacks any facial plausibility. *Do v. Pilgrim's Pride Corp.*, 512 F. Supp. 2d 764, 768-69 (E.D. Tex. 2007) (dismissing plaintiffs' RICO claims where the lender's relationship with other entities "reveal[ed] only standard business arrangements"). Furthermore, the notion that Defendants tricked the housing market with after the fact appraisals is absurd. As explained in more detail below, appraisals did not factor into the negotiated sale prices Plaintiffs agreed to, their purchase obligations were not contingent on any appraisal (or loan approval), and, in any event, appraisals are not based on other appraisals, but on other actual sales.

### a. The Subject Appraisals Played no Role in Plaintiffs' Purchase Decisions Because they were Rendered Months After Plaintiffs Unconditionally Contracted to Buy their Homes at Specified Prices

Ironically, what little facts are alleged by Plaintiffs doom their claims. Plaintiffs apparently recognize the inherent impossibility of alleging "but for" or proximate causation between their decision to purchase a home at a certain price in 2005 and receiving an appraisal – even if inflated – in 2006. To evade this chronologically unchallengeable fact, Plaintiffs allege that "All financed transactions require an appraisal report in order to close escrow. The purchase agreements signed by Plaintiffs and members of the putative classes are subject to financing contingencies which allowed Plaintiffs and Class members to refuse to close the transactions if the property does not appraise at or above the contract price." FAC ¶ 59.

But this allegation is untrue. There is no such contingent provision in the Purchase Agreements. Plaintiffs could not back out of their obligation to purchase the homes at the

agreed-upon prices.  Section 5.3 of Plaintiffs' Purchase Agreements expressly states "that Buyer's obligation to purchase the Property is not contingent upon Buyer obtaining Loan approval" (emphasis added).  *See* Purchase Agreement § b.3, as quoted above at Section I.B.  Even if Plaintiffs' appraisals were essential to their loan approval, which is a separate transaction, the appraisal did not in any way impact their obligation to buy the home.  No matter what the appraised value of their home was – higher than, lower than, or the same as the contract price – Plaintiffs still were obligated legally to purchase the house at the agreed price.  There were no appraisals when Plaintiffs contracted to buy their homes.  Thus, their appraisals did not factor, and could not have factored, into their purchase decision.  And because Plaintiffs were required to buy their homes irrespective of any appraisal, the subject appraisals did not cause Plaintiffs any injury.  Plaintiffs' theory about why the Defendants would want to inflate appraisals – to support higher purchase prices to ensure that Plaintiffs' loans would be approved – has no factual basis because the sales occurred *before* anyone commissioned an appraisal.

### b.   As a Matter of Law, Plaintiffs Cannot Show Proximate Causation Because their Purchase Agreements did not have an Appraisal Contingency Provision

Nor can Plaintiffs claim, as a matter of Arizona law, that they had a right to rely on the appraisals when closing escrow on their homes.  In *Kuehn v. Stanley*, 208 Ariz. 124, 128, 91 P.3d 346, 350 (App. Ariz. 2004), plaintiffs contracted to purchase a home for $282,000, contingent upon their ability to obtain financing which in turn depended on a bank satisfactory appraisal.  The appraisal valued the home at $282,000.  The plaintiffs subsequently hired their own appraiser, who, upon reviewing the bank's appraisal, concluded that the bank's appraiser had "severely deviated" from standard appraisal practices and that the house would appraise for only $245,000.  Plaintiffs sued the appraiser and the lender in negligence, consumer fraud, negligent supervision and breach of contract, claiming that they would not have paid the purchase price if they had known the true value of the home.  The trial court granted summary judgment and attorneys' fees to the lender and the appraiser, and the plaintiffs appealed.

BRYAN CAVE LLP
TWO NORTH CENTRAL AVENUE, SUITE 2200
PHOENIX, ARIZONA 85004-4406
(602) 364-7000

BRYAN CAVE LLP
TWO NORTH CENTRAL AVENUE, SUITE 2200
PHOENIX, ARIZONA 85004-4406
(602) 364-7000

Plaintiffs argued that they received the appraisal and relied on it "as an accurate indicator of value" and as a "reassurance" that they had paid a fair market price. But the court, noting that the plaintiffs were already contractually bound to purchase the home before the lender commissioned the appraisals, found those allegations unpersuasive: "[i]t is unclear how these belated 'reassurances' translate into evidence of detrimental reliance." *Id*. at 130. *See also Hughes v. Holt*, 435 A.2d 687, 689 (Vt. 1981) (recognizing that "it was the testimony, and the unquestioned fact, that the plaintiffs had executed the purchase and sale agreement before the appraisal was ever done," in reversing judgment against appraiser, seller, and lender defendants). Other Arizona cases agree. *Hoffman v. Greenberg*, 767 P.2d 725, 727 (App. Ariz. 1988) ("The report was prepared to aid [the bank] in making a decision"); *Sage v. Blagg Appraisal Co.*, 221 Ariz. 33, 36, 209 P.3d 169, 172 (App. Ariz. 2009) (reversing summary judgment for appraiser because, "[w]hile the plaintiffs in *Kuehn* were contractually bound before they received the appraisal, [plaintiff]'s contract expressly empowered her to cancel if the property did not appraise at the purchase price or greater").

Where, as here, purchase agreements do not contain appraisal-related cancellation contingencies, courts consistently recognize that the appraisals are "not given to induce the purchase of the [property], because the purchase price had already been determined by [the borrower] and the [property owners]." *Dueker v. Gill*, 175 S.W.3d 662, 668 (Mo. App. 2005) (recognizing that "Plaintiffs had already committed to purchase the [property] from the [owners] on September 17, 1996, and on September 24, 1996, agreed on the price of $850,000 before [the] appraisal was ever presented to them in late November of 1996"). *Id*. Rather, "[l]enders require appraisals to protect themselves from the people who are tempted to misrepresent the value of security in order to get their hands on more money." *Decatur Ventures, LLC v. Daniel*, 485 F.3d 387, 390 (7th Cir. 2007) (affirming summary judgment in favor of appraiser for claims of RICO violations and fraud); *accord Hoffman*, 767 P.2d at 727 (App. Ariz. 1988) ("The report was prepared to aid [the bank] in making a decision"); *Nymark v. Heart Fed. Sav. & Loan Assoc.*, 231 Cal. App. 3d 1089, 1096

(1991) ("[D]efendant performed the appraisal of plaintiff's property in the usual course and scope of its loan processing procedures to protect *defendant's* interest by satisfying it that the property provided adequate security for the loan"); *McGee v. First Fed. Sav. & Loan Assoc.*, 761 F.2d 647, 648 (11th Cir. 1985) (stating that "[a]n appraisal is performed for the benefit of the lending institution," and also recognizing that "[f]ederal regulation requires *the lending institution* to commission the appraisal" even though "[t]he appraisal's cost is simply passed on to the borrower as a business cost").

