1    **HAGENS BERMAN SOBOL SHAPIRO LLP**
     Robert B. Carey #011186
2    Donald Andrew St. John #024556
     2425 East Camelback Road, Suite 650
3    Phoenix, Arizona 85016
     Telephone:  (602) 840-5900
4    Facsimile:   (602) 840-3012
     E-Mail:  andy@hbsslaw.com
5
     **HAGENS BERMAN SOBOL SHAPIRO LLP**
6    Steve W. Berman WSBA #12536
     Tom Loeser WSBA #38701
7    Genessa Stout WSBA #38410
     1301 Fifth Avenue, Suite 2900
8    Seattle, Washington 98101
     Telephone:  (206) 623-7292
9    Facsimile:   (206) 623-0594
     E-Mail:   steve@hbsslaw.com
10              toml@hbsslaw.com

11   *Attorneys for Plaintiffs*

12                    UNITED STATES DISTRICT COURT

13                        DISTRICT OF ARIZONA

14   NATHANIEL JOHNSON and KRISTEN          No. CV-09-972-PHX-FJM
     PETRILLI, ABRAHAM NIETO; GLORIA
15   and CHARLES LEWIS; FABIAN and          **PLAINTIFFS' OPPOSITION TO**
     MARIE PATRON, on behalf of themselves  **DEFENDANT KB HOME'S**
16   and all others similarly situated ,    **MOTION TO DISMISS FIRST**
                                            **AMENDED CLASS ACTION**
17                         Plaintiffs,      **COMPLAINT**

18        vs.

19
     KB HOME, a Delaware corporation;
20   COUNTRYWIDE FINANCIAL
     CORPORATION, a Delaware corporation;
21   COUNTRYWIDE HOME LOANS, INC., a
     New York corporation; COUNTRYWIDE
22   MORTGAGE VENTURES, LLC, a
     Delaware company; COUNTRYWIDE-KB
23   HOME LOANS, an unincorporated
     association of unknown form; LANDSAFE,
24   INC., a Delaware corporation; LANDSAFE
     APPRAISAL SERVICES, INC., a California
25   corporation; and DOES 1 through 1000,

26                         Defendant.

27

28

1

# TABLE OF CONTENTS

2
**PAGE**

3  I.   INTRODUCTION ............................................................................................ 1

4  II.   ARGUMENT ................................................................................................... 1

5        A.   The Complaint States a RICO Claim ................................................. 1

6              1.   RESPA does not bar Plaintiffs' RICO claim .................................... 1

7              2.   The PSLRA does not bar Plaintiffs' RICO claim ............................ 4

8              3.   The FAC pleads the RICO claim against KB Home with
                      particularity ....................................................................................... 8
9
10       B.   The California UCL Applies to this Action ............................................. 11

11             1.   The Complaint adequately pleads a California nexus...................... 11

12             2.   The Complaint alleges a claim under the UCL................................ 14

13       C.   The Complaint Adequately Alleges a Claim for Unjust Enrichment ........ 16

14  III.  CONCLUSION ................................................................................................ 17
15

16

17

18

19

20

21

22

23

24

25

26

27

28

010120-12  323920 V1

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

## CASES

**PAGE**

*Acciard v. Whitney,*
    2008 U.S. Dist. Lexis 98131 (M.D. Fla. Dec. 4, 2008) .......................... 8

*Adkins v. Mireles,*
    526 F.3d 531 (9th Cir. 2008) ..................................................... 3

*Bald Eagle Area Sch. Dist. v. Keystone Fin., Inc.,*
    189 F.3d 321 (3d Cir. 1999) ...................................................... 4

*In re Countrywide Fin. Corp. Derivative Litig.,*
    554 F. Supp. 2d 1044 (C.D. Cal. 2008) .......................................... 6

*Howard v. America Online, Inc.,*
    208 F.3d 741 (9th Cir. 2000) ...................................................... 8

*ITI Internet Servs., Inc. v. Solana Capital Partners, Inc.,*
    2006 U.S. Dist. Lexis 44109 (W.D. Wash. June 27, 2006) .................... 7, 8

*Isofoton, S.A. v. Giramberk,*
    2006 U.S. Dist. Lexis 35805 (D. Ariz. May 30, 2006) ........................ 17

*Jefferson v. Chase Home Fin.,*
    2007 U.S. Dist. Lexis 94652 (N.D. Cal. Dec. 14, 2007) ...................... 16

*McKell v. Washington Mut., Inc.,*
    142 Cal. App. 4th 1457 (2006) ................................................. 16

*McKesson HBOC, Inc. v. New York State Common Ret. Fund, Inc.,*
    339 F.3d 1087 (9th Cir. 2003) ................................................. 17

*Morton v. Mancari,*
    417 U.S. 535 (1974) ............................................................ 2

*Nat'l Ass'n of Home Builders v. Defenders of Wildlife,*
    551 U.S. 644 (2007) ............................................................ 2

*Norman v. Niagara Mohawk Power Corp.,*
    873 F.2d 634 (2d Cir. 1989) .................................................... 3

*Norwest Mortgage, Inc. v. Superior Court,*
    72 Cal. App. 4th 214 (1999) ................................................... 11

*In re Ocwen Loan Servicing, LLC,*
    491 F.3d 638 (7th Cir. 2007) .................................................. 16

*In re Padilla,*
    222 F.3d 1184 (9th Cir. 2000) .................................................. 4

*Paulus v. Bob Lynch Ford, Inc.,*
    139 Cal. App. 4th 659 (2006) .................................................. 15

010120-12 323920 V1

*Powers v. Wells Fargo Bank, NA,*
    439 F.3d 1043 (9th Cir. 2006).................................................................... 7

*Process Specialties, Inc. v. Sematech, Inc.,*
    2001 U.S. Dist. Lexis 26261 (E.D. Cal. Nov. 8, 2001)........................... 15

*Radzanower v. Touche Ross & Co.,*
    426 U.S. 148 (1976) ................................................................................. 3

*Reyes v. Downey S&L Ass'n, F.A.,*
    541 F. Supp. 2d 1108 (C.D. Cal. 2008).................................................. 16

