Robert W. Shely, #014261
Jonathan G. Brinson, #025045
BRYAN CAVE LLP, #00145700
Two North Central Avenue, Suite 2200
Phoenix, Arizona 85004-4406
Telephone: (602) 364-7000
rwshely@bryancave.com
jonathan.brinson@bryancave.com
Attorneys for Defendants
Countrywide Financial Corporation;
Countrywide Home Loans, Inc.; Countrywide
Mortgage Ventures, LLC; Countrywide KB Home Loans,
a series of Countrywide Mortgage Ventures, LLC;
Landsafe, Inc.; and Landsafe Appraisal Services, Inc.

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| NATHANIEL JOHNSON and KRISTEN PETRILLI; ABRAHAM NIETO; GLORIA and CHARLES LEWIS; FABIAN and MARIA PATRON, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>KB HOME, a Delaware corporation; COUNTRYWIDE FINANCIAL CORPORATION, a Delaware corporation, COUNTRYWIDE HOME LOANS, INC., a New York corporation; COUNTRYWIDE MORTGAGE VENTURES, LLC, a Delaware company; COUNTRYWIDE-KB HOME LOANS, an unincorporated association of unknown form; LANDSAFE, INC., a Delaware corporation; LANDSAFE APPRAISAL SERVICES, INC., a California corporation; and DOES 1 through 1000,<br><br>Defendants. | CV-09-972-PHX-FJM<br><br>**COUNTRYWIDE/LANDSAFE DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS FIRST AMENDED COMPLAINT** |

651874

## I. PLAINTIFFS FAIL TO SHOW A PLAUSIBLE CLAIM OR CAUSATION

*Twombly* and *Iqbal* require more from Plaintiffs than naked lawyer-generated accusations of wrongdoing, disconnected from any relevant, specific *factual* allegations. Both cases instruct the Court to look beyond lawyer-generated hyperbole – or "conclusory allegations of law and unwarranted inferences" – and verify that Plaintiffs' allegations of specific *facts* sufficiently support a plausible legal claim. Here, although Plaintiffs complain that the Countrywide/Landsafe Defendants "supplies its own 'facts'" (Response at 2), all of the Opening Brief's facts came from the First Amended Complaint ("FAC") itself, public records of which the Court may take judicial notice, or documents on which the FAC relied, and upon which the Court may rely. Plaintiffs did not contest any fact set out in the Opening Brief, conceding in their silence the accuracy of the specific facts for purposes of this motion. Defendants just did what Plaintiffs should have done, but failed to do, in the FAC – set out the facts around which the legal debate can and should coalesce.

In response, Plaintiffs argue that the blunderbuss FAC alleged "that the inflated appraisals at issue were the centerpiece of the Inflated Appraisal Scheme because these allowed Countrywide to make – and then sell in the secondary market – loans that it otherwise could not have made, and it allowed KB Home to sell their houses at values higher than the true market would have allowed."[1] Response at 4, *citing* FAC ¶¶ 48, 85.

These conclusory lawyer contentions cannot substitute for statements of fact required by *Twombly* and *Iqbal*. Plaintiffs do not provide any *facts* to demonstrate their conclusion that a lower-priced "true market" existed where houses sold for cheaper values – as opposed to the "actual" market in which these sales occurred. The market prices that these Plaintiffs agreed to pay were, by definition, "market prices" because they reflected prices agreed upon by willing buyers and sellers, not under duress, in an open and competitive market. Thus, Plaintiffs do not contend that KB Home houses were more

---

[1] Plaintiffs have no standing to complain that Countrywide sold improperly documented loans in the secondary market, because they are not investors.

expensive in the market compared to similar competitive products offered by other homebuilders, or explain how and why some 14,000 purchasers (FAC ¶ 15) bumbled into signing purchase agreements for homes that sold for higher prices than similar products offered by other competitors in the open market. Plaintiffs would have to allege facts plausibly showing that these Defendants somehow hijacked just KB Home's pricing decisions to make just KB Home an outlier with higher prices when compared to the rest of the "true" market. Plaintiffs make no such allegations and provide no facts from which the Court could infer those implausible conclusions. The concept of a "true market" value as opposed to the real, actual market is nothing more than fantastic lawyer accusation, unsupported by any fact in the FAC.

