1   **HAGENS BERMAN SOBOL SHAPIRO LLP**
    Robert B. Carey #011186
2   Donald Andrew St. John #024556
    2425 East Camelback Road, Suite 650
3   Phoenix, Arizona 85016
    Telephone:  (602) 840-5900
4   Facsimile:  (602) 840-3012
    E-Mail:  andy @hbsslaw.com
5
    **HAGENS BERMAN SOBOL SHAPIRO LLP**
6   Steve W. Berman WSBA #12536
    Tom Loeser WSBA #38701
7   Genessa Stout WSBA #38410
    1301 Fifth Avenue, Suite 2900
8   Seattle, Washington 98101
    Telephone:  (206) 623-7292
9   Facsimile:  (206) 623-0594
    E-Mail:  steve@hbsslaw.com
10          toml@hbsslaw.com

11  *Attorneys for Plaintiffs*

12          IN THE UNITED STATES DISTRICT COURT

13          FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| 14  NATHANIEL JOHNSON and KRISTEN PETRILLI, ABRAHAM NIETO; GLORIA and CHARLES LEWIS; FABIAN and MARIE PATRON, on behalf of themselves and all others similarly situated, | No. CV-09-972-PHX-FJM |
| | **PLAINTIFFS' OPPOSITION TO MOTION OF COUNTRYWIDE/ LANDSAFE DEFENDANTS TO DISMISS FIRST AMENDED CLASS ACTION COMPLAINT** |
| Plaintiffs, | |
| vs. | |
| KB HOME, a Delaware corporation; COUNTRYWIDE FINANCIAL CORPORATION, a Delaware corporation; COUNTRYWIDE HOME LOANS, INC., a New York corporation; COUNTRYWIDE MORTGAGE VENTURES, LLC, a Delaware company; COUNTRYWIDE-KB HOME LOANS, an unincorporated association of unknown form, LANDSAFE, INC., a Delaware corporation; LANDSAFE APPRAISAL SERVICES, INC., a California corporation; and DOES 1 through 1000, | |
| Defendants. | |

010120-12  323934 V1

# TABLE OF CONTENTS

**PAGE**

I.    INTRODUCTION ............................................................................................. 1

II.   ARGUMENT ................................................................................................... 2

    A.    The Complaint States Claims that are Plausible ............................................ 2

    B.    The Complaint Alleges Valid RICO Claims................................................... 6

        1.    Plaintiffs allege RICO predicate acts with particularity ................... 6

        2.    Plaintiffs allege that fraudulent appraisals caused them to suffer losses ..................................................................................................... 9

        3.    The Complaint Adequately Alleges a Pattern of Racketeering Activity ................................................................................................ 11

            a.    Plaintiffs adequately allege closed-ended continuity............ 11

            b.    Plaintiffs adequately allege open-ended continuity .............. 13

        4.    The Complaint Adequately Alleges Two RICO Enterprises ........... 14

            a.    The "Countrywide Enterprise" Satisfies Any "Distinctiveness" Requirement ............................................... 14

            b.    Both Enterprises engaged in ongoing behavior .................... 16

            c.    Plaintiffs are not required to allege that the members of the enterprise share a fraudulent purpose ........................ 16

        5.    The RICO Conspiracy Claim is Adequately Alleged ...................... 17

    C.    The Complaint Adequately Alleges a Claim Under the California UCL ...................................................................................................... 17

        1.    Plaintiffs Have Standing Under the UCL ....................................... 17

        2.    The Complaint Adequately Pleads a California Nexus ................... 18

        3.    The Complaint Alleges a Claim Under the UCL............................. 19

    D.    The Complaint Adequately Alleges a Claim for Unjust Enrichment ......... 22

III.  CONCLUSION ............................................................................................. 23

# TABLE OF AUTHORITIES

## CASES

**PAGE**

*Acciard v. Whitney,*
  2008 U.S. Dist. Lexis 98131 (M.D. Fla. Dec. 4, 2008) ............................ 7

*Aetna Casualty Sur. Co. v. P&B Autobody,*
  43 F.3d 1546 (1st Cir. 1994) .......................................................... 7

*Allwaste, Inc. v. Hecht,*
  65 F.3d 1523 (9th Cir. 1995) ........................................................ 14

*Ashcroft v. Iqbal,*
  129 S. Ct. 1937 (2009) ................................................................ 2

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007) ................................................................... 2

*Bridge v. Phoenix Bond & Indem. Co.,*
  128 S. Ct. 2131 (2008) .......................................................... 10, 11

*Brown v. Cassens,*
  546 F.3d 347 (6th Cir. 2008) .................................................. 11, 13

*Cazares v. Pac. Shore Funding,*
  2006 U.S. Dist. Lexis 1081 (C.D. Cal. Jan. 3, 2006) .......................... 20

*Charles J. Vacanti, M.D., Inc. v. State Comp. Ins. Fund,*
  24 Cal. 4th 800 (2001) .............................................................. 19

*Cisneros v. U.D. Registry, Inc.,*
  39 Cal. App. 4th 548 (1995) ....................................................... 19

*Citizens for a Better Env't v. Union Oil,*
  996 F. Supp. 934 (N.D. Cal. 1997) ............................................... 19

*Cortez v. Purolator Air Filtration Prods. Co.,*
  23 Cal. 4th 163 (2000) .............................................................. 20

*In re Countrywide Fin. Corp. Mortg. Mktg. & Sales Practices Litig.,*
  601 F. Supp. 2d 1201 (S.D. Cal. 2009) ................................... 4, 14, 15

*Diaz v. Gates,*
  420 F.3d 897 (9th Cir. 2005) ..................................................... 9, 10

*First Capital Asset Mgmt., Inc. v. Satinwood, Inc.,*
  385 F.3d 159 (2d Cir. 2004) ....................................................... 16

*First Magnus Fin. Corp. v. Star Equity Funding, L.L.C.,*
  2007 U.S. Dist. Lexis 8109 (D. Kan. Feb. 2, 2007) .............................. 8

*Ford v. Hotwire, Inc.,*
  2007 U.S. Dist. Lexis 98370 (S.D. Cal. Nov. 19, 2007) ...................... 22

010120-12 323934 V1

*Friedman v. 24 Hour Fitness USA, Inc.*,
    580 F. Supp. 2d 985 (C.D. Cal. 2008) ............................................................ 16, 17

*Gray v. Upchurch*,
    2006 U.S. Dist. Lexis 90184 (S.D. Miss. Dec. 13, 2006) ...................................... 8

*H.J., Inc. v. Northwestern Bell Tel. Co.*,
    492 U.S. 229 (1989) ........................................................................................ 13

*Howard v. America Online, Inc.*,
    208 F.3d 741 (9th Cir. 2000) ............................................................................ 13

*Ikuno v. Yip*,
    912 F.2d 306 (9th Cir. 1990) ............................................................................ 14

*Kay v. Wells Fargo & Co. N.A.*,
    2007 WL 2141292 (N.D. Cal. 2007) .................................................................. 21

*King v. California*,
    784 F.2d 910 (9th Cir. 1986) ............................................................................ 21

*Kuehn v. Stanley*,
    208 Ariz. 124 (Ct. App. 2004) ........................................................................... 6

*Lawyers Title Ins. Corp. v. Dearborn Title Corp.*,
    118 F.3d 1157 (7th Cir. 1997) .......................................................................... 21

*Lee v. City of Los Angeles*,
    250 F.3d 668 (9th Cir. 2001) .............................................................................. 4

*McKesson HBOC, Inc. v. New York State Common Ret. Fund, Inc.*,
    339 F.3d 1087 (9th Cir. 2003) .......................................................................... 23

*Odom v. Microsoft Corp.*,
    486 F.3d 541 (9th Cir. 2007) ...................................................................... 15, 17

*Oki Semiconductor Co. v. Wells Fargo Bank*,
    298 F.3d 768 (9th Cir 2002) ....................................................................... 10, 11

*Paulus v. Bob Lynch Ford, Inc.*,
    139 Cal. App. 4th 659 (2006) ........................................................................... 21