> **c.** **Plaintiffs Lack a Plausible Causal Connection Between an Inflated Appraisal and Their Decision to Buy, or any Damages**

As Judge Patel wrote in *Actimmune* (where plaintiffs counsel filed a similarly blunderbuss complaint), the "allegations relating to the causal chain of injury as a result of these marketing efforts . . . is scanty." *Actimmune,* 614 F. Supp 2d 1051 (N.D. Cal. 2009). "Plaintiffs need to allege what specific information the individual plaintiffs or their physicians had about the drug, the extent to which they relied upon that information, and that the information relied upon was false, misleading or otherwise fraudulent. Plaintiffs also need to allege when the drug was prescribed, purchased and administered, and whether these actions would not have been taken if not for the concealment/misrepresentations. . . ." *Id*. Here, each Plaintiff would have to describe in detail, among other things, how he or she relied upon the appraisal and how that reliance caused them to take an action that would not have been taken if not for the alleged misrepresentation. But in the FAC, as to each Plaintiff, the allegations are limited to a single, conclusory contention, as set out specifically below. "This is not enough. Plaintiffs mere recitation of the causation element of the RICO claim do not prove sufficient grounds for entitlement to relief." *Id., citing Twombly*, 127 S. Ct. at 1965.

Each Plaintiff expressly agreed on a specific sale price, and their obligation to purchase the home at that price was not contingent upon any appraisal. Furthermore, all of these Plaintiffs chose to add upgrades to their homes. Upgrades cost money; they are not free. The upgrades were not priced based on how much value they might add to the

BRYAN CAVE LLP
TWO NORTH CENTRAL AVENUE, SUITE 2200
PHOENIX, ARIZONA 85004-4406
(602) 364-7000

648998

BRYAN CAVE LLP
TWO NORTH CENTRAL AVENUE, SUITE 2200
PHOENIX, ARIZONA 85004-4406
(602) 364-7000

property.  Plaintiffs agreed to pay the additional amounts irrespective of and long before any appraisal.

### i.    Johnson/Petrilli

Johnson/Petrilli conclude only that if "a true and accurate appraisal had been used, Plaintiff Johnson would not have paid $383,819 for the home."  FAC ¶ 131.  But they did not pay $383,819 for their home; they paid only $293,950 for the home, lot and upgrades. Second, it is clear that they would have paid more than an appraisal value indicated because, in fact, they paid more than the VA appraisal.  It is implausible for Johnson/Petrilli to claim, in retrospect, that they would have strictly followed a lower appraisal when the truth is they received such an appraisal yet still elected to buy their home at the contract price.  Of course, they did not pay the appraised value of the house, so even if the appraisal were too high, Johnson/Petrilli did not suffer damages as a result. Nor do they explain the chain of alleged events showing how the appraisal caused them to purchase a house at an allegedly overvalued price.

### ii.    Nieto

Nieto similarly contends that if he had "not been subjected to the Scheme, he would not have entered into the contract at the contract price agreed to and would not have been 'upside down'" from day one.  *Id*. ¶ 141.  He, too, has failed to demonstrate any correlation between his decision to purchase and any appraisal.  Moreover, the Nietos added $57,000 in upgrades to the home, and have only themselves or the bad economy to blame if they cannot afford the payments on their house.  Nieto does not allege that the Defendants themselves did anything that caused Nieto to fall behind in his payments.  It appears from the FAC that the Nietos fell behind on their mortgage payments, *not* because the payments were too high "from day one," but because they suffered financial setbacks and misfortunes presumably attributable to the poor economy.

### iii.    The Lewises

The Lewises contend that as "a result of the Scheme, the Lewis' [sic] overpaid for their home."  *Id*. ¶ 145.  This conclusory statement is neither a statement of fact nor sufficient under *Twombly* or *Iqbal* to support a claim for damages.  It fails to show the

BRYAN CAVE LLP
TWO NORTH CENTRAL AVENUE, SUITE 2200
PHOENIX, ARIZONA 85004-4406
(602) 364-7000

slightest connection between the alleged "Scheme" and the Lewises' decision to purchase a home, or KB Home's decision to dramatically *lower* the price of the home in response to market conditions.  Indeed, if the alleged Scheme had been in place, KB Home would not have agreed to lower the price.

### iv.    The Patrons

The Patrons conclude that "As a result of the Scheme, the Patrons were financially injured by overpaying for their home."  FAC ¶ 150.  This conclusion suffers the same problems as set forth above with regard to the other similar conclusions.  Moreover, the Patrons contend that the true appraisal value of the home should have been $253,190.  FAC ¶ 151.  As noted above, the house sold for $232,090, minus 1% ($2,320), or a net $229,770.  If the Patrons contend that the house should have appraised at $253,190, then they paid *under* their alleged independent appraiser's valuation, and suffered no damages.

### d.    Plaintiffs' Conclusory Allegations that Defendants Affected 'Market Forces' are Not Plausible and Do Not Salvage Their Claims

Plaintiffs allege that KB Homes somehow sold *each of 14,000 homes*, built since 2006, at an allegedly above-market price based on the subject appraisals.  In essence, Plaintiffs have alleged, without any factual foundation, that KB Home itself forced the entire market to over-value KB Home.  This theory defies logic and fact.  In a highly competitive market, every homebuilder has to compete in price, quality and location with many other homebuilders.  Economic principles would quickly have sent KB Home out of business if its home sales prices, alone, rose incommensurately higher than all of its competitors.

Furthermore, as evidenced by Plaintiffs' own sales contracts, the prices they agreed to were not tied to any appraisals, and their purchase obligations were not contingent on any appraisals.  Indeed, the very definition of "market price" is "[t]he prevailing price at which something is sold in a specific market."  Black's Law Dictionary (9th ed. 2009) 1308.  Here, the Plaintiffs reached a market price without regard to any appraisals.  Moreover, subsequent appraisals of the homes were based on *sales prices of*

BRYAN CAVE LLP
TWO NORTH CENTRAL AVENUE, SUITE 2200
PHOENIX, ARIZONA 85004-4406
(602) 364-7000

other homes – not *appraised* values of those homes.  Plainly put, appraisals did not drive sales prices.  Plaintiffs' alleged tenuous chain of events is missing several critical causal links and, therefore, must fail.  Under *Twombly* and *Iqbal*, the Court should disregard these allegations.

Nor, for the same reason, should the Court accept as true Plaintiffs' allegations that rather than "succumbing" to market pressures "in an environment of falling home prices," the Defendants entered into some RICO-esque plan to prop up home prices.  The only facts in the record show that the exact opposite occurred – that KB Home in fact did succumb to market pressure for the Lewises' home by dropping the price substantially, and the appraisal did come in at substantially below the original purchase price.

**B.      Plaintiffs Lack Article III and RICO Standing Because they Cannot Show that any Alleged Wrongful or Predicate Act Caused any Injury**

**1.      None of the Plaintiffs Fall Within the Scope of Allegedly Injured Persons**

To demonstrate standing, "named plaintiffs who represent a class must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent."  *Lewis v. Casey*, 518 U.S. 343, 357 (1996) (internal quotation marks omitted); *accord Newport v. Dell, Inc.*, 2008 WL 46238723, *2 (D. Ariz. Oct. 17, 2008) (same; finding that plaintiff's "claims that all defendants acted in concert" did not cure her failure to allege "any injury she suffered by the conduct of" each individual defendant); *Griffin v. Dugger*, 823 F.2d 1476, 1483 (11th Cir. 1987) ("[A] claim cannot be asserted on behalf of a class unless at least one named plaintiff has suffered the injury that gives rise to that claim").