*Sell v. Zions First Nation Bank,*
    2006 U.S. Dist. Lexis 6558 (D. Ariz. Feb. 9, 2006) .............................. 6

*Smith v. Fidelity Consumer Discount Co.,*
    898 F.2d 907 (3d Cir. 1989) .................................................................... 3

*Smith v. Jackson,*
    84 F.3d 1213 (9th Cir. 1996) .................................................................. 3

*Smith v. Wells Fargo Bank, N.A.,*
    135 Cal. App. 4th 1463 (2005)............................................................... 16

*Spears v. Wash. Mut., Inc.,*
    2009 U.S. Dist. Lexis 21646 (N.D. Cal. Mar. 9, 2009) ........................ 15

*Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.,*
    552 U.S. 148, 128 S. Ct. 761 (2008) ...................................................... 5

*Swartz v. KPMG LLP,*
    476 F.3d 756 (9th Cir. 2007).................................................................... 7

*Trustees of Amalgamated Ins. Fund v. Geltman Indus. Inc.,*
    784 F.2d 926 (9th Cir. 1986).................................................................... 4

*United States v. Fullwood,*
    342 F.3d 409 (5th Cir. 2003) .................................................................. 8

*United States v. Kohli,*
    110 F.3d 1475 (9th Cir. 1997) ................................................................ 8

*United States v. Nguyen,*
    504 F.3d 561 (5th Cir. 2007) .................................................................. 8

*United States v. Owens,*
    301 F.3d 521 (7th Cir. 2002) .................................................................. 8

*Zaldana v. KB Home,*
    2009 U.S. Dist. Lexis 42409 (N.D. Cal. May 8, 2009)................... 14, 15

## STATUTES

12 C.F.R. § 34.44........................................................................................ 15

12 C.F.R. § 560.2 ....................................................................................... 15

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

12 U.S.C. § 2601 *et seq* ........................................................................................... 1

12 U.S.C. § 2607 ............................................................................................... 4, 17

12 U.S.C. § 2616 ............................................................................................ 1, 2, 14

18 U.S.C. § 1964 ................................................................................................ 1, 4

010120-12  323920 V1

## I.    INTRODUCTION

Defendant KB Home's motion to dismiss ("Motion") the First Amended Complaint ("FAC") should be denied in its entirety.

Plaintiffs state a valid claim under RICO.  First, that claim is not barred by the Real Estate Settlement Procedures Act ("RESPA").  A later-enacted statute (RESPA) does not amend or repeal an earlier-enacted statute (RICO) unless the intent of Congress is manifest and clear.  Far from repealing RICO by enacting RESPA, Congress explicitly preserved causes of action that provide consumers with greater protection than RESPA. *See* 12 U.S.C. § 2616.  Second, the RICO claim is not barred by 18 U.S.C. § 1964(c), because the Defendants' unlawful conduct is not actionable as securities fraud because Plaintiffs did not purchase or sell a security but instead bought homes.  Third, Plaintiffs allege their RICO claim with particularity, explaining in detail how Defendants used fraudulent appraisals (which constitute mail fraud) in violation of RICO.

Plaintiffs also state valid claims for violation of California's Unfair Competition Law ("UCL") and for unjust enrichment.  The UCL applies to Defendants' misconduct, because Plaintiffs allege in detail that their injuries were caused by conduct occurring in California, where KB Home, Countrywide and their joint venture are all headquartered and where they both designed and implemented the scheme at issue.  Further, Plaintiffs state a valid claim under the UCL based, in part, on violations of RICO, RESPA and the Uniform Standards of Professional Appraisal Practice ("USPAP").  Finally, Plaintiffs state a valid claim for unjust enrichment because no contract controls the liability of KB Home to Plaintiffs.

## II.    ARGUMENT

### A.    The Complaint States a RICO Claim

#### 1.    RESPA does not bar Plaintiffs' RICO claim

There is no merit to KB Home's argument that Plaintiffs' RICO claim is barred by the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2601 *et seq*.  *See* Motion at 4-7.  The Supreme Court has held repeatedly that a later-enacted statute will

010120-12  323920 V1

not operate to amend or repeal an earlier statutory provision unless the intent of Congress is clear and manifest.  In *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 662 (2007), the Supreme Court stated:

> While a later enacted statute (such as the ESA) can some-times operate to amend or even repeal an earlier statutory provision (such as the CWA), "repeals by implication are not favored" and will not be presumed unless the "intention of the legislature to repeal [is] clear and manifest." *Watt v. Alaska*, 451 U.S. 259, 267 (1981) (internal quotation marks omitted). We will not infer a statutory repeal "unless the later statute "'expressly contradict[s] the original act'" or unless such a construction "'is absolutely necessary ... in order that [the] words [of the later statute] shall have any meaning at all.'"" *Traynor v. Turnage*, 485 U.S. 535, 548 (1988) ….

*See Morton v. Mancari*, 417 U.S. 535, 551 (1974) ("The courts are not at liberty to pick and choose among congressional enactments, and when two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective.").  Under those standards, KB Home's argument founders.  12 U.S.C. § 2616 makes clear that Congress did not intend RESPA to displace causes of action that provide additional protection to consumers.  Section 2616 states:

> This Act does not annul, alter, or affect, or exempt any person subject to the provisions of this Act from complying with, the laws of any State with respect to settlement practices, except to the extent that those laws are inconsistent with any provi-sion of this Act, and then only to the extent of the inconsis-tency.  The Secretary is authorized to determine whether such inconsistencies exist. *The Secretary may not determine that any State law is inconsistent with any provision of this Act if the Secretary determines that such law gives greater protec-tion to the consumer.*  In making these determinations the Secretary shall consult with the appropriate Federal agencies.

(Emphasis added.)