Moreover, as a matter of law, Plaintiffs cannot support a "fraud on the market" theory under a RICO claim. Open. Br. at 26-27. Plaintiffs have wholly ignored Defendants' explication of the law in that regard, *id.*, and declined to address Judge Patel's "looking askance" at the very same theory asserted by the very same lawyers in a very similar RICO complaint pursuing a fraud on the market claim. Open. Br. at 26-27, *citing In re Actimmune Marketing Litigation*, 614 F. Supp. 2d 1037, 1051 (N.D. Cal. 2009). The FAC – especially the "fraud on the market" theory – amount to nothing more than the already rejected *Actimmune* complaint, recycled. Judge Patel correctly analyzed and law, and her logic provides persuasive authority to this Court.

Plaintiffs also contend that the FAC "claims that when the KB Home properties were substantially completed and appraised, fraudulently inflated appraisals were commissioned to support loans that Plaintiffs would not and could not have entered into, and that an honest lender would not have made, had the true values of the properties been revealed in honest appraisals." Response at 5, *citing* FAC ¶ 88. But that *characterization* of the contents of FAC ¶ 88 is significantly different than its actual contents. FAC ¶ 88 states: "Since Countrywide controlled the appraisal process through exclusive use of complicit Landsafe employees, Countrywide was able to inflate and control the sales prices of KB Home." FAC ¶ 88 does not say anything about using inflated appraisals to

support loans; to the contrary, it only contends that appraisals coming almost a year after Plaintiffs on their own decided to buy a house somehow affected the sales prices agreed upon almost a year earlier. So FAC ¶ 88 is not a statement of *fact* but a conclusory lawyer accusation of the ilk against which *Twombly* and *Iqbal* counseled.

Moreover, the Johnson/Petrilli plaintiffs cannot claim that they would not have purchased their home if they had known the home's "true value" because they purchased the home despite having received an appraisal suggesting that their home was worth $40,000 less than its purchase price, which they openly ignored when they decided nevertheless to purchase the home. Open. Br. at 8-9; *In re Kirsh*, 973 F.2d 1454, 1458 (9th Cir. 1992) (holding that "a person cannot rely upon a representation if he knows that it is false or its falsity is obvious to him"). Nieto contends that "if he had not been subjected to the scheme, he would not have entered into the contract at the contract price he had agreed to and would not have been 'upside down' from day one." *See* Open. Br. at 18, *citing* FAC ¶ 141  But Nieto made the decision to purchase his home "at the contract price" in June 2005, months before the appraisal, so he had not even been exposed to the alleged "scheme" at the time he agreed to pay the contract price. Neither the Patrons nor the Lewises contend that they would not have purchased their home but for the allegedly faulty appraisal; they only contend that "the appraisal was false" (Lewises), FAC ¶ 144, or that their property was "subject to an improper appraisal" (Patrons)  FAC ¶ 148; Open. Br. at 11.  But they fail to provide any specific cognizable causative link between their decision to sign the Purchase Agreement and the appraisal.

At bottom, Plaintiffs' real complaint is that they agreed to purchase a home at a given price, that the price of the house fell after they closed on their home, that they regret purchasing a home at the height of the frenzied real estate market in Phoenix, and now they want to blame someone for their own decision-making process. To do that, they must claim that they relied on the lender and the appraiser to verify that they had made a good purchasing decision by providing an appraisal that supported their independent decision to buy that particular home, at that particular price, in a competitive market. But as set out in

the Opening Brief, Plaintiffs had no right to rely on the appraisal for that purpose because the appraisal is only meant to assist the lender, unless express language in the purchase contract contains an appraisal contingency for the purchaser. Open. Br. at 15-17.

Plaintiffs give inadequate and short shrift to Arizona's controlling law on that issue, *Kuehn v. Stanley*, 208 Ariz. 124, 128, 91 P.3d 346, 350 (App. Ariz. 2004), which is directly on point. *See* Open. Br. at 15-17. Plaintiffs contend that the Court's analysis there should not apply because the case facts "did not involve the measured participation of each the seller, the appraiser and the lender as is alleged here." Response at 6. But Plaintiffs fail to explain how this alleged distinction would somehow change the Court's legal conclusion that the Plaintiffs had no right to rely on an appraisal as a measure of the "true market" value of their homes. In fact, the legal analysis makes clear that Plaintiffs here cannot support their action in Arizona law by arguing that they relied on the appraisals and that they would not have entered into the loans if the appraisals had not been inflated.