*People ex rel. Bill Lockyer v. Fremont Life Ins. Co.*,
    104 Cal. App. 4th 508 (2002) ........................................................................... 19

*Religious Tech. Ctr. v. Wollersheim*,
    971 F.2d 364 (9th Cir. 1992) ............................................................................ 13

*Sage v. Blagg Appraisal Co.*,
    221 Ariz. 33 (Ct. App. 2009) .............................................................................. 6

*Schmuck v. United States*,
    489 U.S. 705 (1989) ........................................................................................ 11

*Sun Sav. & Loan Ass'n v. Dierdorff*,
    825 F.2d 187 (9th Cir. 1987) ............................................................................ 14

010120-12  323934 V1

*Turner v. Cook,*
    362 F.3d 1219 (9th Cir. 2004)...................................................................... 12

*United States v. Feldman,*
    853 F.2d 648 (9th Cir. 1988)...................................................................... 16

*United States v. Fullwood,*
    342 F.3d 409 (5th Cir. 2003)........................................................................ 7

*United States v. Kohli,*
    110 F.3d 1475 (9th Cir. 1997)...................................................................... 6

*United States v. Nguyen,*
    504 F.3d 561 (5th Cir. 2007)........................................................................ 7

*United States v. Owens,*
    301 F.3d 521 (7th Cir. 2002)........................................................................ 7

*United States v. Panza,*
    750 F.2d 1141 (2d Cir. 1984)........................................................................ 7

*Webb v. Smart Document Solutions, LLC,*
    499 F.3d 1078 (9th Cir. 2007).................................................................... 20

*Zaldana v. KB Home,*
    2009 U.S. Dist. Lexis 42409 (N.D. Cal. May 8, 2009)........................... 20

## STATUTES AND REGULATIONS

12 C.F.R. § 34.44.......................................................................................... 21, 22

18 U.S.C. § 1964(c) ........................................................................................... 10

A.R.S. § 32-3633 ............................................................................................... 22

010120-12 323934 V1

# I.    INTRODUCTION

The unabridged motion ("Motion") of the Countrywide/Landsafe defendants to dismiss the first amended complaint ("FAC") should be denied in its entirety.[1]

First, there is no merit to Countrywide's arguments that Plaintiffs do not state a claim under RICO.  First, Plaintiffs' claims are facially plausible.  The FAC identifies Countrywide's role in the Inflated Appraisal Scheme and why it undertook the Scheme.  Countrywide's interpretation of the purchase contracts at issue here is untenable; and its claim that its participation in the Scheme would be "ludicrous" banking policy is not an impeachment of the FAC, but rather an appropriate indictment of its behavior during the tail-end of the mortgage boom-and-bust that nearly brought this country to its economic knees.  Second, Plaintiffs allege their RICO claim with particularity, explaining in detail how Defendants used fraudulent appraisals (which constitute mail fraud) in violation of RICO.  Third, Plaintiffs adequately identify:  (1) the harms they suffered as a result of the Scheme; (2) a pattern of racketeering activity; and (3) two distinct RICO Enterprises.

Plaintiffs also state valid claims for violation of California's Unfair Competition Law ("UCL") and for unjust enrichment.  Countrywide's injury and causation arguments fare no better in their second invocation against Plaintiffs' UCL claims just as they do as against the RICO claims.  The UCL applies to Defendants' misconduct, because Plaintiffs allege in detail that their injuries were caused by conduct occurring in California, where Countrywide, KB Home, and their joint venture are all headquartered and where they designed and implemented the Inflated Appraisal Scheme.  Further, Plaintiffs state a valid claim under the UCL based, in part, on violations of RICO, RESPA, the Uniform Standards of Professional Appraisal Practice ("USPAP"), and Arizona law.  Finally, Plaintiffs state a valid claim for unjust enrichment because no contract controls the liability of Countrywide to Plaintiffs.

---

[1] In the first sentence of its overlength Motion, Countrywide incorrectly claims that the FAC is a "blunderbuss" complaint, citing an inapposite decision concerning the sale of off-label drugs.  Countrywide would be better served to focus on relevant cases rather than find an isolated, inapposite case to attack Plaintiffs and their counsel.

## II.   ARGUMENT

### A.   The Complaint States Claims that are Plausible

Countrywide's first argument is that Plaintiffs' claims fail because it is implausible that Defendants have engaged in the wrongs alleged in the First Amended Complaint ("FAC").  *See* Motion at 14-21.  But Defendants' implausibility argument rests on "facts" which are (1) contrary to the facts alleged in the FAC; and (2) the result of a contractual interpretation that is simply nonsense.  The legal standard set forth in *Twombly* and in *Iqbal*[2] amply support Plaintiffs' claims here.  The FAC is replete with "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 129 S. Ct. at 1949.  Rather than apply these facts that are alleged in the FAC, Countrywide supplies its own "facts" and then applies the legal standard to "facts" as it casts them.  However, in a motion to dismiss, even after *Twombly* and *Iqbal*, this it cannot do.

The central "fact" on which Countrywide relies in its plausibility argument is that irrespective of what value the tainted appraisal assigned to a KB Home purchaser's property, that purchaser would still be bound to purchase the property at the contracted price.  As if by repeating it over and over it will make it come true, Countrywide insists that the purchase contracts at issue were not contingent on appraisals at value or even the ability of the purchaser to acquire the purchase-money financing.  *See* Motion at 2, 3, 4, 6, 14-18, 20-21.  That assertion is wrong both as a matter of contract interpretation, and as a matter of common sense.  The contractual term at issue states, in pertinent part:

> 5.3    Loan Approval; Disapproval.  Buyer shall, in good faith, apply for a Loan and diligently pursue Loan approval. Buyer acknowledges that Buyer's obligation to purchase the Property is not contingent upon Buyer obtaining Loan approval and that Buyer's Deposit shall become non-refundable to Buyer on the Non-Refundable Deposit Date, (as defined in the Key Date Addendum to Purchase Agreement) irrespective of whether the Loan is approved.  Additionally, *if Buyer fails to obtain written verification from Lender of*

---

[2] *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007).

> *unconditional Loan approval within thirty (30) days after the*
> *"Original Sale Date" as set forth in the Key Date Addendum,*
> *or any other time period as agreed to by Buyer and Seller, in*
> *writing, then Buyer or Seller may, by written notice to the*
> *other and to Escrow holder, cancel this Agreement.*

(Emphasis added.)  When read in its entirety, this contractual term does not mean that the buyers are bound to complete the transaction even if they cannot obtain financing, as Countrywide argues.  If that were true then "Buyer or Seller may, by written notice to the other and to Escrow holder, cancel this Agreement" – would be meaningless.  Instead this clause provides that even if buyers do not obtain loan approval, they will still forfeit the deposit if the resulting cancellation occurs after the "Non-Refundable Deposit Date."

Countrywide's foray into contract interpretation fails the common sense test as well.  If KB Home could truly "force" any person to follow through on the purchase contract, even if such person could not get financing, where would the purchase money come from?  As any homeowner and any lender, except perhaps the nation's one-time largest lender, Countrywide, understands, purchase-money financing is an integral part of any home purchase agreement and the failure to obtain financing kills the deal.

Countrywide then incorrectly claims that it "'would be a ludicrous banking policy' that lacks any facial plausibility" for it to intentionally write make "bad loans" to finance inflated KB Home purchases.  Motion at 14.  But this is precisely what is alleged in factual detail in the Complaint.  Countrywide had no interest in the quality of the loans that it made.  *See, e.g.,* FAC ¶ 48 ("'rampant disregard for underwriting standards' at Countrywide in the interest of pushing through as many loans as possible.")  It was paid for originating loans and selling loans in the secondary market.  The more loans, and the higher the face value of the loans, the more money Countrywide made.  Whether the buyer would eventually repay the loan, or even whether the buyer could make the second or third payment simply did not matter at all to Countrywide.  But these are not mere allegations devoid of factual basis as Countrywide would have the Court believe.  The FAC supports these allegations with specifics from insiders and from court orders and pleadings in cases against Countrywide that further detail its drive for excess profit

010120-12  323934 V1

1  through writing as many loans as possible, irrespective of the quality of such loans.  *See,*

2  *e.g.,* FAC ¶¶ 43-46, 48.