Even if there were a class of persons allegedly injured by an illegal scheme, none of the Plaintiffs would have fallen into that class.  The FAC alleges that home prices began to drop sometime in 2006, and that *in response* to that drop, KB Home and the Countrywide/Landsafe Defendants entered into the alleged "illicit scheme."  *See* Section I.A., *quoting* FAC ¶ 61.  Plaintiffs here, however, all bought in a rising market, before

BRYAN CAVE LLP
TWO NORTH CENTRAL AVENUE, SUITE 2200
PHOENIX, ARIZONA 85004-4406
(602) 364-7000

home prices started to drop in the Phoenix metropolitan area and, thus, *before* the alleged illicit scheme would even have begun.  Because they bought into new neighborhoods, they also bought into new markets whose pricing and valuation features developed as a result of Plaintiffs' purchases, not before.  Because they bought "early" and in a "rising market," and because they did not rely on the appraisals when deciding to buy, they could not have been injured by the alleged scheme.

In addition, Plaintiffs contend that the purported class includes residents of Nevada who purchased homes and borrowed from the Defendants.  But none of the individual plaintiffs reside in Nevada.  Plaintiffs provided no specific allegations of predicate acts that allegedly occurred in Nevada.

### 2.  To Show Article III or RICO Standing, Each Plaintiff Must Show an Injury Attributable to the Challenged Conduct

"A motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) tests the subject matter jurisdiction of the court."  *In re Actimmune Mktg. Litigation*, 614 F. Supp. 2d at 1047 (N.D. Cal. 2009) (dismissing plaintiffs' class action complaint, similar to those alleged here and brought under RICO, California consumer protection laws, and unjust enrichment).  "At a constitutional minimum, standing requires the party invoking federal jurisdiction to show that it has 'suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant, and that the injury can be traced to the challenged action and is likely to be redressed by a favorable decision.'"  *Id.* (quoting *Valley Forge Christian Coll. v. Ams. United for Separation of Church and State, Inc.*, 454 U.S. 464, 472, 102 S. Ct. 752 (1982)).  "The party invoking federal jurisdiction bears the burden of establishing these elements."  *Id.* (citing *Lujan* at 561).

Concepts of standing and causation are integrally linked in both Article III and RICO standing.  One cannot exist without the other.  "Article III standing requirements include 'a causal connection between the injury and the conduct complained of' that is 'fairly . . . trace[able]' to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court."  *Actimmune* at 1049 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559-60, 112 S. Ct. 2130, 2134-35

648998

(1992)).  "To satisfy the injury in fact requirement, the alleged harm must be 'an invasion of a legally protected interest' which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical."  *Actimmune* (quoting *Lujan*, 504 U.S. at 560, 112 S. Ct. 2130); *accord Lindquist v. Farmers Ins. Co.*, 2008 WL 343299, *8 n.5 (D. Ariz. Feb. 6, 2008.  "If a plaintiff lacks Constitutional standing, Congress may not confer standing on that plaintiff by statute."  *Actimmune* at 1049, relying on *Lujan*, 504 U.S. at 576-77.

"Liability under § 1962(c) requires (1) the conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity."  *Miller v. Yokohama Tire Corp.*, 358 F.3d 616, 620 (9th Cir. 2004); *Grimmett v. Brown*, 75 F.3d 506, 510 (9th Cir. 1996).  Only a "person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefore."  18 U.S.C. § 1964(c).  A private civil action for fraud under RICO only grants standing to a "person injured in his business or property by reason of a violation of" the RICO Act's substantive provisions.  18 U.S.C. § 1964(c). Thus, "the plaintiff only has standing if, and can only recover to the extent that, he has been injured in his business or property by the conduct constituting the violation."  *Id.* (*quoting Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U. S. 479, 496, 105 S. Ct. 3275, 3285 (1985)).

### 3.  To Maintain a RICO Action, a Plaintiff Must Allege Certain Predicate Acts Showing Racketeering Activity

Plaintiffs seeking to recover under RICO must allege one of a limited number of specifically enumerated predicate acts in order to properly plead a racketeering activity. 18 U.S.C. § 1961(1).  Mail fraud occurs whenever a person, "having devised or intending to devise any scheme of artifice to defraud" used the mail "for the purpose of executing such scheme or artifice or attempting so to do."  18 U.S.C. ¶ 1341.

"It is well settled that, to maintain a civil RICO claim predicated on mail fraud, a plaintiff must show that the defendants' alleged misconduct proximately caused the injury."  *Poulos v. Caesars World, Inc.*, 379 F.3d 654, 664 (9th Cir. 2004); *accord In re Actimmune*, 614 F. Supp. 2d at 1050 (N.D. Cal. 2009) ("[A] class action claim under RICO requires that a defendant's violation was not only a 'but for' cause of injury, but was

BRYAN CAVE LLP
TWO NORTH CENTRAL AVENUE, SUITE 2200
PHOENIX, ARIZONA 85004-4406
(602) 364-7000

BRYAN CAVE LLP
TWO NORTH CENTRAL AVENUE, SUITE 2200
PHOENIX, ARIZONA 85004-4406
(602) 364-7000

the proximate cause as well"). Thus, in a RICO action, "proximate cause demands 'some direct relation between the injury asserted and the injurious conduct alleged.'" *Id.* (quoting *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 267, 112 S. Ct. 1311 (1992)); *Resolution Trust Corp. v. Keating*, 186 F.3d 1110, 1117 (9th Cir. 1999) (reversing summary judgment for plaintiffs and recognizing that "[r]ecovery under RICO is limited to those injuries flowing from predicate acts . . . and does not extend to all injuries caused by an enterprise which violates RICO"); *accord Forsyth v. Humana, Inc.*, 114 F.3d 1467, 1481 (same).

### 4. Allegations of Predicate Acts Under RICO Must Comply with Fed.R.Civ.P 9(b)

"The Ninth Circuit has held that allegations of predicate acts under RICO must comply with Rule 9(b)'s specificity requirements." *U.S. Concord, Inc. v. Harris Graphics Corp.*, 757 F. Supp. 1053, 1061 (N.D. Cal. 1991); *accord Edwards v. Marin Park, Inc.*, 356 F.3d 1058, 1066 (9th Cir. 2004) ("Rule 9(b)'s requirement that in all averments of fraud . . . the circumstances constituting fraud . . . shall be stated with particularity appl[y] to civil RICO fraud claims"); *Schreiber Dist. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1400-01 (applying Rule 9(b) to civil RICO claim predicated on mail and wire fraud). "To avoid dismissal for inadequacy under Rule 9(b), [the] complaint would need to 'state the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentation.'" *Edwards*, 356 F.3d at 1066 (dismissing fraud-based RICO claim for failure to plead fraud with sufficient particularity). Congress created Rule 9(b)'s heightened pleading standard specifically to protect defendants against these types of complaints. *See* 2 *Moore's Federal Practice* § 9.03[1][a] (Matthew Bender 3d ed. 2009).