In light of section 2616, there is no basis to conclude that Congress expressly intended for RESPA to preclude a cause of action against Defendants under RICO based on predicate acts of mail fraud.  Section 2616 shows that Congress designed RESPA to address certain types of violations, while leaving other types of wrongful conduct to be redressed under other laws.  In short, nothing in RESPA or its legislative history provides

010120-12  323920 V1

any basis to find that Congress clearly and manifestly intended for RESPA to displace other federal statutes with respect to all aspects of real estate transactions.[1]

KB Home does not cite any case holding that RESPA bars a RICO claim. Instead, KB Home relies on several inapposite cases that do not involve RESPA. For example, KB Home cites *Smith v. Jackson*, 84 F.3d 1213, 1217 (9th Cir. 1996), in which the Ninth Circuit stated, "Appellants allege in their RICO counts the same activity alleged in their infringement claims: the unauthorized use and dissemination of appellants' copyrighted works. Indeed, without the alleged infringement of copyright, none of appellees' activity in disseminating their songs could be 'fraudulent' and none of appellants' RICO claims could survive." In contrast, Plaintiffs' RICO claims do not rest on violations of RESPA. Instead, Plaintiffs claim that Defendants violated the mail fraud statutes wholly apart from any requirements imposed by RESPA.

KB Home also mistakenly relies on *Adkins v. Mireles*, 526 F.3d 531 (9th Cir. 2008). In *Adkins*, the Court stated that "Appellants' RICO claims rest on their allegation that the Union had bargained in bad faith with Lucky. Because bargaining in bad faith is an unfair labor practice prohibited by NLRA §§ 7 and 8, and a consistent body of labor law requires that the NLRB has exclusive jurisdiction to regulate activity that could arguably constitute unfair labor practices, we defer to the exclusive competence of the NLRB to adjudicate the matter." *Id*. at 542. In contrast, there is no agency that has jurisdiction to regulate claims relating to racketeering in real estate sales.[2]

---

[1] *See Radzanower v. Touche Ross & Co*., 426 U.S. 148, 157-58 (1976) ("[T]here is nothing in the legislative history of the Securities Exchange Act to support the view that Congress in enacting it gave the slightest consideration to the *pro tanto* repeal of § 94 [of the National Bank Act], let alone to indicate 'that Congress consciously abandoned its [prior] policy,' *Morton v. Mancari*, 417 U.S., at 551, or that its intent to repeal § 94 *pro tanto* was 'clear and manifest.'").

[2] Two other cases cited by KB Home similarly do not support its argument. *See Smith v. Fidelity Consumer Discount Co.*, 898 F.2d 907, 909 n.4 (3d Cir. 1989) (rejecting a RICO claim that was "derivative of" state-law usury law claim); *Norman v. Niagara Mohawk Power Corp.*, 873 F.2d 634 (2d Cir. 1989) (RICO claim barred because Section 210 of the Energy Reorganization Act provides the exclusive remedy for employees in the nuclear energy field who allegedly have been discriminated against or discharged for making safety complaints).

010120-12 323920 V1

Moreover, there is no merit to KB Home's argument that "a statute designed to address a particular harm should prevail over a law of more general application." *See* Motion at 5. The two cases cited by KB Home that apply that standard are inapposite, because they concerned multiple sections in a single statutory scheme. *In re Padilla*, 222 F.3d 1184, 1192 (9th Cir. 2000) (interpreting four Bankruptcy Code provisions); *Trustees of Amalgamated Ins. Fund v. Geltman Indus. Inc.*, 784 F.2d 926, 930 (9th Cir. 1986) (interpreting two ERISA provisions). In contrast, RICO and RESPA are not parts of a single statutory scheme. Therefore, the "clear and manifest" standard applies.

Finally, there is no merit to KB Home's argument that its acts are protected by the "safe harbor" provision in section 2607(c)(2) of RESPA. *See* Motion at 6-7. That argument fails for two independent reasons. First, as described in Section II(B)(2) below, that "safe harbor" does ***not*** protect KB Home from liability under section 2607(a) for the wrongs alleged by Plaintiffs. Second, section 2607(c)(2) only limits the reach of section 2607(a) and does not clearly and manifestly provide immunity from liability under RICO. Section 2607(c) states that "[n]othing *in this section* shall be construed as prohibiting" specified conduct. (Emphasis added.) By using the phrase "in this section," Congress limited the reach of the safe harbor to alleged violations of RESPA only. If Congress had intended to clearly and manifestly immunize conduct from liability under *any* federal statute, it would have done so. But it did not.

### 2. The PSLRA does not bar Plaintiffs' RICO claim

KB Home erroneously argues that Plaintiffs' RICO claim is barred by the Private Securities Litigation Reform Act ("PSLRA"). *See* Motion at 7-9. The PSLRA amended RICO to provide that "no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of" RICO. 18 U.S.C. § 1964(c). The "proper focus of the analysis is on whether the conduct pled as predicate offenses is 'actionable' as securities fraud – not on whether the conduct is 'intrinsically connected to, and dependent upon' conduct actionable as securities fraud." *Bald Eagle Area Sch. Dist. v. Keystone Fin., Inc.*, 189 F.3d 321, 330 (3d Cir. 1999).

010120-12 323920 V1

1

2    Thus, to come within the ambit of section 1964(c), there must be a purchase or

3  sale in connection with the sale of a security.  *Stoneridge Inv. Partners, LLC v. Scientific-*

4  *Atlanta, Inc.*, 552 U.S. 148, 128 S. Ct. 761, 770 (2008) ("we note § 10(b) provides that

5  the deceptive act must be 'in connection with the purchase or sale of any security'").

6  Here, Plaintiffs did not purchase or sell a security but instead bought homes.  That ends

   the inquiry.

7        More particularly, Plaintiffs rely on predicate offenses that are not actionable as

8  securities fraud.  Plaintiffs allege that Defendants "inflated the sale amounts of KB Home

9  properties and loan amounts of Countrywide loans by corrupting the appraisals of KB

10 Home properties such that the appraisals would always indicate a value at or above the

11 contracted sales price for the properties or were otherwise inflated."  FAC, ¶ 1.  Plaintiffs

12 also allege that when they and the class members are "placed into loans that are for

13 amounts in excess of the true value of their homes and the level at which they would

14 actually qualify, they are doomed for financial failure when they can neither make the

15 payments for the loans they have been given, nor sell the home at a value that will allow

16 them to repay the mortgage."  FAC, ¶ 36.  This fraudulent conduct does not remotely

17 form the basis for a securities fraud claim.  Neither a private investor nor the SEC could

18 sue *anyone* for securities fraud based on Defendants' allegedly wrongful conduct in

19 dealing with Plaintiffs and class members.