Plaintiffs also contend that the *Kuehn* "plaintiffs were required to show their own detrimental reliance on the tainted appraisal in order to succeed. Here, in contrast, under RICO, no such showing is required."[2] Response at 6, relying on Response at "Section III.b.2, which section does not exist in the Response (*See* Response at "i" (TOC)). Defendants presume that Plaintiffs meant to refer to Section II.B.2, where they contend that *Bridge v. Phoenix Bond & Indemn. Co.*, 128 S. Ct 2131, 2138-39 (2008) stands for the proposition that in a RICO claim, "plaintiffs need not show that they relied on fraudulent statements." Response at 10.

The Opening Brief addressed *Bridge* (Open. Br. at 24, fn. 6), but Plaintiffs failed to recognize the important legal issues of law raised there. The Supreme Court noted that although a plaintiff did not have to show that it relied on a fraudulent statement as a

---

[2] Plaintiffs do not address and, therefore, must lose, the reliance argument in connection with the UCL or unjust enrichment claims, both of which would require detrimental reliance as an element of the causal connection between the alleged act and the alleged damages. Open. Br. at 34.

651874                                             4

specific element of a RICO claim, the plaintiff must show that *someone* relied on the statement, that the reliance somehow caused the injury, and that a plaintiff rarely will be able to "establish even but-for causation if no one relied on the misrepresentation." *Id.*, *quoting Bridge*, 128 S. Ct. 2144; *see also Bridge*, 128 S. Ct. at 2143, n. 6 ("Of course, a misrepresentation can cause harm only if a recipient of the misrepresentation relies on it"). Here, Plaintiffs do not contend that anyone in fact relied on the appraisals in deciding to execute the Purchase Agreements, and they had no legal right to rely on the appraisals. Nor do they claim that any of the Countrywide/Landsafe Defendants relied on the appraisals when making loans – indeed, to the contrary, the entire premise of Plaintiffs' case is that the Countrywide Defendants knew that the appraisals were inflated, but that the Countrywide Defendants "had no interest in the quality of loans that it made." Response at 3, *quoting* FAC ¶ 48 (for the proposition that Countrywide showed "rampant disregard for underwriting standards at Countrywide in the interest of pushing through as many loans as possible"); *see also In re Kirsh*, 973 F.2d at 1458 ("[A] person cannot rely upon a representation if he knows that it is false or its falsity is obvious to him").

Both parties have relied on Section 5.3 of the relevant Purchase Agreements, which the Court may and should interpret as a matter of law. But Plaintiffs' interpretation is wrong as a matter of law. Section 5.3 states: "Buyer acknowledges that Buyer's obligation to purchase the Property is not contingent upon Buyer obtaining Loan approval and that Buyer's Deposit shall become non-refundable to Buyer on the Non-Refundable Deposit Date, (as defined in the Key Date Addendum to Purchase Agreement) irrespective of whether the Loan is approved." *See* Open. Br. at 6. Plaintiffs never address this language.

This language meant something; the Plaintiffs cannot wish it away and the Court cannot assume that it had no intended meaning. *Guo v. Maricopa County Med. Ctr.*, 992 P.2d 11, 15 (App. Ariz. 1999) (recognizing that Arizona courts "construe a contract so as to give effect to all of its provisions. As a corollary, [they] do not construe one provision in a contract so as to render another provision meaningless"). Here, the clause means that KB Home gave the buyers a 30 day timeframe in which to obtain financing commitments

– not a loan, but a commitment -- and if the buyers could not obtain such commitments, then either side could, with written notice, cancel the Purchase Agreement. Each Plaintiff signed a "Key Date Addendum to Purchase Agreement," attached as part of the Purchase Agreements in the Opening Brief (at Exs. 1-4), with the following provision – "<u>Earned Money Deposit</u>: The Deposit shall become non-refundable to Buyer and shall be deemed fully earned by Seller thirty (30) calendar days after Buyer executes this Purchase Agreement (the "Non-refundable Deposit Date"), regardless of whether Buyer's Loan . . . is approved or disapproved. At an time *prior to the Non-Refundable Date*, Buyer may cancel this Agreement and the Deposit, less any costs incurred by Seller, pursuant to Section e of Additional Terms, shall be returned to Buyer." (emphasis added). Another section within the same document defines the "Loan Approval Deadline" as "30 days from Buyer's signature. See Section 5 of Additional Terms [which includes Section 5.3]."