3       As set forth in the FAC, the inflated appraisals at issue were the centerpiece of the

4  Inflated Appraisal Scheme because these allowed Countrywide to make – and then sell in

5  the secondary market – loans that it otherwise could not have made, and it allowed KB

6  Home to sell their houses at values higher than the true market would have allowed.

7  FAC ¶¶ 48, 85.

8       The implausibility argument is undercut by several other facts.  First, this is not

9  the first case that alleges that Countrywide engaged in a far reaching scheme to write as

10  many over valued loans and possible.  As further support of the notion that Countrywide

11  now claims is "ludicrous," that it purposefully wrote bad loans to make money, Plaintiffs

12  note the raft of lawsuits against Countrywide alleging exactly that including:  (1) a

13  shareholder derivative action cited at Paragraph 48 of the FAC;[3] (2) On June 4, 2009, the

14  SEC filed a complaint for violations of securities laws against Countrywide executives

15  Angelo Mozilo, David Sambol and Eric Sieracki.[4]  The SEC complaint details

16  Countrywide's abandonment of underwriting standards in its relentless drive to capture

17  market share, profits, and individual income; and (3) a nationwide class action attacking

18  Countrywide's lending practices details how and why Countrywide sought to make as

19  many loans as possible to fuel its ambition and greed.[5]  The Court in that RICO case

20  denied Countrywide's motion to dismiss, upholding enterprise allegations mirroring the

21

22       [3] *See In re Countrywide Fin. Corp. Derivative Litig.*, 554 F. Supp. 2d 1044 (C.D. Cal.
2008) (Order on motions to dismiss) and Class Action Complaint, attached as Ex. A to

23  the Berman Declaration.  As Countrywide notes, "under Fed. R. Evid. 201, a court may
take judicial notice of matters of public record."  *Lee v. City of Los Angeles*, 250 F.3d

24  668, 689 (9th Cir. 2001).

25       [4] *SEC v. Mozilo et al.,* Case No. CV 09-03994-VBF.  A copy of the SEC complaint is
attached as Ex. B to the Berman Declaration.

26       [5] *See In re Countrywide Fin. Corp. Mortg. Mktg. & Sales Practices Litig.*, Case No.

27  08-MD-01988 (S.D. Cal.).  A copy of the complaint is attached as Ex. C to the Berman
Declaration.  *See also In re Countrywide Fin. Corp. Mortg. Mktg. & Sales Practices*

28  *Litig.*, 601 F. Supp. 2d 1201 (S.D. Cal. 2009), and Berman Decl., Ex. D for the Orders
sustaining the RICO Enterprises alleged in that case.

allegations in this case.[6]  Not only have these cases survived motions to dismiss, they have done so where the plaintiff had to plead scienter, a burden not present here.

Second, the argument ignores specific factual allegations documenting the scheme.  *See* FAC, ¶¶ 104-106 (a former employer explaining how he complained about the scheme to senior management); ¶ 100 (internal email regarding pushing values to meet the contract amount; ¶ 91 (outlining meeting where executives explained the scheme); ¶¶ 113-124 (showing inflated appraisals on homes in California); ¶¶ 127-151 (detailing plaintiffs' fraudulent appraisals).  What is implausible is that all of these facts could be plead absent the scheme described.  At the very least, these facts overcome the pleading requirements set forth in *Iqbal* and *Twombly*.

Countrywide's reliance arguments also fail legally and betray a radical re-casting of the allegations in the FAC.  Countrywide says that the appraisals played no role in the purchase decisions because they occurred long after the purchase contracts were executed.  *See* Motion at 17-19.  While Countrywide has the timing of events right, it appears not to have read the allegedly "blunderbuss" complaint that it is attacking.  The FAC nowhere alleges that Plaintiffs relied on appraisals *before* agreeing to buy KB Home properties.  Instead it claims that when the KB Home properties were substantially completed and appraised, fraudulently inflated appraisals were commissioned to support loans that Plaintiffs would not and could not have entered into, and that an *honest lender* would not have made, had the true values of the properties been revealed in honest appraisals.  *See, e.g.,* FAC ¶ 88 ("Since Countrywide controlled the appraisal process through exclusive use of complicit LandSafe employees, Countrywide was able to inflate and control the sales prices of KB Homes").  Countrywide apparently overlooks the FAC to the extent that it states that it too was complicit in the scheme.  Had an honest appraiser *and an honest lender* been involved instead, then loan approval would never have been given and, per the contractual term, "Buyer or Seller may, by written notice to the other and to Escrow holder, cancel this Agreement."

_____

[6] *See supra*, n.3.

1    The cases Countrywide cites do not further its argument.  *Kuehn v. Stanley*, 208
2    Ariz. 124, 128 (Ct. App. 2004), is inapposite because it did not involve the measured
3    participation of each the seller, the appraiser *and* the lender as is alleged here.  The *Kuehn*
4    plaintiffs were required to show their own detrimental reliance *on the tainted appraisal* in
5    order to succeed.  Here, in contrast, under RICO, no such showing is required.  *See infra*
6    Section III.b.2.  Even apart from that distinguishing factor, Countrywide cites the more
7    recent and more applicable case, *Sage v. Blagg Appraisal Co.*, 221 Ariz. 33, 36 (Ct. App.
8    2009), which held that when a purchase agreement can be cancelled for an over-inflated
9    appraisal, a fraud action will be upheld.  Here, as the purchase contract all Plaintiffs
10   signed provide, Plaintiffs could cancel the agreements if they did not get loan approval.
11   As the FAC alleges, no honest lender would have provided loan approval based on the
12   inflated appraisals at issue in this case.  *E.g.,* FAC ¶ 89 ("Forcing buyers to use KB-
13   Countrywide as the lender was essential to the Scheme as another lending institution
14   might use a truly independent appraiser who in turn would unravel the inflated appraisal
15   scheme by appraising at a price that was below the contract value.").

16   Because, as set forth in the purchase contracts and as squarely alleged in the FAC,
17   the Countrywide loans and the KB Home sales at issue would not and could not have
18   been consummated absent the inflated appraisals and corrupt lending practices of
19   Countrywide, Countrywide's implausibility argument utterly fails.

20   **B.    The Complaint Alleges Valid RICO Claims**

21   **1.    Plaintiffs allege RICO predicate acts with particularity**

22   Countrywide erroneously asserts that Plaintiffs fail to allege predicate acts with
23   particularity.  *See* Motion at 23-25.  In fact, Plaintiffs allege in detail that Defendants
24   implemented a scheme based on fraudulent appraisals, which numerous courts have held
25   constitute mail fraud.  For example, in *United States v. Kohli*, 110 F.3d 1475, 1476 (9th
26   Cir. 1997), the defendants pled guilty to mail fraud in the sale of homes by "fraudulently
27   inducing lenders to make loans on the properties after inflated appraisals."  *See also*
28   *United States v. Nguyen*, 504 F.3d 561, 568 (5th Cir. 2007) (affirming conviction for mail

010120-12 323934 V1

fraud based on false representations, because "a rational jury could find beyond a reasonable doubt that Myna knew that the sales prices and loan amounts for the Fox Hunt and Silvercrest properties stemmed from false appraisals"); *United States v. Fullwood*, 342 F.3d 409 (5th Cir. 2003); *United States v. Owens*, 301 F.3d 521, 528 (7th Cir. 2002) (affirming conviction for scheme that relied on fraudulent appraisals, where the "jury's conclusion that Owens had an intent to defraud is also supported by the abundant evidence that Owens received 'kickbacks' for his artificially-inflated appraisals").