### 5. Plaintiffs have Failed to Adequately Plead Predicate Acts Under Rule 9(b)

Johnson/Petrilli and Patron do not allege <u>any</u> specific cognizable predicate act sufficient to support a RICO claim, so their RICO allegations must fail immediately as a matter of law. Nieto and Lewis at least allege a predicate act by relying on alleged

BRYAN CAVE LLP
TWO NORTH CENTRAL AVENUE, SUITE 2200
PHOENIX, ARIZONA 85004-4406
(602) 364-7000

violations of 18 U.S.C. §§ 1341 (relating to mail and wire fraud).  *E.g.*, FAC ¶ 134 ("As part of the Scheme, Countrywide Home Loans notified Nieto in a document sent via U.S. Mail on or about April 21, 2006, that his home would be appraised through LandSafe."); FAC ¶ 135 ("As Part of the Scheme, C.S. Heaton used the wires and/or mails to transmit an appraisal to Countrywide-KB Home indicating that the appraisal value was $415,000.")[6]; FAC ¶¶ 142-143 ("The false appraisal [dated September 27, 2006] was sent to the Lewises via mail by Countrywide Home Loans.").  Finally, the FAC alleges that CHL used the mails to send Nieto a Good Faith Estimate ("GFE").  FAC ¶ 200.  But these allegations fail to pass muster.

Nieto's claim that CHL sent him a letter saying that LSA would perform the appraisal does not meet the Rule 9(b) requirements.  In particular, Nieto failed to identify any misrepresentation in the letter on which he relied that subsequently caused him damages.  Indeed, the letter apparently made an entirely truthful statement – that LSA would perform the appraisal.  But, again, the FAC fails to explain what, if any, fraudulent statement or misrepresentation CHL made in the GFE statement it allegedly sent to Nieto, how that statement affected his decision to purchase, or how the GFE letter caused any decision or conduct by Nieto or any damages arising from such decision or conduct.

Nor does Nieto's claim that appraiser Heaton provided a false appraisal to satisfy the pleading standards.  Nieto fails to allege that CKBHL relied on any false information, or even if so, to explain how its reliance caused Nieto to make a decision to purchase his

---

[6]  In *Bridge v. Phoenix Bond & Indemn. Co.,* 128 S. Ct. 2131 (2008), the Supreme Court held that the plaintiffs do not have to show first party reliance on an alleged misrepresentation or fraudulent statement – that is, that the plaintiffs themselves relied on a fraudulent statement or misrepresentation.  But they have to show that someone – even a third party – relied on the statement and that such reliance must lead directly to injury.  *Bridge*, 128 S. Ct. at 2144 ("In most cases, the plaintiff will not be able to establish even but-for causation if no one relied on the misrepresentation.")  The only third party representation to which the Plaintiffs refer is this alleged use of the mail or wire by Heaton.  But there is no showing that KB Home – which controlled the pricing of the home, ever received or relied on the appraisal to cause any damages to Plaintiffs.  In fact, by the time CKBHL received the appraisal report, the pricing and contractual obligation to purchase had already been established.

BRYAN CAVE LLP
TWO NORTH CENTRAL AVENUE, SUITE 2200
PHOENIX, ARIZONA 85004-4406
(602) 364-7000

house almost a year before CKBHL would have received the appraisal.  Nieto's failure to connect the alleged mail fraud to the alleged damages fatally bars his action.

The Lewises' allegation that CHL sent them the appraisal is insufficient and incomplete because they have not set out the details – that is, how and when CHL sent it. They do not allege that they read the appraisal or that they relied upon it.  Most importantly, and as noted elsewhere, the Lewises do not explain how the appraisal they received in 2006 caused them to purchase a house in 2005, at any price.

Plaintiffs also contend "Defendants" used "fraudulent HUD-1 forms to complete transactions."  FAC ¶ 197.  This conclusory allegation falls woefully short of Rule 9(b) standards.  Plaintiffs fail to specify which Defendant used the form, the misrepresentations contained in the form, when such misrepresentations were made, and how the use of fraudulent HUD-1 forms furthered the fraudulent appraisal scheme.

Plaintiffs also contend, in shotgun fashion, that "Defendants' use of the U.S. mails and interstate wire facilities to perpetrate the Scheme involved thousands of communications throughout the Class Period including telephone, email and U.S. Mail communication to borrowers and appraisers; the transmission by email and/or U.S. mail of appraisals prepared by appraisers and the use of fraudulent HUD-1 forms to complete transactions.  Use of the U.S. Mail occurred on hundreds of thousand of occasions where Countrywide, KB and Landsafe communicated amongst themselves."  FAC ¶ 197. "Specifically Defendants perpetrated their Scheme against Plaintiffs through interstate mail and wire facilities by sending documents for California, Texas, and potentially other states, to Plaintiffs in Arizona."  FAC ¶ 200.  Such allegations fail on their face to meet the pleading requirements for a RICO mail or wire fraud claim.

Plaintiffs also contend that Defendants "used the mails on or about May 31, 2007, to send a fraudulent appraisal."  FAC ¶ 200.  But they fail to identify to whom this alleged appraisal was sent, how it was fraudulent, why it was allegedly fraudulent, how it had any impact on any of the Plaintiffs' decisions to purchase their houses, or any other specifics that would qualify this allegation as sufficient under Rule 9(b).

BRYAN CAVE LLP
TWO NORTH CENTRAL AVENUE, SUITE 2200
PHOENIX, ARIZONA 85004-4406
(602) 364-7000

### 6.   Plaintiffs have Failed to Show how the Alleged Predicate Acts Caused any Alleged Harm

Here, as in *Actimmune*, Plaintiffs "have not put forth any specific allegations that *anyone* . . . the plaintiffs themselves, or any other third party – relied on defendants' purportedly fraudulent misrepresentations to cause the injury." *Actimmune* 624 F. Supp. 2d at 1052 (emphasis in original). "The court will not make the unsupported inference that the individual plaintiffs purchased the [home] as a result of defendants' fraudulent conduct. The chasm between plaintiffs' allegations and the legal causes of action under which they seek relief is simply too wide." 624 F. Supp. 2d at 1053. Plaintiffs have not alleged, and cannot allege, their "actions would not have been taken if not for the concealment/misrepresentations of facts made" with respect to the home appraisals. *Id*. at 1052.

### C.   Plaintiffs' "Fraud on the Market" Theory cannot Support a Claim Under RICO

"Courts have generally limited the use of the fraud-on-the-market theory to securities fraud cases." *Appletree Square 1, LP v. W.R. Grace & Co.*, 29 F.3d 1283, 1286-87 (8th Cir. 1994) (affirming summary judgment for defendant where plaintiff attempted to establish injury "through a fraud-on-the-market theory"). Judge Patel in *Actimmune* held that she "looked askance" at this very plaintiffs' counsel's "fraud-on–the-market theory, which must fail because the presumption of reliance does not work in non-efficient markets like prescription drug 'markets' (if individual patients . . . for personalized conditions can even constitute a 'market') and it further fails to distinguish between competitive business practices and fraudulent marketing efforts." 614 F. Supp. 2d at 1054. "The court will not let plaintiffs escape their burden to plead and prove the element of reliance by using a market-based fraud theory to handwave the requirement that there be a connection between the misdeed complained of and the loss suffered under state law. As is the case with the RICO claims, even under the more relaxed standard for proximate cause under state law, a fraud-on-the-market theory cannot plead the necessary element of causation because the relationship between defendants' alleged misrepresentations and the

purported loss suffered by patients is so attenuated, at least on the facts alleged, that it would be effectively nonexistent." *Id.* at 1054.