20        In a failed attempt to avoid this conclusion, KB Home asserts that investors who

21 buy mortgages from Countrywide "can challenge – and have challenged – the same

22 appraisal inflation practices alleged here."  *See* Motion at 9.  In fact, the plaintiffs in those

23 cases do *not* allege that Defendants' use of fraudulent appraisals constitutes securities

24 fraud.  Instead, they allege that Countrywide and its employees engaged in an additional,

25 separate act of fraud by misleading the investing public.  For example, the plaintiffs in

26 one such case alleged that employees of Countrywide "misled the public with regard to

27 the rigor of Countrywide's loan origination process, the quality of its loans, and the

28 Company's financial situation – even as they realized that Countrywide had virtually

010120-12  323920 V1

abandoned its own loan underwriting practices." *In re Countrywide Fin. Corp. Derivative Litig.*, 554 F. Supp. 2d 1044, 1057 (C.D. Cal. 2008).  Moreover, the complaint in that case makes clear that the fraud at issue was not the fraudulent appraisals but rather fraudulent misrepresentations and omissions in documents disseminated to the investing public.[3]  Thus, the plaintiffs in that case do not claim that the fraudulent appraisals violate the securities laws.  In contrast, Plaintiffs here claim that the fraudulent appraisals violate RICO and do not rely in any respect on the misleading statements alleged by investors.

KB Home does not cite and cannot cite a single case in which a court has held that an alleged RICO violation that is *not* committed in connection with the purchase or sale of securities is barred merely because the defendants engaged in *additional* fraud in selling securities to others.  Instead, in all of the cases cited by KB Home, the fraud alleged by the plaintiff occurred in connection with the sale of securities.  For example, in *Sell v. Zions First Nation Bank*, 2006 U.S. Dist. Lexis 6558 (D. Ariz. Feb. 9, 2006), the court ruled that a RICO claim was barred by the PSLRA, because the fraud at issue patently occurred in connection with securities:

> This Ponzi scheme, like seemingly all Ponzi schemes, functioned by duping investors to give money for what they believe is one type of investment but is actually another, and some of those investors sometimes receive what they are promised, only it does not come from where they think it does, but from other, more recent, investors.  The disbursement of money from more recent investors to older investors is the hallmark of the scheme.  Those disbursements are, in other words, "in connection with" securities fraud.

*Id*. at *34.  In contrast, the fraud committed against Plaintiffs in this action was complete without *any* sale or purchase of securities.

---

[3] The complaint in *Countrywide* "alleges five categories of false and misleading statements:  press releases (including ones in 1Q04, 3Q04, 3Q05, and 1Q06); conference calls (including calls in April 2004, April 2005, and May 2005); SEC 10-K and 10-Q filings (including the Form 10-K's for 2004, 2005, and 2006); proxy statements for the annual shareholder meetings in 2005, 2006, and 2007; and continued statements in 2007 about Countrywide's financial prospects."  *Id*. at 1071-72.

010120-12  323920 V1

KB Home also misses the mark when it argues that the PSLRA applies because Plaintiffs allege a Ponzi scheme.  *See* Motion at 9.  Unlike in *Sell*, the Ponzi scheme here is not based in any respect on the sale or purchase of securities.  Plaintiffs allege:

> The inflated sale prices resulting from the tainted appraisals, in turn, infected subsequent appraisals and valuations, allowing the KB-Countrywide Criminal Enterprise to continue to obfuscate falling values.  In other words, this was a Madoff-like Ponzi scheme that depended upon the initial use of false appraisals to prop up early sales in a KB Home subdivision, which were then used to continue to prop up the value and selling activity in entire KB Home subdivisions.

FAC, ¶ 14.  Thus, Plaintiffs' contention that Defendants engaged in a Ponzi-like scheme does not implicate the securities laws but instead refers to Defendants' use of initial false appraisals to prop up later false appraisals in connection with committing mail fraud that is unrelated to the purchase or sale of securities.[4]

Other cases cited by KB Homes also involved claims sounding in securities fraud.  In *Swartz v. KPMG LLP*, 476 F.3d 756 (9th Cir. 2007), the defendants allegedly sold a failed tax shelter to the plaintiff, who alleged a violation of RICO and other wrongs.  The Ninth Circuit held that the PSLRA barred the RICO claim, because the sale of stock was the "lynchpin" of the scheme.  *Id*. at 761.  "If Swartz never sold the assets with the inflated basis (the stock) he would never realize the 'loss' that he required to offset his real capital gains."  *Id*.  And in *ITI Internet Servs., Inc. v. Solana Capital Partners, Inc.*, 2006 U.S. Dist. Lexis 44109 (W.D. Wash. June 27, 2006), the plaintiffs sued for securities fraud and the violation of RICO.  The district court held that the RICO claim was barred by the PSLRA, because "the substance of the RICO Act claims is clearly based on the

---

[4] For the same reason, KB Home's argument is not supported by its citation to *Powers v. Wells Fargo Bank, NA*, 439 F.3d 1043 (9th Cir. 2006).  In *Powers*, the Ninth Circuit rejected the plaintiff's argument that "the Ponzi scheme did not involve the purchase or sale of securities."  *Id*. at 1045.  The Court explained that "[t]his argument is squarely foreclosed by *J.T. Wallenbrock & Associates*, in which we held that the notes issued as part of the same Ponzi scheme at issue here are 'securities regulated by the Securities Acts.'"  *Id*.  Again, KB Home's Ponzi scheme did not involve the purchase or sale of securities.

010120-12 323920 V1

same allegations underlying the securities fraud claims." *Id*. at \*23.  In contrast to those cases, Plaintiffs' RICO claim does not rest on conduct that constitutes securities fraud.