This language meant what it said: the buyer signed a purchase agreement, and had a contractual commitment to get a loan commitment very quickly – within 30 days – or risk a cancellation of the contract. After the 30 day period, they could not cancel the Purchase Agreement because the contract was "not contingent upon" a buyer's failure to obtain a loan. So that by the time an appraisal came along, months or a year later, these Plaintiffs already were bound by a contract, and legally subject to contract remedies if they declined to complete the purchase. Plaintiffs bore the risk and received the benefit of a change in the market price between the date of purchase and date of the loan approval.

Even if Plaintiffs' interpretation of section 5.3 were correct – that is, that the Purchase Agreements *were* contingent upon loan approval – that result would not change the law announced in *Kuehn* prohibiting plaintiffs in Arizona from relying on appraisals when seeking a loan, because the sales contract in *Kuehn* was also "contingent on the Kuehns qualifying for a sufficient financing" to purchase the home. 208 Ariz. at 126. Despite that fact, the *Kuehn* court held that the plaintiffs could not rely on the appraisal because they "were already contractually bound to purchase the property, contingent upon qualifying for funding, before they received the appraisal." *Id.* Thus, just like in *Kuehn*,

Plaintiffs' decision to execute the Purchase Agreements long before they received an appraisal dooms their after-the-fact claim that they would not have taken the loans but for the appraisals.[3]

Moreover, Plaintiffs seem to assume that the lenders would not have made a loan to them if the appraisals had come in under the market price. But there are no facts to support that assumption, and Plaintiffs neither assert nor identify any law that would prohibit a lender from such a practice.[4] A homeowner who has no legal right to rely on the appraisal as an assurance of the house's value would not suffer any legally cognizable damages, because the homeowner only received what he or she sought – a loan sufficient to purchase a home at a price that the homeowner had already concluded made sense in the exercise of his or her due diligence and discretion.

Plaintiffs also contend that *Sage v. Blagg Appraisal Co*., 221 Ariz. 33, 36 (App. 2009), stands for the proposition that "when a purchase agreement can be cancelled for an over-inflated appraisal, a fraud action will be upheld." Response. at 6. This misstated hyperbole stretches the boundaries of intellectually fair advocacy; *Sage* was not a fraud action, and its facts were unlike the facts in *Kuehn*. 209 P.3d at 171, n. 4. Among other things, the Purchase Agreement in *Sage* was "contingent upon an appraisal of the Premise by an appraiser acceptable for the lender for at least the sales price," *Id*. at 170, while none of the Purchase Agreements here contained that kind of carve out.

---

[3] Contrary to Plaintiffs' alleged "common sense," approach, KB Home would not then be in a position to "force" any person to follow through on the purchase price, "even if such person could not get financing." Response at 3. But KB nevertheless would have had a right to bring an action for damages, if it suffered any, if it so chose.

[4] Indeed, Plaintiffs refer to and rely upon USPAP, which they contend has been incorporated into federal law at 12. C.F.R. § 34.44 and, for appraisers involved in federally regulated transactions, through 12 U.S.C. § 3331 and 12 C.F.R. § 34.45. While these Defendants do not concede that their transactions are subject to those federal regulations, they note that under the very same regulations "[a] loan-to-value limit has not been established for permanent mortgage or home equity loans on owner-occupied, 1- to 4-family residential property." 12 C.F.R. Part 34, Subpart D, Appx. A

## II. PLAINTIFFS HAVE OTHERWISE FAILED TO ADEQUATELY PLEAD THEIR RICO CLAIMS

### A. Plaintiffs Have Failed to Plead Predicate Acts With Particularity

The laundry list of accusations in Plaintiffs' Response (at 8-9) reinforces the need for Plaintiffs to allege facts, not mere conclusions, to satisfy Rule 9(b)'s heightened pleading standards. *See Cholla Ready Mix, Inc. v. Civish*, 382 F.3d 969, 973 (9th Cir. 2004) (The court is not "required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences"). Rather, the "complaint would need to state the time, place, and specific content of the false representations." *Edwards v. Marin Park, Inc.*, 356 F.3d 1058, 1066 (9th Cir. 2004) (emphasis added).

Plaintiffs simply ignored the controlling Ninth Circuit case law cited in the Countrywide/LandSafe Defendants' Motion to Dismiss showing that Plaintiffs have failed to adequately plead predicate acts under RICO. Instead, the Response pieces together dissimilar cases from other jurisdictions, that generally have no relevance to this case, for the proposition that "numerous courts have held [that schemes based on fraudulent appraisals] constitute mail fraud." Response at 6. In the only Ninth Circuit case on which Plaintiffs relied, *U.S. v. Kohli*, 110 F.3d 1475 (9th Cir. 1997), the court had neither reason nor a chance to "hold" that the conduct constituted mail fraud because the defendant took the decision-making away from the court by pleading guilty. *Kohli* just discussed whether the facts leading to the charges that caused the guilty plea warranted enhanced sentences.