Moreover, courts have sustained RICO allegations based on fraudulent appraisals, which constitute the predicate act of mail or wire fraud. For example, in *Acciard v. Whitney*, 2008 U.S. Dist. Lexis 98131, *10 (M.D. Fla. Dec. 4, 2008), the plaintiffs sued the defendants under RICO for fraudulent sales of real estate, basing their claims in part on defendants' use of a "fraudulent appraisal value for the property." The defendants argued that the plaintiffs failed to allege fraud with particularity, but the court disagreed:

> Plaintiffs have identified the false statements that were made – the fraudulent appraisal values. Plaintiffs allege that United Mortgage, which is alleged to be an agent of First Community Bank, provided loan documents to Plaintiffs containing the fraudulent appraisals. Plaintiffs also allege that the Lenders, which include First Community Bank, knowingly utilized the fraudulent appraisal and that the fraudulent appraisals and financing were key to the fraudulent scheme. Accordingly, the Court finds that Plaintiffs meet the particularity requirements for pleading fraud in this case.

*Id*. at *15-16. In denying the motion to dismiss the RICO claim, the court explained that "Plaintiffs allege that Huron coerced or attempted to coerce Plaintiffs to close on permanent financing based on fraudulent appraisal values in order to further the fraudulent scheme." *Id*. at *34. Thus, the fraudulent appraisals constituted the fraud necessary to support the RICO claim. *See also Aetna Casualty Sur. Co. v. P&B Autobody*, 43 F.3d 1546, 1562 (1st Cir. 1994) (scheme to defraud insurance company by submission of "fraudulent appraisals" constituted mail fraud and supported jury verdict that defendants violated RICO); *United States v. Panza*, 750 F.2d 1141, 1147 (2d Cir. 1984) (affirming RICO convictions for scheme that used "fraudulent appraisals"); *First Magnus Fin. Corp. v. Star Equity Funding, L.L.C.*, 2007 U.S. Dist. Lexis 8109, *14 (D. Kan. Feb. 2, 2007)

010120-12 323934 V1

1   (denying motion to dismiss RICO claim where defendant "directed the loan officers to

2   obtain appraisals at pre-determined, inflated values"); *Gray v. Upchurch*, 2006 U.S. Dist.

3   Lexis 90184, *15 (S.D. Miss. Dec. 13, 2006) (denying motion to dismiss RICO claim

4   where complaint set forth "the appraisal fraud and the HUD-1 fraud allegedly perpetra-

5   ted" by the defendants).

6         Numerous allegations throughout the Complaint demonstrate that Defendants

7   utilized fraudulent appraisals to carry out their scheme.  For example, the FAC alleges:

- "KB Home, Countrywide, and LandSafe … built, financed, appraised and controlled virtually every aspect of a buyer's real estate transaction and thus Defendants were in a position to rig and falsify the appraised value of the homes they were selling and financing." ¶ 7.

- "When an order for an appraisal on a KB Home went to LandSafe, it was routed to a single person at LandSafe, that individual assigned appraisals of KB Home properties to a small group of appraisers who had been specifi- cally approved for each development by KB Home due to their willingness to "play-ball," *i.e.*, come in with the appraisal at whatever number was necessary to close the deal at the price desired by Countrywide-KB." ¶ 9.

- "[I]n order to ensure that Plaintiffs' and Class members' home transactions would occur at inflated contracted prices for KB homes, notwithstanding the actual and sometimes declining home market between the date of a contract and settlement, the KB-Countrywide Criminal Enterprise steered Plaintiffs and Class members to its complicit appraisers who were under direct instruction to value homes at or above the contract price even if it meant completing appraisals in violation of regulatory guidelines and requirements pertaining to appraisals." ¶ 10.

- "Plaintiffs' and Class members' home appraisals were tainted with false and misleading data, deceptive practices, and violations of the Regulatory standards for professional appraisers including, *inter alia*, the following:  (i) Improper selection of distant, dissimilar properties….; (ii) Use of pending transactions as comparable sales … even when no sale was actually pend- ing because the ostensible buyer had abandoned the transaction; and (iii) The tainted appraisals gave false and misleading statements concerning the generally downward trending real estate market at the time that the appraisals were performed." ¶ 11.

- "The appraiser's use of such unverified information and patently faulty methodology demonstrates their complicity in the scheme.  In contrast, when a prospective KB Home purchaser was able to have a non-complicit appraiser look at public records of recently closed sales of truly comparable properties, the independent appraisals revealed values far below the KB

1
2
3

Home contract price and the KB Home tainted appraisal to match.  In such cases, KB Home often conceded the difference in order to close the sale, but then concealed the facts of these transactions from contemporaneous and subsequent purchasers."  ¶ 13.

4
5
6
7

- "The inflated sale prices resulting from the tainted appraisals, in turn, infected subsequent appraisals and valuations, allowing the KB-Countrywide Criminal Enterprise to continue to obfuscate falling values.  In other words, this was a Madoff-like Ponzi scheme that depended upon the initial use of false appraisals to prop up early sales in a KB Home subdivision, which were then used to continue to prop up the value and selling activity in entire KB Home subdivisions."  ¶ 14.

8
9
10
11
12

Moreover, Plaintiffs allege in detail that their appraisals were fraudulent.  *See* FAC ¶¶ 127-151.  (*See, e.g.*, ¶ 129 (identifying fraudulent nature of Johnson appraisal); ¶ 134 (use of mail to effectuate scheme for Nieto's appraisal); ¶¶ 143-147 (use of mails to send fraudulent Lewis appraisal); ¶¶ 148-149 (fraudulent Patron appraisal)).  These allegations and others throughout the FAC adequately allege predicate acts of mail fraud.[7]

13

    **2.    Plaintiffs allege that fraudulent appraisals caused them to suffer losses**

14
15
16
17
18

Countrywide claims that Plaintiffs lack standing because they cannot show that the Inflated Appraisal Scheme caused them injury.  *See* Motion at 21-22.  This argument is merely a repetition of its flawed "plausibility" argument, which Plaintiffs discuss in Section II(A), above, and it ignores specific allegations to the contrary.  FAC ¶¶ 131, 141, 145, 150-151, 205-206 (all alleging specific injury).

19
20
21
22
23

Further, there is no merit to Countrywide's argument that Plaintiffs have failed to allege proximate causation under RICO.[8]  In *Diaz v. Gates*, 420 F.3d 897, 901 (9th Cir. 2005) (en banc), the Court explained the standards for proximate causation under RICO:

      The only requirement for RICO standing is that one be a 'person injured in his business or property by reason of a

24
25

    [7] In the midst of its argument about whether Plaintiffs allege predicate acts with particularity, Countrywide injects yet more arguments about causation and reliance.  *See, e.g.*, Motion at 24 n.6.  Plaintiffs address those arguments in the following subsections.

26
27
28

    [8] Countrywide notes that Plaintiffs are required to establish proximate causation under RICO, *see* Motion at 22-23, but it conflates its discussion of causation with proximate causation in another portion of its moving papers in which it does not address the RICO standards for proximate causation, *see id*. at 15-17.  Plaintiffs will nonetheless explain why they adequately allege proximate causation.

010120-12  323934 V1

1

2

3

4

> violation of section 1962.'  18 U.S.C. § 1964(c).  And the Supreme Court has already told us that 'by reason of' incorporates a proximate cause standard, *see Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 265-68, 117 L. Ed. 2d 532, 112 S. Ct. 1311 (1992), which is generous enough to include the unintended, though foreseeable, consequences of RICO predicate acts ….

5   The Court also stated that there is "no room in the statutory language for an

6   additional, amorphous requirement that, for an injury to be to business or property, the

7   business or property interest have been the 'direct target' of the predicate act."  *Id*.  Thus,

8   if a plaintiff "properly alleges that his injuries were 'by reason of a violation of section

9   1962,' there is nothing to prevent him from 'suing therefor.'  *See* 18 U.S.C. § 1964(c)."

10   *Id*. at 902.  *See also Oki Semiconductor Co. v. Wells Fargo Bank*, 298 F.3d 768, 773 (9th

11   Cir 2002) (the injurious RICO conduct need only be "a substantial factor in the sequence

12   of responsible causation") (internal quotation omitted).