Although Judge Patel's opinion relates to prescription drug marketing, the same analysis applies in the real estate market.  Like the prescription drug market, the housing market is particularly "personalized."  Here, Plaintiffs chose a floor plan, upgrades, neighborhoods, styles and locations to suit their own tastes.  "The real estate market, unlike the stock market, is not a well-developed market in which the price of a building reflects all publicly available information.  Thus, [plaintiffs] cannot employ the fraud-on-the-market theory" for RICO claims based on real estate transactions.  *Id.; see also District 1199P Health & Welfare Plan v. Janssen*, 2008 WL 5413105, *5 (D.N.J. Dec. 23, 2008) (holding that "[a] showing of injury requires proof of a concrete financial loss and not mere injury to a valuable intangible property interest" and dismissing RICO claim where "[p]laintiffs' only identified injury is their alleged economic loss from 'overpayment'") (quoting *Maio v. Aetna, Inc.*, 221 F.3d 472, 483 (3d Cir. 2000)).  Thus, the fraud-on-the-market theory does not satisfy RICO's requirement that a plaintiff plead a "concrete" financial loss.

Even if the law allowed Plaintiffs to bring a "fraud on the market theory," their formulation of the theory here makes no sense.  Plaintiffs allege that Defendants developed the alleged scheme as a response to a falling market.  FAC ¶ 61.  This allegation undermines Plaintiffs' later contention in paragraph 97 that the alleged scheme "depended upon the initial use of false appraisals to prop up early sales."  Moreover, since the early appraisals came *after* Plaintiffs had already decided to purchase, with a contract that had no appraisal contingency and, thus, did not affect Plaintiffs' decision or obligation to purchase, it is clear that Plaintiffs' theory has no plausible factual support.  Plaintiffs' confusing and conflicting allegations cannot support a legal cause of action.

BRYAN CAVE LLP
TWO NORTH CENTRAL AVENUE, SUITE 2200
PHOENIX, ARIZONA 85004-4406
(602) 364-7000

648998

BRYAN CAVE LLP
TWO NORTH CENTRAL AVENUE, SUITE 2200
PHOENIX, ARIZONA 85004-4406
(602) 364-7000

**D.   The First Amended Complaint Fails to Allege Facts Sufficient to Support Other Elements of a RICO Allegation**

**1.   The First Amended Complaint Fails to Allege Sufficient Continuity of Racketeering Activity to Maintain a RICO Claim**

To establish a *pattern* of racketeering activity, "plaintiff's allegations must show that 'the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity.'" *Religious Tech. Center v. Wollersheim*, 971 F.2d 364, 366 (9th Cir. 1992) (quoting *H.J., Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 239 (1989)). "Continuity' is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *H.J., Inc.*, 492 U.S. at 241.

**a.   The FAC Fails to Plead Closed-Ended Continuity**

Plaintiffs set out numerous non-specific and wide ranging allegations about the alleged pattern of predicate acts supporting their RICO allegations. They allege, for example, that "Defendants' pattern of racketeering *likely involved* thousands of separate instances of use of the U.S. mails or interstate wire facilities in furtherance of the Scheme." FAC ¶ 203 (emphasis added). Such imprecise guesswork about what "likely" occurred is insufficient to meet the specificity requirements in pleading under *Iqbal*. 129 S. Ct. at 1949 ("Sheer possibility that a defendant has acted unlawfully" is insufficient to support a claim.).

Reduced to its essence, however, the FAC only identifies three[7] alleged specific uses of the mails to support the alleged pattern: i) a letter to Nieto dated on or about April 21, 2006 indicating that Landsafe would appraise the home; ii) a Good Faith Estimate sent to Nieto on or about April 21, 2006 as to which the Plaintiffs failed to show a misrepresentation; and iii) an appraisal sent to the Lewises on or about September 27, 2006, which admittedly did not affect the Lewises' decision to purchase their home at the previously accepted contract price, as modified.

---

[7]  Excluding the alleged transmission of an appraisal from C.S. Heaton to CHL.

BRYAN CAVE LLP
TWO NORTH CENTRAL AVENUE, SUITE 2200
PHOENIX, ARIZONA 85004-4406
(602) 364-7000

"[A]n alleged 'series of related predicates' not 'extending over a substantial period of time' and not 'threatening . . . future criminal conduct' fails to charge closed-ended continuity." *Turner v. Cook*, 362 F.3d 1219, 1229 (9th Cir. 2004) (affirming dismissal of RICO claims for failure to properly allege continuity).  Closed-ended "continuity cannot usually be proven unless the scheme has been in existence for at least one year." *Grimmett v. Brown*, 75 F.3d 506, 512 (9th Cir. 1996) (dismissing RICO claim as time-barred); *Wollersheim*, 971 F.2d at 366-67 ("We have found no case in which a court had held the requirement to be satisfied by a pattern of activity lasting less than a year").  "Activity that lasts only a few months is not sufficiently continuous." *Howard v. America Online, Inc.*, 208 F.3d 741, 750 (9th Cir. 2000) (affirming dismissal of RICO claims); *see also H.J., Inc.* 492 U.S. at 242 ("Predicate acts extending over a few weeks or months . . . do not satisfy this requirement"); *Wollersheim*, 971 F.2d at 366 (affirming dismissal of RICO claims because "the alleged activity continued for six months at most").

Here, where Plaintiffs contend that the alleged scheme began sometime in 2006 in response to the down market, the FAC fails to establish a pattern that is cognizable for RICO purposes because it only lists three alleged events, which appear to be sporadic and, thus, insufficient to show a pattern as a matter of law.  *Howard*, 208 F.3d at 750 (dismissing RICO claim in part because "[p]laintiffs provided some specifics for advertisements made before February 1997, but gave no factual support for acts after that date").  *See also Turner*, 362 F.3d at 1231 ("Because almost all of the alleged fraudulent communications occurred during the two month period . . . and the additional three categories of communication occurred only sporadically in the preceding year . . . appellants have failed to allege a series of predicate acts extending over a substantial period of time") (internal quotes omitted).

### b.      The FAC Fails to Plead Open-Ended Continuity

"[I]n order to allege open-ended continuity, a RICO plaintiff must charge a form of predicate misconduct that 'by its nature projects into the future with a threat of repetition.'" *Id. at* 1229.  Allegations of sporadic or isolated predicate acts are insufficient

to establish a threat of continuing activity, and even "two acts may not be sufficient." *Schreiber Dist. Co.*, 806 F.2d at 1399 (citing *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985)).