Finally, KB Home's PSLRA argument is not buttressed by *Howard v. America Online, Inc.*, 208 F.3d 741 (9th Cir. 2000).  In *Howard*, the plaintiffs "claimed that AOL committed securities fraud as part of a pattern of racketeering activity." *Id*. at 749.  The plaintiffs argued that section 107 of the PSLRA "does not apply because they lack standing to bring securities fraud claims against AOL." *Id*.  The Ninth Circuit rejected that argument, stating that the PSLRA "proscribes using as a predicate 'any *conduct* that would have been actionable as [securities] fraud.'  (Emphasis added)." *Id*.  *Howard* is inapposite, because Plaintiffs here do not seek to rely on conduct that would have been actionable as securities fraud.  To the contrary, Plaintiffs rely on conduct that does ***not*** constitute securities fraud in any respect.

### 3.    The FAC pleads the RICO claim against KB Home with particularity

There is no merit to KB Home's argument that Plaintiffs fail to allege their RICO claim with particularity.  *See* Motion at 10-12.  Plaintiffs allege a scheme based on fraudulent appraisals, which numerous courts have held constitute mail fraud.  *See United States v. Kohli*, 110 F.3d 1475, 1476 (9th Cir. 1997); *United States v. Nguyen*, 504 F.3d 561, 568 (5th Cir. 2007); *United States v. Fullwood*, 342 F.3d 409 (5th Cir. 2003); *United States v. Owens*, 301 F.3d 521, 528 (7th Cir. 2002).  Moreover, courts have sustained RICO allegations based on fraudulent appraisals.  *See, e.g., Acciard v. Whitney*, 2008 U.S. Dist. Lexis 98131, at \*15-16 (M.D. Fla. Dec. 4, 2008).[5]

Similarly, the FAC alleges with particularity that KB Home knowingly utilized fraudulent appraisals to carry out the RICO scheme.  For example, the FAC alleges:

---

[5] The court stated: "Plaintiffs have identified the false statements that were made – the fraudulent appraisal values.  Plaintiffs allege that United Mortgage, which is alleged to be an agent of First Community Bank, provided loan documents to Plaintiffs containing the fraudulent appraisals.  Plaintiffs also allege that the Lenders, which include First Community Bank, knowingly utilized the fraudulent appraisal and that the fraudulent appraisals and financing were key to the fraudulent scheme.  Accordingly, the Court finds that Plaintiffs meet the particularity requirements for pleading fraud in this case." *Id*. at \*15-16.

- "KB Home, Countrywide, and LandSafe … built, financed, appraised and controlled virtually every aspect of a buyer's real estate transaction and thus Defendants were in a position to rig and falsify the appraised value of the homes they were selling and financing." ¶ 7.

- "When an order for an appraisal on a KB Home went to LandSafe, it was routed to a single person at LandSafe, that individual assigned appraisals of KB Home properties to a small group of appraisers who had been specifically approved for each development by KB Home due to their willingness to "play-ball," *i.e.*, come in with the appraisal at whatever number was necessary to close the deal at the price desired by Countrywide-KB." ¶ 9.

- "[T]the KB-Countrywide Criminal Enterprise steered Plaintiffs and Class members to its complicit appraisers who were under direct instruction to value homes at or above the contract price even if it meant completing appraisals in violation of regulatory guidelines and requirements pertaining to appraisals." ¶ 10.

- "Plaintiffs' and Class members' home appraisals were tainted with false and misleading data, deceptive practices, and violations of the Regulatory standards for professional appraisers including, *inter alia*, the following:  (i) Improper selection of distant, dissimilar properties….; (ii) Use of pending transactions as comparable sales … even when no sale was actually pending because the ostensible buyer had abandoned the transaction; and (iii) The tainted appraisals gave false and misleading statements concerning the generally downward trending real estate market at the time that the appraisals were performed." ¶ 11.

- "The appraiser's use of such unverified information and patently faulty methodology demonstrates their complicity in the scheme.  In contrast, when a prospective KB Home purchaser was able to have a non-complicit appraiser look at public records of recently closed sales of truly comparable properties, the independent appraisals revealed values far below the KB Home contract price and the KB Home tainted appraisal to match.  In such cases, KB Home often conceded the difference in order to close the sale, but then concealed the facts of these transactions from contemporaneous and subsequent purchasers." ¶ 13.

- "The inflated sale prices resulting from the tainted appraisals, in turn, infected subsequent appraisals and valuations, allowing the KB-Countrywide Criminal Enterprise to continue to obfuscate falling values.  In other words, this was a Madoff-like Ponzi scheme that depended upon the initial use of false appraisals to prop up early sales in a KB Home subdivision, which were then used to continue to prop up the value and selling activity in entire KB Home subdivisions." ¶ 14.

010120-12 323920 V1

Moreover, Plaintiffs allege in detail that their appraisals were fraudulent.  FAC ¶¶ 127-151.  (*See, e.g.*, ¶ 129 identifying fraudulent nature of Johnson appraisal; ¶ 134 use of mail to effectuate scheme for Nieto's appraisal; ¶¶ 143-147 use of mails to send fraudulent Lewis appraisal, ¶¶ 148-149 fraudulent Patron appraisal.)  Thus, there is no merit to KB Home's assertion that "the complaint makes only conclusory allegations regarding KB Home's role as a peripheral bystander in a scheme allegedly driven by individual appraisers."  Motion at 11 (footnote omitted).  In fact, Plaintiffs allege in detail the fundamental role played by KB Home in the RICO scheme.  *See also* FAC ¶¶ 104-106 (where a former employee describes KB's role in the Scheme).

KB Home also makes the misguided argument that "Plaintiffs lump multiple parties together as 'Defendants' or refer to them by the generalized and inflammatory shorthand 'KB-Countrywide Criminal Enterprise,' thereby providing inadequate notice of the allegations against each defendant."  *See* Motion at 10 (citing only three paragraphs from FAC).  That argument not only ignores the numerous allegations in the FAC that explain KB Home's role in the scheme but also overlooks the fact that KB Home itself as a matter of uncontested fact formed a joint venture with Countrywide, known as Countrywide-KB, and that the joint venture carried out the wrongful conduct alleged by Plaintiffs.  *See, e.g.,* FAC ¶¶ 62-110.