Plaintiffs' reliance on *U.S. v. Fullwood*, 342 F.3d 409 (5th Cir. 2003) for the same proposition is similarly misplaced. The defendant in *Fullwood* submitted false crop insurance claims to the United States, and no one ever accused him of inflating appraisals.

Plaintiffs also cite to other cases in which courts or juries have upheld RICO charges in alleged fraudulent appraisal schemes, and there have been some such cases. But the question here is whether Plaintiffs have demonstrated fact allegations that meet all of the requirements to maintain a RICO action – and they clearly have not met the elements necessary to prevail on this motion.

### B. Plaintiffs Have Not Factually Pled a Pattern of Racketeering Activity

Plaintiffs' failure to plead facts with particularity includes a failure to plead a pattern of racketeering activity. Even overlooking their failure to factually plead predicate acts, Plaintiffs have only alleged, at most, sporadic instances of conduct spanning a period from February 2006 through September 2006. *See* Response at 11. This is inadequate as a matter of law. Open. Br. at 29.

Recognizing that their pleadings fall far short of this mark, Plaintiffs inserted into the FAC an allegation from a complaint filed by an unrelated plaintiff in another jurisdiction, the contents and veracity of which Plaintiffs have no way of verifying. Response at 12. Even if true, however, that paragraph does not allege any predicate acts whatsoever. *Id.* Thus, Plaintiffs cannot stretch out their pleadings to cover a period of greater than one year by relying on this unrelated allegation.

### C. Plaintiffs Do Not Adequately Allege RICO Enterprises

Plaintiffs admit that they have not alleged a common fraudulent purpose. Response at 16-17. Instead, Plaintiffs rely entirely on *Friedman v. 24 Hour Fitness USA, Inc.*, 580 F. Supp. 2d 985 (C.D. Cal. 2008) to assert that no such common fraudulent purpose is necessary. Admittedly, the Central District of California in *Friedman* disagreed with the Second Circuit cases relied upon in the Countrywide/LandSafe Defendants' Motion to Dismiss, and reinterpreted the Ninth Circuit's language in *Odom* that required a common fraudulent purpose. *Id.* at 991-92.

The Southern District of California, however, agreed with the Second Circuit and the Ninth Circuit's language in *Odom*. Specifically, that court recognized that:

> At a minimum, Plaintiffs must set forth particularized allegations that [defendants] had the common purpose of increasing their revenues by fraudulent means. The hallmark of an enterprise is an association of entities, groups or individuals that must share a common purpose to engage in a particular fraudulent course of conduct and work together to achieve such purposes.

*In re Jamster Marketing Litigation*, 2009 WL 1456632, *5 (S.D. Cal. May 22, 2009) (citing to *First Capital Asset Mgmt. Inc. v. Satinwood, Inc.*, 385 F.3d 159, 174 (2d Cir. 2004); *Odom v. Microsoft Corp.*, 486 F.3d 541, 552 (9th Cir. 2007)). These cases provide

the better reasoned approach, validated by the Ninth Circuit, by recognizing that RICO requires a common fraudulent purpose.

Moreover, Plaintiffs do not address the numerous cases from multiple federal circuit courts holding that a parent and subsidiary cannot satisfy RICO's distinctiveness requirement, relying instead on a Northern District of California case. Response at 14-15. Neither the Ninth Circuit nor the District Court of Arizona have ruled on this issue. While this Court is not bound by either approach, the majority rule acknowledged by the various federal circuit courts cited in the Countrywide/LandSafe Motion to Dismiss more closely complies with the U.S. Supreme Court's holding that "liability depends on showing that the defendants conducted or participated in the conduct of the '*enterprise's* affairs,' not just their *own* affairs." *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993) (emphasis in original). Under this reasoning, the "Countrywide Enterprise" cannot satisfy the distinctiveness requirement.

## III.    CALIFORNIA LAW IS NOT APPLICABLE

Plaintiffs contend that California's Unfair Competition Law ("UCL") applies here because they alleged a "nexus" between the Defendants and California, and then devote four pages to regurgitating the lawyer allegations set out in the FAC. They provide no law suggesting that a "nexus" between a defendant and a state is sufficient, as a matter of law, to require a court sitting in one state to apply another state's law extraterritorially. Nor do Plaintiffs respond to the Countrywide/LandSafe Defendants' case law specifically holding that federal courts must dismiss claims based on state consumer protection statutes where "there is no named plaintiff from those states who has suffered injury." Open. Br. at 34-35. The Plaintiffs here all reside in Arizona, not California.