13   Further, Plaintiffs need not show that they relied on fraudulent statements.  In

14   *Bridge v. Phoenix Bond & Indem. Co.*, 128 S. Ct. 2131, 2138-39 (2008), the Supreme

15   Court stated:

16

17

18

19

20

> Using the mail to execute or attempt to execute a scheme to defraud is indictable as mail fraud, and hence a predicate act of racketeering under RICO, even if no one relied on any misrepresentation.  *See Neder v. United States*, 527 U.S. 1, 24-25, 119 S. Ct. 1827, 144 L. Ed. 2d 35 (1999) ("The common-law requirement[t] of 'justifiable reliance' … plainly ha[s] no place in the [mail, wire, or bank] fraud statutes").  And one can conduct the affairs of a qualifying enterprise through a pattern of such acts without anyone relying on a fraudulent misrepresentation.

21

22

23

24

25

26

27

28

Moreover, the Court stated, "Having rejected petitioners' argument that reliance is an element of a civil RICO claim based on mail fraud, we see no reason to let that argument in through the back door by holding that the proximate-cause analysis under RICO must precisely track the proximate-cause analysis of a common-law fraud claim."  *Id*. at 2142.  The Court explained that if the defendants had not engaged in mail fraud, the plaintiffs would have had the opportunity to acquire valuable liens.  *See id*. at 2138 ("[R]espondents lost the opportunity to acquire valuable liens.  Accordingly, respondents were injured in their business or property by reason of petitioners' violation of § 1962(c)) ….").

- 10 -

1    Under those standards, Plaintiffs have adequately alleged proximate causation.  If

2  Defendants had not engaged in their RICO scheme, which required fraudulent appraisals,

3  Plaintiffs would not have suffered the losses described in the preceding subsection of this

4  Opposition.  *See* FAC ¶¶ 205, 131, 141, 145, 150-151 (alleging causation and injury).

5  Thus, Plaintiffs' losses were "a substantial factor in the sequence of responsible

6  causation," *Oki*, 298 F.3d at 773.

7    **3.    The Complaint Adequately Alleges a Pattern of Racketeering Activity**

8      **a.    Plaintiffs adequately allege closed-ended continuity**

9    There is no merit to Countrywide's argument that the FAC fails to allege closed-

10  ended continuity of the alleged racketeering activity.  *See* Motion at 28-29.  Countrywide

11  bases its faulty argument on the incorrect premise that Plaintiffs only allege that the

12  pattern of racketeering activity lasted from April 21, 2006, to September 27, 2006.  *See*

13  Motion at 28.  Countrywide cobbles that distorted time period together by asserting that

14  the FAC "only identifies three alleged specific uses of the mails to support the alleged

15  pattern." *Id.*[9]

16    That argument falters for two reasons.  First, the continuity of racketeering activity

17  is not judged merely by the dates of mailings, which need not themselves constitute mail

18  fraud.  *See Schmuck v. United States*, 489 U.S. 705 (1989).  Second, the pattern is not

19  judged by conduct aimed only at specific plaintiffs.  *See Brown v. Cassens*, 546 F.3d 347,

20  353 (6th Cir. 2008) ("As long as the defendant engaged in a pattern of racketeering acti-

21  vity, and the plaintiff was injured by this pattern of activity, this suffices to state a claim

22  under 18 U.S.C. § 1964(c); nowhere does the statute require that the injury to each plain-

23  tiff must have independently consisted of a pattern of activity by the defendant.").

24    In fact, Plaintiffs allege that the racketeering activity lasted far more than a year.

25  Plaintiffs specifically allege that Defendants' appraisal for plaintiffs Fabia and Maria

26  Patron was done on February 26, 2006, and was fraudulent.  *See* FAC ¶¶ 147-148.  While

27  _____

28  [9] In a footnote to that assertion, Countrywide states, "Excluding the alleged transmis-
sion of an appraisal from C.S. Heaton to CHL." *Id.* at 28 n.7.  Why Countrywide feels
free to exclude that mailing is not explained.

010120-12  323934 V1

that is not the actual starting date of the racketeering activity, it shows that the fraud began no later than that date.  On the other end of the time continuum, Plaintiffs allege that Mark Zachary, a former Countrywide-KB Regional Vice President and Manager, filed a wrongful termination suit.  FAC, ¶ 103.  Zachary alleges that beginning in September 2006, he began questioning Countrywide-KB's use of fraudulent appraisals.  FAC, ¶ 104.  When Zachary brought his concerns to executives within Countrywide-KB, he was told that "that was they way KB Home wanted it."  FAC, ¶ 105.  Paragraph 106 of the FAC in this case then alleges:

> Zachary continued to make this inflated appraisal issue known to Defendant's executives.  For example, Zachary recounted in an e-mail dated May 11, 2007, to KB Homes executives and Countrywide-KB's Senior Vice President and Divisional Manager to whom Zachary reported, a letter from an appraiser to the appraiser's Area Appraiser Manager whereby the appraiser was told by the KB Homes Closing Coordinator that "*KB will not be able to continue doing business with him if he cannot hit the contract sales price on his appraisals*" and that the KB Homes Closing Coordinator stated that "*his past appraiser never missed the contract sales price even if he had to go outside of the given community to make value*."  Zachary went on to state in the e-mail that "[t]his is considered appraisal fraud."

Thus, Plaintiffs plainly allege that Defendants utilized fraudulent appraisals from at least February 2006 to at least May 2007.  Further, the complaint cites to specific examples of the Scheme operating in February 2006 (FAC, ¶ 113, December 2005) (FAC, ¶ 117).  And the proposed class period continues beyond 2007 in light of the fact this Scheme was the defendants way of doing business.  *See* FAC, ¶ 167.  That time period, which is conservative, sufficiently supports a finding of closed-ended continuity.

In light of those allegations, none of the cases cited by Countrywide supports its argument.  For example, in *Turner v. Cook*, 362 F.3d 1219, 1231 (9th Cir. 2004), the Ninth Circuit held that the plaintiffs failed to allege closed-ended continuity, because "almost all of the alleged fraudulent communications occurred during the two month period between June and July of 2001, and the additional three categories of communication occurred only sporadically in the preceding year."  In contrast, Plaintiffs in this action allege that Defendants carried out their racketeering activity continuously for more

- 12 -

than a year, at the very least.  Similarly, the other cases cited by Countrywide are inappo-site, because they involved finite schemes of short duration.  *See Howard v. America Online, Inc.*, 208 F.3d 741, 750 (9th Cir. 2000) (no continuity where alleged inability of defendant to provide unlimited Internet access arose immediately after announcement of unlimited access, which "resulted in an overload of AOL's network, and prevented or delayed many subscribers ability to access the Internet"); *Religious Tech. Ctr. v. Wol-lersheim*, 971 F.2d 364, 366 (9th Cir. 1992) ("Since the only goal of the Greene defend-ants was the successful prosecution of the *Wollersheim* state tort suit, there was no threat of activity continuing beyond the conclusion of that suit…. Thus the alleged activity continued for six months at most.").

### b. Plaintiffs adequately allege open-ended continuity

There is also no merit to Countrywide's cursory argument that the FAC fails to allege open-ended continuity.  Without any analysis, Countrywide merely asserts that the "FAC fails to state any facts that would support an inference that Defendants' conduct, by its nature, threatened repetition, or that Defendants would continue its activity." Motion at 30.  To the contrary, Plaintiffs allege in detail that the racketeering activity was a regular way of conducting Defendants' business, as explained throughout this brief. *See, e.g.*, FAC, ¶¶ 87-90, 93, 98-99, 104-106, 113, 115, 129-130, 139, 144, 148.  Thus, Plaintiffs adequately allege open-ended continuity.  *See H.J., Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 243 (1989) (the "continuity requirement is likewise satisfied where it is shown that the predicates are a regular way of conducting defendant's ongoing legitimate business (in the sense that it is not a business that exists for criminal purposes), or of conducting or participating in an ongoing and legitimate RICO 'enterprise'").