The FAC fails to state any facts that would support an inference that Defendants' conduct, by its nature, threatened repetition, or that Defendants would continue its activity. Bare legal conclusions that "Defendants' racketeering activities amounted to a common course of conduct," FAC ¶ 204, cannot defeat a motion to dismiss.

### c.       The FAC Fails to Allege a Cognizable RICO Enterprise

RICO defines an "enterprise" as "any individual, partnership, corporation, association, or other legal entity, and *any group of individuals associated in fact* although not a legal entity." 18 U.S.C. § 1961(4) (emphasis added). Here, Plaintiffs attempt to plead two separate "associated in fact" enterprises: The first is the "Countrywide Enterprise" consisting of "(1) Countrywide and (2) its Landsafe settlement services subsidiaries." FAC ¶ 187. The second is the so-called "Countrywide KB Appraisal Enterprise" which consists of "(1) Countrywide, including its Landsafe loan closing services subsidiaries; (2) KB Home and its various entities operating in the Southwest; (3) Countrywide-KB Home; and (4) complicit appraisers who conducted the actual appraisals." FAC ¶ 180.

To establish the existence of an associated-in-fact enterprise, Plaintiffs must satisfy three criteria by showing: (1) "a group of persons associated together for a common purpose of engaging in a course of conduct"; (2) "evidence of an ongoing organization, formal or informal"; and (3) "evidence that the various associates function as a continuing unit." *Odom v. Microsoft Corp.*, 486 F.3d 541, 552 (9th Cir. 2007) (internal quotes omitted) (citing *United States v. Turkette*, 452 U.S. 576, 583 (1981)). Plaintiffs have failed to do so.

### i.       The "Countrywide Enterprise" Does Not Satisfy the Statute's Distinctiveness Requirement

To maintain a claim under section 1962(c), the "person" must be sufficiently distinct from the alleged "enterprise." *See Rae v. Union Bank*, 725 F.2d 478, 480-81 (9th

BRYAN CAVE LLP
TWO NORTH CENTRAL AVENUE, SUITE 2200
PHOENIX, ARIZONA 85004-4406
(602) 364-7000

BRYAN CAVE LLP
TWO NORTH CENTRAL AVENUE, SUITE 2200
PHOENIX, ARIZONA 85004-4406
(602) 364-7000

Cir. 1984) (affirming dismissal of RICO claims). "[L]iability depends on showing that the defendants conducted or participated in the conduct of the '*enterprise's* affairs,' not just their *own* affairs." *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993) (emphasis in original). Thus, a parent corporation and its subsidiary lack sufficient distinctiveness to constitute a RICO "enterprise." *See Fogie v. Thorn Ams., Inc.*, 190 F.3d 889, 897-98 (8th Cir. 1999) (surveying circuit courts and collecting cases); *see also Bucklew v. Hawkins, Ash, Baptie & Co.*, 329 F.3d 923, 934 (7th Cir. 2003) (affirming dismissal of RICO claim) (Posner, J.); *Bessette v. Avco Fin. Servs., Inc.*, 230 F.3d 439, 448-49 (1st Cir. 2000) (same); *Lorenz v. CSX Corp.*, 1 F.3d 1406, 1412 (3d Cir. 1993) (same). These courts recognized that although parent corporations and their subsidiaries constitute separate corporate entities, "a subsidiary that simply conducts its affairs as delegated by the parent company for the profit of the parent company is engaged in nothing more than a legitimate corporate and financial relationship, which is certainly not subject to RICO liability on that basis alone." *Bessette*, 230 F.3d at 449.

Plaintiffs hope to circumvent this well-settled law by asserting in summary fashion that CFC and its subsidiaries "have an existence separate and distinct from the enterprise" because LSA allegedly provides services to third-party companies. FAC ¶ 189. LSA is a subsidiary of Landsafe, which was, at relevant times, a subsidiary of CFC.[8] LSA is an appraisal management company. While it is true that LSA performs appraisal settlement services for third-party companies, such services were wholly consistent with the symbiotic parent-subsidiary relationship that existed between it and CFC. Indeed, Plaintiffs' own allegations point out that "[t]he driving purpose in Countrywide's creation of the Landsafe entities, is to capture profit from the vast number of loans brokered and closed by Countrywide," and by offering a "range of real estate closing services, even where Countrywide is not the lender . . . ." FAC ¶ 34. Thus, even when LSA performed appraisal settlement services for third-parties, such as mortgage brokers and other lenders,

---

[8]  Landsafe now is a subsidiary of NB Holdings Corporation, a subsidiary of Bank of America Corporation.

648998

BRYAN CAVE LLP
TWO NORTH CENTRAL AVENUE, SUITE 2200
PHOENIX, ARIZONA 85004-4406
(602) 364-7000

1   including those that conduct business with CHL, LSA conducted the very business for

2   which, as Plaintiffs acknowledge, CFC created LSA in the first place.  The FAC only

3   alleges that CFC and its Landsafe subsidiaries are engaged in a legitimate corporate and

4   financial relationship.  This is not actionable under RICO.

5            ii.      The "Countrywide KB Appraisal Enterprise" is Not a
                      Continuing Unit and Lacks a Common Purpose

6            The FAC lacks any facts to establish that the alleged members of the Countrywide

7   KB Appraisal Enterprise worked together to achieve their objectives through the use of

8   fraudulent means.  Members of a RICO associated-in-fact enterprise must associate

9   "together for a common purpose of engaging in a course of conduct." *Turkette*, 452 U.S.

10  at 483.  Plaintiffs must, therefore, establish that the members of the alleged Countrywide

11  KB Appraisal Enterprise shared the common purpose of carrying out their objectives

12  through fraudulent means.  *See Odom*, 486 F.3d at 552 (finding that the defendants shared

13  a common purpose of increasing a product's usage "and doing so by fraudulent means").

14           Here, the FAC alleges that members of the enterprise "associated for the common

15  or shared purposes of providing appraisals and loans on real estate transactions in which

16  KB Home is the seller, Countrywide or Countrywide-KB is the mortgage lender, and

17  Landsafe or KB Home arranged for the appraisal."  FAC ¶ 180.  Plaintiffs do not allege

18  any facts that, if proven, would show that the alleged enterprise members shared the

19  common purpose of inflating home prices through the use of fraudulent appraisals, nor

20  does the FAC set forth any facts that would support such an allegation.  Instead, the FAC

21  seeks to hold multiple defendants liable for fraud *without* showing that each of the

22  Defendants shared the common purpose of using fraudulent means.  Plaintiffs' theory

23  would inequitably punish members of a perfectly legitimate business arrangement of just

24  one of these parties – acting unilaterally and without the support of the other entities –

25  engages in fraudulent conduct.  RICO should not be construed so expansively.