Finally, there is no merit to KB Home's argument that the RICO claim must be dismissed because "Plaintiffs omit critical and elementary factual allegations such as who referred them to Countrywide, what was said, to whom they were referred, when they were referred, or how the referral was made.  Likewise, Plaintiffs never allege who provided the pending home sale information, to whom it was provided, when it was provided, or how it was communicated."  *See* Motion at 11.  Rule 9(b) requires plaintiffs to "state with particularity the circumstances constituting fraud," but the matters listed by KB Home do not bear on Plaintiffs' fraud claims.  KB Home makes no attempt to explain why such matters must be alleged with particularity when they do not allegedly constitute fraud.  Plaintiffs spell out in detail the precise circumstances of their fraudulent appraisals

010120-12 323920 V1

(¶¶ 129, 139, 144, 148-149) and the precise amount of the fraudulent appraisal, $70,030 (Lewis), $8,810 (Patron), $163,668 (Nieto) (¶ 151).

**B.    The California UCL Applies to this Action**

    **1.    The Complaint adequately pleads a California nexus**

It is true that "non-residents of California cannot recover under the California UCL 'for injuries … caused by conduct occurring outside of California's borders.'" Motion at 12-13 (*citing Norwest Mortgage, Inc. v. Superior Court*, 72 Cal. App. 4th 214, 224 (1999)). *Norwest* was quite specific, however, in describing the claims that the UCL did not reach. This was where "the only contact between the claims of [non-residents] and California is [defendant's] state of incorporation. Because [defendant]'s headquarters and principal place of business, the place [non-residents] were injured, and the place the injury-producing conduct occurred are outside California, we conclude application of the UCL to the claims of [these non-residents] would be arbitrary and unfair and transgress due process limitations." 72 Cal. 4th at 227.

KB Home's argument fails because it overlooks the facts plainly alleged in the Complaint that Plaintiffs' injuries were caused by conduct occurring *within and emanating from within* California's borders, where KB Home, Countrywide and their joint venture are all headquartered. The FAC alleges specific acts in furtherance of the scheme which occurred by and through executives at Countrywide and KB Home headquarters, which are in California. (FAC, ¶ 18). Moreover:

- "Numerous Confidential Witnesses ('CWs') from different levels and involved in different aspects of the Company corroborate the nature of Countrywide's strategic shift [to lowered lending standards]. Chairman and CEO Angelo Mozilo's stated goal was to gain 30% of the national market share for mortgage originations. To do so, he and other high-ranking executives at Countrywide ordered many of the lowered standards." FAC, ¶ 43.

- "... These stock programs provided an incentive for the Defendants, and the top officials of Countrywide, to develop and implement the Scheme alleged in this Complaint." FAC, ¶ 46.

- "... Judge Mariana R. Pfaelzer found a 'strong inference of a Company-wide culture that, at every level, emphasized increasing loan origination

volume in derogation of underwriting standards.'  Derivative Action Order, 2008 WL 2064977, at *10."  FAC, ¶ 48.

The FAC provides a detailed factual explanation as to how the California resident parent companies, Countrywide and KB Home, joined forces to create Countrywide-KB, a sham affiliated business arrangement (ABA) under RESPA, which was also operated out of California.  FAC, ¶¶ 64-90.  Included among these allegations are the following:

- "Pursuant to the joint venture agreement, Countrywide-KB was operated and managed by Countrywide Financial.  *See* KB Home 2005 SEC Form 10-K, p. 27."  FAC, ¶ 70.

- "Pursuant to the joint venture agreement, the operation and management of Countrywide-KB occurred by and through Countrywide Home, a wholly owned subsidiary of Countrywide Financial, which held California mortgage banking and brokerage licenses."  FAC, at ¶ 71.

- "Pursuant to the joint venture agreement, all persons who provided mortgage settlement services in connection with Countrywide-KB loans: (a) were physically located in office space possessed, controlled, and man-aged by Countrywide; (b) utilized computer networks, systems, software, and similar resources furnished by Countrywide; (c) were supported by accounting, technical support, information technology, human resources, facilities, and similar 'back office' resources supplied by Countrywide; and (d) were under the management and control of Countrywide employees." FAC, ¶ 77.

- "Pursuant to the joint venture agreement, Countrywide sold these mortgages in the secondary markets for the benefit of the Countrywide-KB joint venture."  FAC, ¶ 80.

- "Pursuant to the joint venture agreement, Countrywide then paid KB Home a portion of the profits attributable to service fees and secondary market sales of all KB Home referred mortgages, including those settlement service fees paid by Plaintiffs and those secondary market profits acquired through the sale of their mortgages."  FAC, ¶ 81.

The FAC also alleges that the Inflated Appraisal Scheme was implemented and conducted by Defendants' highest executives, from their headquarters.  For example:

- "At the highest levels of Countrywide, LandSafe and KB Home, executives were aware that truly independent appraisals of KB Home properties would jeopardize KB Home's continuing profits on sales, and Countrywide's continuing profits on mortgage origination fees and sales of loans in the secondary market."  FAC, ¶ 85.

- "For the entire United States, as part of the Scheme, one LandSafe employee was placed in charge of controlling who received appraisal assignments for every KB Home/ Countrywide-KB transaction. This employee was under instruction, agreed to by executives of KB Home, Countrywide and LandSafe, to only use appraisers that valued homes where KB Home needed them to be."  FAC, ¶ 90.

The FAC quotes from an anonymous letter sent to Plaintiffs' counsel that describes the reach of the Scheme and the involvement of KB Home President and CEO Jeff Mezger and former Countrywide Senior Vice President James Hecht.  FAC, ¶¶ 91-92.

The FAC includes an email from a Countrywide loan officer in California setting up a meeting with a LandSafe appraisal manager to explain how and when to inflate or "push" values.  FAC, ¶¶ 100-101.  The FAC includes specific factual allegations from the complaint filed by former Countrywide-KB executive Mark Zachary, who specifically describes that Countrywide-KB executives had knowledge of and participated in and endorsed the Inflated Appraisal Scheme.  FAC, ¶¶ 103-110.