Nor do the Plaintiffs' conclusory allegations change the result under the Restatement. "When the plaintiff has suffered pecuniary harm on account of his [alleged] reliance on the defendant's false representations and when the plaintiff's action in reliance took place in the state where the false representations were made and received, the local

law of this state determines the rights and liabilities of the parties . . . ." RESTATEMENT (2ND) CONFLICT OF LAWS, § 148(1). The drafters explained:

> No definite rules as to the selection of the applicable law can be stated, *except* in the situation covered by Subsection (1). If any two of the above-mentioned contacts, apart from the defendant's domicile, state of incorporation or place of business, are located wholly in a single state, this will usually be the state of the applicable law with respect to most issues. So when the plaintiff acted in reliance upon the defendant's representations in a single state, this state will usually be the state of the applicable law, with respect to most issues, if (a) the defendant's representations were received by the plaintiff in this state, or (b) this state is the state of the plaintiff's domicile or principal place of business, or (c) this state is the situs of the land which constituted the subject of the transaction between the plaintiff and the defendant, or (d) this state is the place where the plaintiff was to render at least the great bulk of his performance under his contract with the defendant. The same would be true if any two of the other contacts mentioned immediately above were located in the state in question even though this state was not the place where the plaintiff received the representations.

*Id.*, cmt. (j) (emphasis added).

## IV.   PLAINTIFFS' UNJUST ENRICHMENT CLAIM FAILS

Plaintiffs' reliance on *McKesson HBOC, Inc. v. N.Y. State Common Ret. Fund, Inc.*, 339 F.3d 1087 (9th Cir. 2003) to support their unjust enrichment claim is surprising, since Plaintiffs' assertion that the Ninth Circuit upheld the unjust enrichment claim is not true. Rather, the Ninth Circuit in *McKesson* dismissed the plaintiffs' unjust enrichment claim because "an equitable remedy is unnecessary where a legal remedy for the same wrong is available against a different party." *Id.* at 1093-94 (dismissing unjust enrichment claim because plaintiff's contracts with other entities provided a legal remedy). Here, the purchase agreements and loan agreements entered into between Plaintiffs and certain of the Defendants govern the parties' relationship.

## V.   CONCLUSION

These Defendants request that the Court dismiss the FAC, with prejudice.

///

///

///

| | |
|---|---|
| 1 | RESPECTFULLY SUBMITTED this 18th day of September, 2009. |
| 2 | BRYAN CAVE LLP |
| 3 | |
| 4 | |
| 5 | By: /s/ Jonathan G. Brinson |
|   | Robert W. Shely |
| 6 | Jonathan G. Brinson |
|   | Two North Central Avenue, Suite 2200 |
| 7 | Phoenix, Arizona 85004-4406 |
|   | Attorneys for Defendants |

The foregoing is being electronically filed with the Court and electronically served this 18th day of September, 2009, to:

Robert B. Carey
Donald Andrew St. John
Hagens Berman Sobol Shapiro LLP
2425 E. Camelback Road, Suite 650
Phoenix, Arizona 85016

Steve W. Berman
Thomas E. Loeser
Genessa Stout
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
Seattle, Washington 98101

Attorneys for Plaintiffs

Bruce A. Abbott
Brad D. Brian
Hailyn J. Chen
Peter C. Renn
Munger Tolles & Olson LLP
355 South Grand Avenue, 35th Floor
Los Angeles, California 90071-1560

BRYAN CAVE LLP
TWO NORTH CENTRAL AVENUE, SUITE 2200
PHOENIX, ARIZONA 85004-4406
(602) 364-7000

| | |
|---|---|
| 1 | Patricia Lee Refo |
| | Kelly A. Kszywienski |
| 2 | Snell & Wilmer LLP |
| | One Arizona Center |
| 3 | 400 E. Van Buren Street |
| | Phoenix, Arizona 85004-2202 |
| 4 | |
| 5 | Attorneys for KB Home |

/s/ Jonathan G. Brinson

BRYAN CAVE LLP
TWO NORTH CENTRAL AVENUE, SUITE 2200
PHOENIX, ARIZONA 85004-4406
(602) 364-7000