Indeed, courts routinely uphold claims of open-ended continuity where the alleged racketeering activity is a regular way of doing business that is not closed-ended by its nature.  *See, e.g., Brown v. Cassens Transp. Co.*, 546 F.3d at 355 (complaint adequately alleged open-ended continuity by asserting that "the legitimate business or part of the legitimate business of each of the defendants … is regularly conducted by fraudulently

1    denying benefits to which the employees are entitled through the use of fraudulent

2    communications by mail and wire"); *Allwaste, Inc. v. Hecht*, 65 F.3d 1523, 1529 (9th Cir.

3    1995) ("Allwaste's allegations, if proved, would suffice to establish that extorting

4    kickbacks had become Defendant Hecht's and Defendant Henebury's regular way of

5    doing business.  Such a showing would satisfy the open-ended continuity requirement….

6    Because these activities were made possible by Hecht's and Henebury's employment

7    status, were directed at a variety of Allwaste suppliers, and were not connected to the

8    consummation of any particular transaction, there is nothing to suggest that they would

9    have ceased unless Allwaste had intervened as it did."); *Ikuno v. Yip*, 912 F.2d 306, 309

10   (9th Cir. 1990) (open-ended continuity alleged based on two false annual reports in 12

11   months where defendant "was filing annual reports and there is no evidence that he

12   would have stopped doing so if KLCL had not ceased to do business"); *Sun Sav. & Loan*

13   *Ass'n v. Dierdorff*, 825 F.2d 187, 194 (9th Cir. 1987) (four predicate acts over a two-

14   month period satisfied the continuity requirement based on the threat of continued

15   activity).

16          **4.     The Complaint Adequately Alleges Two RICO Enterprises**

17                 **a.     The "Countrywide Enterprise" Satisfies Any "Distinctiveness"**
                            **Requirement**

18
19          Countrywide incorrectly asserts that the Countrywide Enterprise does not satisfy

20   the requirement that the defendants are distinct from the enterprise.  *See* Motion at 30-31.

21   Specifically, Countrywide asserts that "a parent corporation and its subsidiary lack suffi-

22   cient distinctiveness to constitute a RICO 'enterprise.'"  Motion at 31.  Countrywide does

23   not address another case brought against it, in which the district court rejected that very

24   argument.  In *re Countrywide Fin. Corp. Mortg. Mktg. & Sales Practices Litig.*, 601

25   F. Supp. 2d 1201, 1212 (S.D. Cal. 2009), the plaintiffs alleged an enterprise comprising

26   "(1) Countrywide, including its LandSafe loan closing services subsidiaries, and (2) Mid

27   Atlantic Capital, One Source Mortgage, and other mortgage brokers not named as

28   defendants herein who have contracts with Countrywide pursuant to which they sell,

     arrange, promote, or otherwise assist Countrywide in directing borrowers into loans

010120-12 323934 V1

issued by Countrywide."  The defendants argued "assert these allegations are insufficient because a parent corporation and its subsidiaries cannot legally constitute a RICO enterprise."  *Id.* at 1213.  The district court rejected that argument, stating:

> Plaintiffs allege that the decision to operate through the Land-Safe Defendants facilitated the activity of the enterprise by removing a potential for "checks and balances" from the loan process.  [Citation omitted.]  Plaintiffs also allege that each individual in the Countrywide Enterprise had a distinct role. For instance, CHL was in the business of originating loans, CT provided tax services in connection with the loans, Land-Safe Inc. provided a variety of products during the closing process, LandSafe Appraisal Services, Inc. provided appraisal services, *etc.  See Lorenz*, 1 F.3d at 1412 ("the plaintiff must plead facts which, if assumed to be true, would clearly show that the parent corporation played a role in the racketeering activity which is distinct from the activities of its subsidiary.")  These allegations satisfy the distinctiveness requirement, and are sufficient to withstand Defendants' motion to dismiss.

*Id.* at 1214-15.

For the same reasons, Plaintiffs' allegations satisfy the distinctiveness requirement in this case.  Plaintiffs allege that the Countrywide Enterprise comprises Countrywide and its LandSafe settlement services subsidiaries.  FAC, ¶ 187.  In addition, as in the *Countrywide* case, Plaintiffs allege that Countrywide Home Loans originated loans (*see, e.g.,* FAC, ¶¶ 37-48), that LandSafe, Inc. provided a variety of products during the closing process (FAC, ¶ 30), and that LandSafe Appraisal Services, Inc. provided appraisal services (FAC, ¶¶ 31, 78-79).  Therefore, Plaintiffs' allegations satisfy the distinctiveness requirement.  *See also Odom v. Microsoft Corp.*, 486 F.3d 541, 551 (9th Cir. 2007) (en banc) ("We take this opportunity to join the circuits that hold that an associated-in-fact enterprise under RICO does not require any particular organizational structure, separate or otherwise.").  Defendants do not assert this defense as to the Countrywide KB Appraisal Enterprise.

### b.      Both Enterprises engaged in ongoing behavior

There is no merit to Countrywide's argument that Plaintiffs fails to allege that the Enterprises engaged in ongoing behavior.  *See* Motion at 32-33.[10]  Countrywide's only argument is that "Plaintiffs' allegations of acts spanning just two months cannot satisfy the continuing unit element of RICO."  Motion at 33.  As shown above, Plaintiffs do not merely allege acts spanning just two months.  Therefore, Countrywide's argument fails.

### c.      Plaintiffs are not required to allege that the members of the enterprise share a fraudulent purpose

Countrywide erroneously contends that all members of an enterprise must share a "fraudulent purpose."  Motion at 33.  In support of that argument, Countrywide cites only two Second Circuit cases, including *First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159 (2d Cir. 2004).  Those cases are not good law in the Ninth Circuit, as the district court explained in *Friedman v. 24 Hour Fitness USA, Inc.*, 580 F. Supp. 2d 985 (C.D. Cal. 2008).  In *Friedman*, the defendant cited *First Capital* to argue that the plaintiffs were required to allege that members of a RICO enterprise share a common *fraudulent* purpose.  The court rejected that argument.  First, the court explained that "Plaintiffs acknowledge that the Second Circuit appears to require a 'common fraudulent purpose.' … However, the Second Circuit in *First Capital Asset Mgm't* did not explain its passing reference to such a requirement, nor can this Court discern the reasoning in the Southern District of New York line of cases to which the Second Circuit cited."  *Id*. at 991 n.2.  The court then stated that "[c]ontrary to Defendant's contention, the Ninth Circuit in *Odom* did not establish or affirm the proposition that the common purpose must be fraudulent."  *Id*. at 991.  Then, after discussing *United States v. Feldman*, 853 F.2d 648 (9th Cir. 1988), the *Friedman* court stated:

> To require a common fraudulent purpose would essentially require each member of the enterprise to possess a fraudulent intent.  *Feldman* teaches that such intent is *not* required for each member.  This logically follows from the basic principle

---

[10] In heading "ii" on page 32, Countrywide asserts that the Countrywide KB Appraisal Enterprise is not a continuing unit.  However, in that subsection, Countrywide fails to make any argument to support its assertion.

010120-12  323934 V1

> that RICO enterprises may include "entirely legitimate" enti-
> ties that are exploited by wrongdoers and the companion
> principle that not every member of an enterprise need be a co-
> defendant. *Id.* at 657.

580 F. Supp. 2d at 992.  Thus, there is no merit to Countrywide's argument that Plaintiffs

must allege a fraudulent common purpose.

### 5.      The RICO Conspiracy Claim is Adequately Alleged

Countrywide erroneously asserts that Plaintiffs' RICO conspiracy claims fails.

*See* Motion at 33.  First, there is no merit to Countrywide's argument that "[b]ecause

Plaintiffs' Section 1962(c) claim fails (as set forth above), their Section 1962(d) claim

must fail as well."  *Id*.  The premise of Countrywide's argument is incorrect, because

Plaintiffs have stated a valid claim under Section 1962(c), as explained above.