26           For this very reason, the Second Circuit explicitly requires a RICO claim

27  predicated on fraud to establish a "fraudulent common purpose" among the enterprise

28  members.  *See First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 174

BRYAN CAVE LLP
TWO NORTH CENTRAL AVENUE, SUITE 2200
PHOENIX, ARIZONA 85004-4406
(602) 364-7000

(2d Cir. 2004) ("the individuals must share a common purpose to engage in a particular fraudulent course of conduct and work together to achieve such purposes").  Requiring such a showing prevents Plaintiffs from "simply tacking on entities to the enterprise which do not in fact . . . share a 'common purpose.'"  *City of New York v. Smokes-Spirits.com*, 541 F.3d 425, 447 (2d Cir. 2008).  Although not yet adopted in the Ninth Circuit, the wisdom behind this approach is apparent.  Without this requirement, a plaintiff could tack on an entity that does not share a fraudulent purpose – a purpose by nature wholly unrelated to Plaintiffs' claims – and automatically convert any civil claim into a RICO claim.

**iii.   The Countrywide KB Enterprise is Not a "Continuing Unit" and Lacks a Common Purpose**

The "continuing unit" element "focuses on whether the alleged associates' behavior was 'ongoing' rather than isolated activity."  *Odom*, 486 F.3d at 553.  As the Supreme Court has recognized, although the continuing unit element is separate from the "continuity" needed to show a "pattern" of racketeering activity, the two elements may in fact "coalesce" in particular cases.  *See Turkette*, 452 U.S. at 583.  Like continuity, the continuing unit analysis is temporal in nature, and allegations of acts extending over a few months and threatening no future criminal conduct cannot suffice to show the "ongoing" behavior indicative of a RICO "enterprise."  *Cf. H.J., Inc.*, 492 U.S. at 242.  As such, Plaintiffs' allegations of acts spanning just two months cannot satisfy the continuing unit element of RICO.

## III.   ALLEGED VIOLATION OF RICO SECTION 1962(D)

### A.   Plaintiffs' 1962(c) Claim Fails

Plaintiffs allege that Defendants violated Section 1962(d) by conspiring to violate Section 1962(c).  As the Ninth Circuit recognizes, "failure to adequately plead a substantive violation of RICO [under 1962(c)] precludes a claim for conspiracy."  *Howard*, 208 F.3d at 751 (affirming dismissal of RICO claims).  Because Plaintiffs' Section 1962(c) claim fails (as set forth above), their Section 1962(d) claim must also fail.

BRYAN CAVE LLP
TWO NORTH CENTRAL AVENUE, SUITE 2200
PHOENIX, ARIZONA 85004-4406
(602) 364-7000

### B.     Plaintiffs have Not Alleged a Specific Intent to Defraud

"Mail fraud under Section 1341 requires the showing of a scheme to defraud involving use of the United States mails with the specific intent to defraud." *Forsyth v. Humana, Inc.*, 114 F.3d 1467, 1481 (9th Cir. 1997) (affirming summary judgment on RICO claims); *accord Howard*, 208 F.3d at 751 ("A defendant must also have been aware of the essential nature and scope of the enterprise and intended to participate in it").

Plaintiffs do not allege any such specific intent, nor could they.  The appraisals were performed after Plaintiffs' decision to purchase at a specified price and would not, under any circumstances, release Plaintiffs from their obligation to purchase the homes at the agreed prices.   There are no allegations that any of the Countrywide/Landsafe Defendants were involved in setting the sales prices.  So they could not, under the facts, form the specific intent necessary to support a RICO claim.

## IV.   PLAINTIFFS' UCL CLAIM FAILS AS A MATTER OF LAW

### A.     Plaintiffs Lack Standing Under California's UCL

Standing to pursue an unfair competition claim is limited to certain specified public officials and to any person who "has suffered injury in fact and has lost money or property as a result of such unfair competition." *Peterson v. Cellco Partnership*, 164 Cal. App. 4th 1583, 1590 (2008) (citations omitted); Cal. Bus. & Prof. Code § 17204.  "The phrase 'as a result of' in its plain and ordinary sense means 'caused by' and requires a showing of a causal connection or reliance on the alleged misrepresentation." *Hall v. Time, Inc.*, 158 Cal. App. 4th 847, 855 (2008); *see also Laster v. T-Mobile United States, Inc.*, 407 F. Supp. 2d 1181 (S.D. Cal. 2005) (no standing where plaintiffs did not allege they relied on allegedly false or misleading advertising).  Plaintiffs have not alleged, and cannot allege, an injury in fact because they did not rely on the subject appraisals, nor were they injured by them.  They have no standing to bring this action.

### B.     There is No Basis for the Extraterritorial Application of California Law

Where Plaintiffs allege causes of action under state statutes, "[e]ach claim under each state statute must be analyzed separately," and a federal court must dismiss claims

BRYAN CAVE LLP
TWO NORTH CENTRAL AVENUE, SUITE 2200
PHOENIX, ARIZONA 85004-4406
(602) 364-7000

where "there is no named plaintiff from those states who has suffered injury." *In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011, 1026-27 (N.D. Cal. 2007) (dismissing state claims for lack of standing where none of plaintiffs resided in state); *accord In re Apple & AT & TM Antitrust Litig.*, 596 F. Supp. 2d 1288, 1309 (N.D. Cal. 2008) (dismissing plaintiffs' state law claims where no plaintiff resided). Moreover, "[t]here is a presumption that California statutes have no extraterritorial application." *Cumis Ins. Soc'y Inc. v. Merrick Bank Corp.*, 2008 WL 4277877, *5 (D. Ariz. 2008) (citing *Churchill Village, L.L.C. v. Gen. Elec. Co.*, 160 F. Supp. 2d 1119, 1126-27 (N.D. Cal. 2007)). This presumption includes the California UCL. *Id.*

Plaintiffs here have failed to allege a sufficient nexus to California that would warrant extraterritorial application of the UCL. Plaintiffs have failed to allege that any harm occurred in California. In fact, all of the alleged conduct is alleged to have occurred in Arizona and allegedly was directed at Arizona residents. *See, e.g.*, FAC ¶ 32 ("The Scheme was Carried out in Arizona and Injured Plaintiffs in Arizona"). Not a single Plaintiff resides in California or purchased a home in California. As such, these Plaintiffs cannot invoke the UCL, and this claim must be dismissed.

## C. Plaintiffs Otherwise Fail to Adequately Plead a Violation of California's UCL[9]

Even assuming that California's UCL applies to these Arizona Plaintiffs, they have nonetheless failed to adequately plead a violation of that statute. In summary fashion, the FAC alleges that all of the Defendants engaged in "unlawful," unfair," or "deceptive" conduct in violation of the UCL. FAC ¶¶ 216-224. The UCL allegations rely on platitudes and rhetoric in place of facts to state a claim under the "unlawful" prong of the California UCL. Plaintiffs must properly plead the violation of another statute. *See Stearns v. Select Comfort Retail Corp.*, __ F. Supp. 2d __, 2009 WL 1635931, *17 (N.D. Cal. 2009) (dismissing UCL claim because underlying statutory violation improperly

---

[9] In addition to the reasons set forth below, the Countrywide/Landsafe Defendants specifically join in the KB Homes Defendants' assertion that Plaintiffs' UCL claim is barred by RESPA.

pled); *Ford v. Hotwire, Inc.*, 2007 WL 6235779, *5 (S.D. Cal. 2007) (dismissing UCL claims); *Mat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*, 319 F. Supp. 2d 1059, 1074 (C.D. Cal. 2003) ("The 'unlawful' prong of the UCL proscribes anything that can be properly be [sic] called a business practice and that at the same time is forbidden by law").