The FAC also plainly alleges that practices originating in and emanating from California were then implemented in Arizona and throughout the United States:

- "The same improper appraisal practices used in California were also used in Arizona…. The California examples set forth below illustrate how the Scheme operated in California and Scheme was implemented."  FAC, ¶ 111.

- "Countrywide-KB and Countrywide provided services for KB Home related loans through their offices in California, Texas and other states and referred appraisal work to LandSafe, which assigned appraisals to hand-picked appraisers through its Texas operations center.  Countrywide re-packaged and sold mortgages secured by KB Homes in the secondary market to investors across the United States and throughout the world."  FAC, ¶ 193.

- "The nature and pervasiveness of the Scheme, which was orchestrated out of KB's Countrywide's and LandSafe's offices, necessarily required those offices to communicate directly and frequently with each other, with appraisers, and with customers by the U.S. mails and interstate wire facilities."  FAC, ¶ 195.

- "Defendants perpetrated their Scheme against Plaintiffs through interstate mail and wire facilities by sending documents from California, Texas, and potentially other states, to Plaintiffs in Arizona."  FAC, ¶ 200.

- 13 -

- "The Enterprises had a hierarchical decision-making structure headed by Countrywide and guided by: (1) the overt KB-Countrywide joint venture agreement; and (2) the illicit agreements surrounding the joint venture through which KB Home referred customers exclusively to Countrywide in exchange for control over the valuation of the homes it sold."  FAC, ¶ 202.

- "Defendants KB Home and Countrywide are residents of the State of California.  On information and belief, the actions and underlying decisions of Defendants, alleged herein emanated from and occurred within the State of California. California law applies to the claims of Plaintiffs and all Class members.  Defendants planned and implemented their wrongful scheme in California and many of the wrongful acts emanated from Countrywide's California offices."  FAC, ¶ 216.

Far from "the mere allegation that KB Home has its headquarters and principal place of business in California," as KB Home urges is the case, the FAC explains in detail how the Inflated Appraisal Scheme was developed and implemented through the California operations of KB Home, Countrywide, LandSafe, the Countrywide-KB joint venture, and the Countrywide-KB Criminal Enterprise.  For these reasons, Plaintiffs have sufficiently pled a nexus to support their claims under the California UCL.

   2.    **The Complaint alleges a claim under the UCL**

KB Home argues that RESPA's "safe-harbor" provision somehow shields it from liability under the UCL.  As discussed *supra*, at Section II(A)(1), however, this provision of RESPA simply has no application to the facts at issue and, in any event, RESPA specifically provides that Congress did not intend for RESPA to displace other causes of action that provide additional protection to consumers.  *See* 12 U.S.C. § 2616.

Just this year a California District Court ruled that the allegations in the FAC that KB now claims are insufficient to overcome RESPA's safe harbor provision do exactly that.  In *Zaldana v. KB Home*, 2009 U.S. Dist. Lexis 42409 (N.D. Cal. May 8, 2009), Judge Chesney denied KB Home's motion to dismiss wherein it claimed that the Countrywide-KB joint venture fell within RESPA's safe harbor.  Judge Chesney held: "Further, contrary to defendants' argument, Zaldana has adequately alleged that CKB [the Countrywide-KB joint venture] was a 'sham' affiliated business arrangement, and, consequently, that defendants are not entitled to the safe harbor provided by § 8(c)(4) of

010120-12 323920 V1

1    RESPA." *Id*. at *4.  Thus, KB Home's argument that these allegations do not meet the

2    'unlawful' or 'unfair' prongs of the UCL are unsupportable.

3        KB Home's argument that violations of Arizona law cannot support a UCL claim

4    are also unavailing.  KB Home's argument was rejected in *Process Specialties, Inc. v.*

5    *Sematech, Inc.*, 2001 U.S. Dist. Lexis 26261 (E.D. Cal. Nov. 8, 2001).  The court held:

6        [Defendant] Sematech argues that PSI's claim fails because it
         cannot rely on an out-of-state law as a predicate for a UCL
7        claim.  However, Sematech has not cited any authority, nor is
         the court aware of any, prohibiting PSI from doing so.  In-
8        stead, California law on the UCL emphasizes the broad nature
         of a UCL claim.  *See Cel-Tech* [*Communications, Inc. v. Los*
9        *Angeles Cellular Tel. Co.*], 20 Cal.4th [163,] 181 [(1999)]….
         Accordingly, the court finds that PSI may bring its UCL
10       claim based on a violation of Delaware law.

11   *Id.* at *47-48.  Indeed, footnote 18 in *Sematech* distinguished the very case that KB Home

12   here argues carries the day.  *See id.* at n.18.  Thus, KB Home's argument fails.

13       Moreover, Plaintiffs' allegations that KB Home violated USPAP support a UCL

14   claim because those standards have been incorporated into federal regulations at 12

15   C.F.R. § 34.44.  *See Paulus v. Bob Lynch Ford, Inc*., 139 Cal. App. 4th 659, 681 (2006)

16   ("Virtually any law or regulation – federal or state, statutory or common law – can serve

17   as a predicate for a Business and Professions Code section 17200 'unlawful' violation.").

18       KB Home's single citation is unavailing.  In *Spears v. Wash. Mut., Inc.*, 2009 U.S.

19   Dist. Lexis 21646 (N.D. Cal. Mar. 9, 2009), the court held that the Home Owners' Loan

20   Act ("HOLA"), enforced by the Office of Thrift Supervision ("OTS"), preempted a

21   § 17200 claim predicated on violations of USPAP.  However, HOLA, and specifically its

22   preemption provision, applies only to the lending practices *of federally regulated thrifts*.

23   The preemption regulation states:  "To enhance safety and soundness and to enable

24   *federal savings associations* to conduct their operations in accordance with best

25   practices…, OTS hereby occupies the entire field of lending regulation *for federal*

26   *savings associations*."  12 C.F.R. § 560.2 (emphasis added).  KB Home is not regulated

27   by the OTS, so HOLA is inapplicable.  Plainly, only a federal savings association –

28   which in turn must abide by the rules and regulations of OTS – enjoys the protection of

010120-12 323920 V1

OTS preemption.