Similarly, there is no merit to Countrywide's argument that the conspiracy claim

must be dismissed because Plaintiffs allegedly fail to allege specific intent to defraud.

*See* Motion at 34.  Aside from the non sequitur of its placement in Countrywide's

challenge to the conspiracy count, there is no basis for Countrywide's bald assertion that

the Defendants "could not, under the facts, form the specific intent necessary to support a

RICO claim."  Motion at 34.  As the Ninth Circuit has explained in discussing Rule 9(b),

"the third requirement [for mail fraud] – specific intent to deceive or defraud – requires

only a showing of the defendants' state of mind, for which general allegations are suffi-

cient."  *Odom*, 486 F.3d at 554.  As shown throughout this brief, Plaintiffs' allegations of

the RICO scheme adequately establish Countrywide's illicit intent.

### C.      The Complaint Adequately Alleges a Claim Under the California UCL

### 1.      Plaintiffs Have Standing Under the UCL

Countrywide incorrectly argues that Plaintiffs lack standing for their UCL claim

because they "have not alleged, and cannot allege, an injury in fact because they did not

rely on the subject appraisals, nor were they injured by them."  *See* Motion at 34.  This is

the same "plausibility" argument that Countrywide makes at the outset of its motion.

Rather than burden the Court with senseless repetition, Plaintiffs refer the Court to its

arguments in Section II(A) above.  Further, for the same reasons that Plaintiffs' injuries

1   flow directly from Defendants' RICO violations, proximate cause also exists for purposes

2   of the UCL.  *See* Section II(B)(2), above.

3        **2.**         **The Complaint Adequately Pleads a California Nexus**

4        There is no merit to Countrywide's argument that the UCL cannot be applied in

5   this action.  *See* Motion at 34-35.  Defendant KB Home makes the same unavailing argu-

6   ment in its motion to dismiss, and Plaintiffs address that argument at length in their oppo-

7   sition to KB Home's motion to dismiss.  Rather than burden the Court by repeating that

8   argument here, Plaintiffs respectfully ask the Court to consider their response to KB

9   Home's motion to dismiss regarding this issue.

10       In short, Plaintiffs demonstrate in their opposition to KB Home's motion that

11  Defendants overlook the facts plainly alleged in the Complaint that Plaintiffs' injuries

12  were caused by conduct occurring *within and emanating from within* California's

13  borders, where KB Home, Countrywide and their joint venture are all headquartered.

14  The FAC alleges specific acts in furtherance of the scheme which occurred by and

15  through executives at Countrywide and KB Home headquarters, which are within

16  California.  *See* FAC, ¶¶ 18, 43, 46, 48.  The FAC also provides a detailed factual

17  explanation as to how the California resident parent companies, Countrywide and KB

18  Home, joined forces to create a sham affiliated business arrangement (ABA) under

19  RESPA, which was also operated out of California.  FAC, ¶¶ 64-90.  Moreover, the FAC

20  alleges that the Inflated Appraisal Scheme was implemented and conducted by

21  Defendants through their executives, from their headquarters.  FAC, ¶¶ 83, 85, 90.  In

22  addition, the FAC quotes from an anonymous letter sent to counsel that describes the

23  reach of the Scheme and the involvement of KB Home President and CEO Jeff Mezger

24  and former Countrywide Senior Vice President James Hecht.  FAC, ¶¶ 91-92.

25       The FAC includes other allegations that support the application of the UCL in this

26  action.  The FAC includes an email from a Countrywide loan officer in California setting

27  up a meeting with a LandSafe appraisal manager to explain how and when to inflate or

28  "push" values.  FAC, ¶¶ 100-101.  The FAC includes specific factual allegations from the

010120-12 323934 V1

1   complaint filed by former Countrywide-KB executive Mark Zachary, who describes that

2   Countrywide-KB executives had knowledge of and participated in and endorsed the

3   Inflated Appraisal Scheme.  FAC, ¶¶ 103-110.  The FAC also plainly alleges that

4   practices originating in and emanating from California were then implemented in Arizona

5   and throughout the United States.  FAC, ¶¶ 111, 193, 195, 200, 202, 216.

6          Thus, far from "all of the alleged conduct is alleged to have occurred in Arizona

7   and allegedly was directed at Arizona residents" (Motion at 35), the FAC is replete with

8   specific factual contentions detailing how the Inflated Appraisal Scheme was developed,

9   implemented, orchestrated and carried out by and through the California operations of

10  KB Home, Countrywide, LandSafe, the Countrywide-KB joint venture, and the

11  Countrywide KB Criminal Enterprise.  For these reasons, Plaintiffs have sufficiently pled

12  a nexus to support their claims under the California UCL.

13         **3.     The Complaint Alleges a Claim Under the UCL**

14         Countrywide incorrectly argues that Plaintiffs have insufficiently pled the unlaw-

15  ful prong of the UCL.  *See* Motion at 35-37.  "With respect to the unlawful prong,

16  virtually any state, federal or local law can serve as the predicate for an action under

17  section 17200."  *See People ex rel. Bill Lockyer v. Fremont Life Ins. Co*., 104 Cal. App.

18  4th 508, 515 (2002); *see also Cisneros v. U.D. Registry, Inc*., 39 Cal. App. 4th 548, 562-

19  564 (1995) (reversing trial court order sustaining demurrer to UCL unlawful prong action

20  based on violation of federal Fair Credit Reporting Act).  The California Supreme Court

21  agrees.  *See, e.g.*, *Charles J. Vacanti, M.D., Inc. v. State Comp. Ins. Fund*, 24 Cal. 4th

22  800, 828 n.9 (2001) ("Plaintiffs may, however, pursue their tortious interference and

23  UCL claims to the extent they are predicated on their RICO claims because conducting

24  an enterprise through a pattern of racketeering activity establishes a wrongful interference

25  [citation] and an unlawful business practice [citation].").  And so have federal courts.

26  *See, e.g.*, *Citizens for a Better Env't v. Union Oil,* 996 F. Supp. 934, 938 (N.D. Cal. 1997)

27  ("[D]efendant first asserts that a violation of § 17200 ... cannot be predicated on a

28  violation of federal law. That assertion has no merit.  'Virtually any law – federal, state or

010120-12  323934 V1

1    local – can serve as a predicate for a § 17200 action'....The Court finds that § 17200

2    liability can be predicated on a violation of the Clean Water Act."); *Cazares v. Pac.*

3    *Shore Funding*, 2006 U.S. Dist. Lexis 1081 (C.D. Cal. Jan. 3, 2006) (permitting UCL

4    unlawful prong violation predicated on violation of federal Truth in Lending Act).  In

5    short, "Section 17200 is a broad statute designed to remedy violations of other laws, both

6    state and federal."  *Webb v. Smart Document Solutions, LLC*, 499 F.3d 1078, 1082

7    (9th Cir. 2007) (finding no underlying HIPAA violation to support unlawful prong

8    violation).

9         Plaintiffs' RICO claims, which as set forth above are properly pled, thus can

10   provide the basis for a violation of the UCL.  Countrywide's attacks on Plaintiffs'

11   RESPA and Arizona state law claims as a basis for UCL liability are also unavailing.

12        Countrywide insists that RESPA violations have not been adequately pled and

13   even if they were, they are barred by RESPA's one-year statute of limitations.  However,

14   the FAC pleads in intricate detail facts that support the allegations that the Countrywide-

15   KB joint venture was a sham ABA and thus violates RESPA's prohibition of such

16   entities.  FAC, ¶¶ 64-82.  Just this year a California District Court ruled that the facts in

17   the FAC that Defendants now claim do not state a RESPA violation do exactly that.  In

18   *Zaldana v. KB Home*, 2009 U.S. Dist. Lexis 42409 (N.D. Cal. May 8, 2009), Judge

19   Chesney denied defendants' (KB Home and Countrywide) motions to dismiss wherein

20   they claimed that the Countrywide-KB joint venture fell within RESPA's safe harbor.