To support this element of the UCL, Plaintiffs contend that the Countrywide/Landsafe Defendants violated federal RICO laws.  FAC ¶ 218.  At this point, however, it is clear that they did not.  Plaintiffs also contend that the Defendants violated the federal Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2601-2617, *id.*, but they do not provide even the slightest analysis of their alleged RESPA claims.  In any event, those claims would be barred under RESPA's one year statute of limitations, which begins on the date on which the Deed of Trust was recorded, when they first would have known the contents of their HUD-1 and other settlement documents.  *Castro v. Executive Trustee Services,* LLC, 2009 WL 438683 (D. Ariz. Feb. 23, 2009) at *8.  Plaintiffs also contend that the Defendants violated the guidance of the Uniform Standards of Professional Appraisal Practices ("USPAP"), *id.*, but USPAP is not a statute and does not provide a foundational basis on which to base a UCL claim.

Plaintiffs also contend that Defendants violated A.R.S. § 32-3633, a provision of Arizona law that makes conduct that induces or influences the actions of an appraiser for purposes of securing an appraisal that is grossly misleading a Class 6 felony.  While Plaintiffs might so allege, no allegation in the FAC suggests that any law enforcement agency has thought it either necessary or appropriate to pursue the Countrywide/Landsafe Defendants, or any of their employees or agents, for such alleged violations, and in fact, the Court may take judicial notice that no such actions have been brought or convictions rendered.  Plaintiffs' suggestion that the Defendants or their agents have violated criminal law is just wrong as a matter of law, and insufficient to support this cause of action.

Without alleging any facts, and with no explanation, Plaintiffs also contend that the Defendants "operated a sham ABA."  Plaintiffs have not given any facts or information that would allow Defendants to properly defend against their conclusion.  FAC ¶ 220.

BRYAN CAVE LLP
TWO NORTH CENTRAL AVENUE, SUITE 2200
PHOENIX, ARIZONA 85004-4406
(602) 364-7000

648998

BRYAN CAVE LLP
TWO NORTH CENTRAL AVENUE, SUITE 2200
PHOENIX, ARIZONA 85004-4406
(602) 364-7000

Finally, Plaintiffs contend that Defendants' alleged violations of "the common law of unjust enrichment," but violation of the common law cannot form the basis for a UCL unlawfulness claim. *See Stearns*, 2009 WL 1635931 at *17 (dismissing UCL claims based on negligence and products liability because common law claims cannot form basis of UCL claim).

Likewise, Plaintiffs' reliance on the UCL's "unfairness" prong fails because Plaintiffs have failed to tether this claim to a plausible statutory violation. *See Ford v. Hotwire, Inc.*, 2007 WL 6235779 at *4 (S.D. Cal. Nov. 19, 2007). Further, Plaintiffs' hackneyed generalizations (at ¶ 207) that Defendants' conduct offends public policy and is "immoral, unethical, oppressive, unscrupulous, or substantially injurious," represents nothing short of lawyers' feigned outrage designed to catch headlines in the local press; obviously such rhetoric fails to "discharge Plaintiffs' obligation . . . under Rule 8(a)(2) to provide the grounds of his entitlement to relief [with] more than labels and conclusions." *Id.* at *5 (internal quotes and alterations omitted). Plaintiffs fail in their attempt to repackage their RICO fraud claims as "deceptive" practices under the UCL. The appraisals, as a matter of fact, could not persuade a homebuyer to purchase or not purchase a home, and certainly did not affect any of the Plaintiffs' decisions to purchase their homes, so by definition there was not any deceptive practice.

## V.     PLAINTIFFS' UNJUST ENRICHMENT CLAIM ALSO FAILS

Plaintiffs cannot maintain a claim for unjust enrichment. "To establish a claim for unjust enrichment, a party must show: (1) an enrichment; (2) an impoverishment; (3) a connection between the enrichment and the impoverishment; (4) the absence of justification for the enrichment and the impoverishment; and (5) the absence of a legal remedy." *Trustmark Ins. Co. v. Bank One*, 202 Ariz. 535, 541, 48 P.3d 485, 491 (Ct. App. 2002) (affirming trial court's grant of JMOL for defendant on plaintiff's unjust enrichment claim).

Importantly, "if there is 'a specific contract which governs the relationship of the parties, the doctrine of unjust enrichment has no application.'" *Id.* at 542, 48 P.3d at 492

(quoting *Brooks v. Valley Nat'l Bank*, 113 Ariz. 169, 174, 548 P.2d 1166, 1171 (1976)). Here, the parties have express written contracts to purchase the homes, and separate specific written contracts to borrow the funds to finance the homes.  Although Plaintiffs chose not to bring a breach of contract action against CHL, Plaintiffs cannot "seek[ ] to avoid possible contractual limitations on [their] recovery by resorting to an unjust enrichment cause of action."  *Id.* at 543, 48 P.3d at 493.  Thus, Plaintiffs have a legal remedy, and cannot assert unjust enrichment.

Moreover, the Countrywide/Landsafe Defendants received only those fees to which the contracts legally entitle them.  Plaintiffs have failed to adequately allege otherwise and, therefore, their retention of these fees is not unjust.  Finally, Plaintiffs have received the benefit of CHL's performance under the contracts in the form of hundreds of thousands of dollars in loan proceeds.  "A person is not entitled to compensation on the grounds of unjust enrichment if he receives from the other that which it was agreed between them the other should give in return." *Brooks*, 113 Ariz. at 174, 548 P.2d at 1171 (citing Restatement of Restitution § 107 cmt. 1(a)).

## VI.   CONCLUSION

For the foregoing reasons, the Countrywide/Landsafe Defendants request that the Court dismiss the First Amended Complaint in its their entirety, with prejudice.

RESPECTFULLY SUBMITTED this 20th day of August, 2009.

BRYAN CAVE LLP

By: s/ Robert W. Shely
    Robert W. Shely
    Jonathan G. Brinson
    William T. Luzader, III
    Two North Central Avenue, Suite 2200
    Phoenix, Arizona 85004-4406
    Attorneys for Defendants

BRYAN CAVE LLP
TWO NORTH CENTRAL AVENUE, SUITE 2200
PHOENIX, ARIZONA 85004-4406
(602) 364-7000

648998

The foregoing is being electronically
filed with the Court and electronically
served this 20th day of August, 2009, to:

Robert B. Carey
Donald Andrew St. John
Hagens Berman Sobol Shapiro LLP
2425 E. Camelback Road, Suite 650
Phoenix, Arizona 85016

Steve W. Berman
Thomas E. Loeser
Genessa Stout
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
Seattle, Washington 98101

Attorneys for Plaintiffs

Bruce A. Abbott
Munger Tolles & Olson LLP
355 South Grand Avenue, 35th Floor
Los Angeles, California 90071-1560
Attorneys for KB Home

s/ Kathy J. O'Reilly

648998