Even HOLA and OTS regulations however, do not preempt state laws of general application which only incidentally affect lending operations. *See In re Ocwen Loan Servicing, LLC*, 491 F.3d 638, 643-44 (7th Cir. 2007) (holding that state consumer protection laws complement federal regulation and further the same purpose of providing sound S&Ls). Further, multiple courts in California have ruled that federal banking regulations do not preempt a UCL claim. *Reyes v. Downey S&L Ass'n, F.A.*, 541 F. Supp. 2d 1108, 1114 (C.D. Cal. 2008) ("when plaintiffs rely on a state law of general application, and the application of the law does not purport to specifically regulate lending activity, the state law is not preempted"); *McKell v. Washington Mut., Inc.*, 142 Cal. App. 4th 1457 (2006) (finding state claims based on alleged misrepresentations as to disclosed loan financing fees not preempted); *Smith v. Wells Fargo Bank, N.A.*, 135 Cal. App. 4th 1463, 1482 (2005) (holding that state consumer and contract claims are not preempted by the Bank Act); *Jefferson v. Chase Home Fin.,* 2007 U.S. Dist. Lexis 94652, at *29 (N.D. Cal. Dec. 14, 2007) (holding no Bank Act preemption of laws of general application (in that case the UCL), that "merely require all businesses (including banks) to refrain from misrepresentations and abide by contracts and representations to customers do not impair a bank's ability to exercise its lending powers").[6]

## C.    The Complaint Adequately Alleges a Claim for Unjust Enrichment

KB Home argues that Plaintiffs cannot state a claim for unjust enrichment because (1) Plaintiffs executed contracts with KB Home; and (2) Plaintiffs have a remedy at law. Motion at 15-16. The first argument fails because although KB Home unquestionably contracted with Plaintiffs to sell its homes, the contracts do not govern the claims at issue here, that is, there is no express term in the purchase contracts that KB Home would have necessarily breached by engaging in the Countrywide Criminal Enterprise and implementing the Inflated Appraisal Scheme. Further, since KB Home's co-conspirators,

---

[6] Plaintiffs' RICO claims independently support the UCL claim under the unlawful prong, because KB Home's arguments against the RICO claims are unavailing.

010120-12  323920 V1

Countrywide, Countrywide-KB and Landsafe are not parties to the purchase agreements, Plaintiffs have not, and cannot bring a breach of contract claim under the facts at issue here and, therefore, the purchase agreements do not govern this dispute and an unjust enrichment claim is available.  In *McKesson HBOC, Inc. v. New York State Common Ret. Fund, Inc.*, 339 F.3d 1087, 1091-93 (9th Cir. 2003), cited by KB Home, the court held that there was not a contract that controlled the relationship between the parties because the defendant shareholders were not parties to the subject agreement, and thus unjust enrichment was an available claim.

KB Home urges that the unjust enrichment claim fails because Plaintiffs have an adequate remedy at law – to wit, RESPA.  However, KB Home dances on the head of a pin since in this same motion it argues that Plaintiffs cannot state such a RESPA claim. In a penultimate exercise of double-speak, KB explains that such remedy at law is available for purposes of excluding an unjust enrichment claim even though "Congress intend[ed] that no liability should attach under the circumstances alleged."  Motion at 16. But even if KB Home could have it both ways, a "*generally available but not available here*" RESPA claim would not provide an adequate remedy at law because RESPA concerns and provides a remedy for tainted settlement service fees.[7]  The damages provision of RESPA is wholly different from the excess profits KB Home has unjustly retained.  As such, KB Home has not shown an adequate remedy at law sufficient to defeat Plaintiffs' unjust enrichment claim.  KB Home's argument that an unjust enrichment claim would be inconsistent with Plaintiffs' statutory claims has been rejected in Arizona.  *See*, *e.g.*, *Isofoton, S.A. v. Giramberk*, 2006 U.S. Dist. Lexis 35805, at *9 (D. Ariz. May 30, 2006) ("unjust enrichment count should not be dismissed unless it was insufficient apart from its inconsistency with the other counts").

### III.    CONCLUSION

KB Home's motion should be denied in its entirety.

---

[7] Under RESPA, a successful plaintiff may only recover three times the settlement service fee involved in the violation.  *See* 12 U.S.C. § 2607(d).

010120-12 323920 V1

1

2          September 8, 2009

3                                          HAGENS BERMAN SOBOL SHAPIRO LLP

4

5                                          By _____s/ Robert B. Carey_____
                                                  Robert B. Carey
6                                                 Donald Andrew St. John
                                           2425 East Camelback Road, Suite 650
7                                          Phoenix, Arizona  85016

8                                          HAGENS BERMAN SOBOL SHAPIRO LLP

9

10                                         By _____s/ Steve W. Berman_____
                                                  Steve W. Berman
11                                                Thomas E. Loeser
                                                  Genessa Stout
12                                         1301 Fifth Avenue, Suite 2900
                                           Seattle, Washington  98101
13

14                                         *Attorneys for Plaintiffs and the Proposed Class*

15

16

17

18

19

20

21

22

23

24

25

26

27

28

010120-12  323920 V1

## CERTIFICATION OF SERVICE

I hereby certify that on September 8, 2009, I electronically transmitted the attached document to the Clerk's office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrant(s):

Bruce A. Abbott, Esq.
Bruce.Abbott@mto.com

Jonathan Grant Brinson, Esq.
jonathan.brinson@bryancave.com

Robert B. Carey, Esq.
rcarey@hbsslaw.com

Thomas Loeser, Esq.
toml@hbsslaw.com

William Thomas Luzader, III, Esq.
william.luzader@bryancave.com

Robert W. Shely, Esq.
rwshely@bryancave.com

Donald Andrew St. John, Esq.
andy@hbsslaw.com

Genessa A. Stout, Esq.
genessa@hbsslaw.com


s/ Steve W. Berman