21   Judge Chesney held:  "Further, contrary to defendants' argument, Zaldana has adequately

22   alleged that CKB [the Countrywide-KB joint venture] was a 'sham' affiliated business

23   arrangement, and, consequently, that defendants are not entitled to the safe harbor

24   provided by § 8(c)(4) of RESPA."  *Id.* at *4.  Thus, Countrywide's argument that these

25   allegations do not meet the 'unlawful' or 'unfair' prongs of the UCL are unsupportable.

26        Countrywide's statute of limitations argument fails because the relevant limita-

27   tions period is not that in RESPA, but rather, that of the UCL.  *See Cortez v. Purolator*

28   *Air Filtration Prods. Co.,* 23 Cal. 4th 163, 178-179 (2000) ("*Any* action on *any* UCL

010120-12 323934 V1

1   cause of action is subject to the four-year period of limitations created by that section….

2   We therefore reject defendant's claim that the shorter periods of limitation applicable to

3   contractual or statutory wage claims govern a UCL action based on failure to pay

4   wages.").  Furthermore, Plaintiffs have pleaded tolling of the RESPA statute of

5   limitations, which is available under Ninth Circuit precedent.[11]

6       Moreover, Plaintiffs' allegations that KB Home violated USPAP support a UCL

7   claim because those standards have been incorporated into federal regulations at 12

8   C.F.R. § 34.44.  *See Paulus v. Bob Lynch Ford, Inc.*, 139 Cal. App. 4th 659, 681 (2006)

9   ("Virtually any law or regulation – federal or state, statutory or common law – can serve

10  as a predicate for a Business and Professions Code section 17200 'unlawful' violation.").

11      Countrywide's argument that alleged violations of Arizona law cannot support a

12  UCL claim is similarly unavailing.  Countrywide attempts to add a new element to the

13  pleading standard – *i.e.*, that to support a UCL claim, a defendant must actually have

14  been criminally charged and prosecuted for the alleged violations of law.  Countrywide

15  cites no case for this proposition because there in none.  Instead Countrywide argues that

16  "Plaintiffs' suggestion that the Defendants or their agents have violated criminal law is

17  just wrong as a matter of law, and insufficient to support this cause of action."  The

18  argument is nothing more than a thinly veiled refutation of the facts squarely alleged in

19  the FAC.  In a motion to dismiss, this Countrywide cannot do.  Plaintiffs' factually

20  supported allegations must be taken as true.

21      Finally, Countrywide contends that Plaintiffs have not adequately pleaded a UCL

22  claim under the unfairness prong.  But here, Countrywide simply restates its prior

23  unavailing arguments that there was no statutory violations and there was no deception

24  because the fraudulent appraisals at issue were completed after the home purchase

25  agreements were executed.  As explained above, these arguments fail.  At least one court

26  ───────────────

[11] *See* FAC, ¶¶ 156-65;  *See Kay v. Wells Fargo & Co. N.A.,* 2007 WL 2141292, *3

27  (N.D. Cal. 2007) (RESPA statute of limitations is not jurisdictional); *King v. California*,
784 F.2d 910, 914-15 (9th Cir. 1986) (Truth-In-Lending Act (TILA) statute of limitations

28  is not jurisdictional); *Lawyers Title Ins. Corp. v. Dearborn Title Corp.,* 118 F.3d 1157,
1166-67 (7th Cir. 1997) (applying *King* to RESPA).

has already concluded that Countrywide deceived its customers.  *See* FAC, ¶ 48 ("This scheme of pushing quantity over quality, including a lack of any analysis of reasonable criteria to ascertain the appropriateness of the loans Countrywide issued to its borrowers, was uniformly concealed from borrowers, just as it was concealed from the public.") (citing and quoting *In re Countrywide Fin. Corp. Derivative Litig.*, 554 F. Supp. 2d 1044, 1057 (C.D. Cal. 2008)).  Countrywide's sole case, *Ford v. Hotwire, Inc.*, 2007 U.S. Dist. Lexis 98370 (S.D. Cal. Nov. 19, 2007), is unpersuasive.  There the District Court rejected Plaintiff's claim under the "unfair" prong because the only mentioned statute was one concerning rental car rates and the case before concerned hotel rates.  *Id.* at *12-13.  Further the court found that Plaintiff there had not pleaded any facts in support of his contention that defendant's act were "immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers."  *Id.* at *13.  In contrast, Plaintiffs here have tethered their claim to multiple applicable statutory and regulatory provisions, including RICO, RESPA, USPAP (12 C.F.R. § 33.44-45) and A.R.S. § 32-3633.  The Inflated Appraisal Scheme, as detailed in the FAC, also squarely presents a compelling factual basis that Defendants' acts were indeed "immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers."

**D.     The Complaint Adequately Alleges a Claim for Unjust Enrichment**

Countrywide argues that Plaintiffs cannot state a claim for unjust enrichment because (1) Plaintiffs executed contracts with "CHL"; and (2) Plaintiffs have a remedy provided at law.  Motion at 38.  The first argument fails because although "CHL" may have contracted with Plaintiffs to finance their homes, the contracts do not govern the claims at issue here, that is, there is no express term in the loan agreements that CHL would have necessarily breached by engaging in the Countrywide Criminal Enterprise and implementing the Inflated Appraisal Scheme.  Further since CHL's co-conspirators, KB Home, Countrywide-KB and Landsafe are not parties to the loan agreements, Plaintiffs have not, and cannot bring a breach of contract claim under the facts at issue here, thus the loan agreements do not govern this dispute and an unjust enrichment claim

is available.  In *McKesson HBOC, Inc. v. New York State Common Ret. Fund, Inc.*, 339 F.3d 1087, 1091-93 (9th Cir. 2003), the court held that there was not a contract that controlled the relationship between the parties because the defendant shareholders were not parties to the subject agreement, and thus unjust enrichment was an available claim.

Finally, Countrywide claims that it was not unjustly enriched because it only collected the lending and other settlement service fees provided for in the loan agreements.  However that statement is in direct conflict with the facts alleged in the FAC, specifically that Countrywide profited from the Inflated Appraisal Scheme by garnering illicit profits from the sale of inflated loans in the secondary market (FAC, ¶ 85); that the appraisal fees were unearned because the fraudulent appraisals had no value (FAC, ¶ 126); and that the fees Countrywide collected resulted from illegal referrals and thus were not justly received. (FAC, ¶¶ 66-82).

### III.   CONCLUSION

Countrywide's motion should be denied in its entirety.

September 8, 2009

HAGENS BERMAN SOBOL SHAPIRO LLP

By _____s/ Robert B. Carey_____
Robert B. Carey
Donald Andrew St. John
2425 East Camelback Road, Suite 650
Phoenix, Arizona  85016

HAGENS BERMAN SOBOL SHAPIRO LLP

By _____s/ Steve W. Berman_____
Steve W. Berman
Thomas E. Loeser
Genessa Stout
1301 Fifth Avenue, Suite 2900
Seattle, Washington  98101

*Attorneys for Plaintiffs and the Proposed Class*

010120-12  323934 V1

1

## <u>CERTIFICATION OF SERVICE</u>

2

I hereby certify that on September 8, 2009, I electronically transmitted the

3
attached document to the Clerk's office using the CM/ECF System for filing and
transmittal of a Notice of Electronic Filing to the following CM/ECF registrant(s):

4

5
Bruce A. Abbott, Esq.
Bruce.Abbott@mto.com

6

7
Jonathan Grant Brinson, Esq.
jonathan.brinson@bryancave.com

8
Robert B. Carey, Esq.

9
rcarey@hbsslaw.com

10
Thomas Loeser, Esq.

11
toml@hbsslaw.com

12
William Thomas Luzader, III, Esq.

13
william.luzader@bryancave.com

14
Robert W. Shely, Esq.
rwshely@bryancave.com

15

16
Donald Andrew St. John, Esq.
andy@hbsslaw.com

17

18
Genessa A. Stout, Esq.
genessa@hbsslaw.com

19

20

21
s/ Steve W. Berman

22

23

24

25

26

27

28

010120-12  323934 V1