**WO**

**NOT FOR PUBLICATION**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| Nathaniel Johnson, et al., | ) | No. CV-09-00972-PHX-FJM |
| Plaintiffs, | ) | **ORDER** |
| vs. | ) | |
| KB Home, et al., | ) | |
| Defendants. | ) | |

The court has before it motions to dismiss by KB Home and the Countrywide and Landsafe defendants ("Countrywide/Landsafe") (docs. 45 & 49), plaintiffs' responses (docs. 51 & 64), and defendants' replies (docs. 58 & 60). We also have before us Countrywide/Landsafe's notices of supplemental authority (docs. 110 & 112), plaintiffs' responses (docs. 111 & 127), and plaintiffs' motion to amend the scheduling order (doc. 144).

As an initial matter, we deny plaintiffs' motion to amend the scheduling order as moot pursuant to our order of March 5, 2010 (doc. 147).

**I. Background**

In 2005, plaintiffs agreed to purchase custom homes from KB Home. Fabian and Maria Patron, Nathaniel Johnson with Kristen Petrilli, and Abraham Nieto chose three lots in Buckeye, Arizona. Charles and Gloria Lewis chose a lot in Surprise, Arizona. Plaintiffs

allege that KB Home referred them to Countrywide for home loans through a Countrywide-KB joint venture. After the homes were completed in 2006, Countrywide had them appraised through a subsidiary, Landsafe.[1] Plaintiffs apparently paid about $400 for each appraisal and completed their purchases.

Based on a recent review, plaintiffs claim that the appraised values of their homes were inflated to meet or exceed the contract prices. They allege, in detail, that the appraisals were deficient because they were based on non-comparable homes from distant neighborhoods and prices from pending KB Home sales. With the exception of the Patrons, plaintiffs assert that they overpaid for their homes and that they would not have completed their purchases at the contract prices had proper appraisals been prepared. The Patrons allege that they paid less than their home was worth. Plaintiffs and Countrywide/Landsafe dispute the conditions under which plaintiffs could have cancelled their purchase contracts.

According to plaintiffs, in the face of a deteriorating real estate market in 2006, KB Home and Countrywide/Landsafe arranged to inflate appraisals. Under this arrangement, home buyers would first be directed to Countrywide for lending services. Countrywide would then request an appraisal through a single employee at Landsafe, and this individual would assign appraisers from a small group chosen by KB Home to return values desired to complete sales at the contract prices. Allegedly, KB Home contributed pending sales information to assist with the inflated appraisals. Plaintiffs also assert that KB Home accepted referral fees from Countrywide through their joint venture, which was predominately under the management and control of Countrywide.

Plaintiffs maintain that this arrangement allowed KB Home to complete sales and enter into purchase contracts at above-market prices in its Arizona and Nevada subdivisions

---

[1] Countrywide/Landsafe's corporate structure is complex. The named entities are Countrywide Financial Corp., Countrywide Home Loans, Inc., Countrywide Mortgage Ventures, LLC, Countrywide-KB Home Loans, Landsafe, Inc., and Landsafe Appraisal Services, Inc. They refer to themselves as the Countrywide/Landsafe defendants.

1  starting in 2006. Countrywide allegedly profited by collecting fees on home loans and
2  selling home loans to investors in the secondary market, including plaintiffs' home loans.
3      Aside from their own allegedly deficient appraisals, plaintiffs offer similar allegations
4  from a group of home buyers in California. They also offer allegations from Mark Zachary,
5  a former Countrywide-KB Regional Vice President. Zachary, whose name has appeared in
6  a number of actions against Countrywide, was allegedly fired because he complained about
7  appraisal and mortgage fraud. In May 2007, he apparently sent an email to KB Home
8  executives and Countrywide-KB's Senior Vice President recounting an appraiser's allegation
9  that a KB Home Closing Coordinator pressured him to return appraised values commensurate
10 with contract prices, even if he had to use non-comparable homes, or he would risk losing
11 KB Home's business. Plaintiffs also allege that a California Countrywide loan officer sent
12 an email to a Landsafe manager in order to schedule a meeting to address such things as
13 "how and when we should push values." Id. ¶ 100. Finally, plaintiffs offer an anonymous
14 letter sent to their counsel and confidential witness statements. Some of the confidential
15 witnesses are identified only as Countrywide employees, others are not identified at all.
16     On behalf of themselves and all others similarly situated, plaintiffs claim that
17 defendants violated the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18
18 U.S.C. § 1962. They also allege that KB Home and Countrywide violated California's
19 Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, and were unjustly
20 enriched. Plaintiffs seek RICO damages stemming from overpaying for their homes and
21 restitution through their UCL and unjust enrichment claims. KB Home and
22 Countrywide/Landsafe move to dismiss all claims.

## II. Article III Standing

24 Countrywide/Landsafe challenges our jurisdiction over this case under Article III of
25 the United States Constitution. In order to establish Article III standing, plaintiffs bear the
26 burden of showing an actual or imminent injury that is concrete, particularized, fairly
27 traceable to defendants' challenged actions, and likely to be redressed by a favorable
28 decision. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61, 112 S. Ct. 2130, 2136

1  (1992). Countrywide/Landsafe contends that plaintiffs cannot show an injury in fact or
2  causation because their contract prices were set in 2005, before defendants' alleged
3  arrangement began, and they did not rely on the appraisals. To the extent that these issues
4  relate to plaintiffs' individual claims, we will address them in the context of plaintiffs' RICO
5  claims. To the extent that they relate to class standing, we will not address them in this order.
6  At this point, plaintiffs' allegations that they were charged around $400 for fraudulent
7  appraisals due to defendants' conduct are sufficient to establish Article III standing. A
8  favorable decision on their unjust enrichment claims would likely redress these injuries
9  through restitution because plaintiffs allege that defendants shared the appraisal fees.
10 Therefore, plaintiffs present a live case or controversy within our constitutional jurisdiction.

## III. RICO

12  Plaintiffs bring two claims under RICO's civil remedy for "[a]ny person injured in his
13 business or property by reason of a violation of" § 1962. 18 U.S.C. § 1964(c). In relevant
14 part, § 1962(c) makes it "unlawful for any person employed by or associated with any
15 enterprise . . . to conduct or participate, directly or indirectly, in the conduct of such
16 enterprise's affairs through a pattern of racketeering activity." Racketeering activity includes
17 mail fraud under 18 U.S.C. § 1341. 18 U.S.C. § 1961(1). Plaintiffs claim that defendants
18 conducted the affairs of an enterprise made up of KB Home and Countrywide/Landsafe or
19 Countrywide and Landsafe through a pattern of mail fraud. Mail fraud "occurs whenever a
20 person, 'having devised or intending to devise any scheme or artifice to defraud,' uses the
21 mail 'for the purpose of executing such scheme or artifice or attempting so to do.'" Bridge
22 v. Phoenix Bond & Indem. Co., 553 U.S. 639, __, 128 S. Ct. 2131, 2138 (2008) (quoting 18
23 U.S.C. § 1341). Plaintiffs also claim that defendants violated 18 U.S.C. § 1962(d) by
24 conspiring to violate § 1962(c).

**1. The Real Estate Settlement Procedures Act**

KB Home contends that the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. §§ 2601-2617, bars plaintiffs' RICO claims. According to KB Home, plaintiffs' allegations amount to a real estate appraisal kickback scheme that would be unlawful under RESPA. See 12 U.S.C. § 2607(a) (prohibiting the giving and receiving of fees and kickbacks through agreements to refer settlement services involving certain mortgage loans). Describing RESPA as a specific statute and RICO as a general one, KB Home relies on a canon of statutory interpretation sometimes used to resolve inconsistencies in favor of specific statutes. See Radzanower v. Touche Ross & Co., 426 U.S. 148, 153, 96 S. Ct. 1989, 1992 (1976). But KB Homes fails to identify any inconsistency between RESPA and RICO or the mail fraud statute. It maintains that RESPA does not prohibit at least some of the defendants' alleged conduct, including any payments made to the appraisers. 12 U.S.C. § 2607(c)(2) (excepting payments made for services actually performed from liability under § 2607(a)). Congress's decision to limit the scope of RESPA, however, does not suggest that it meant to limit the scope of RICO or the mail fraud statute. See Morton v. Mancari, 417 U.S. 535, 551, 94 S. Ct. 2474, 2483 (1974) ("[W]hen two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective.").

KB Home also contends that RESPA bars plaintiffs' RICO claims because they are reformulated RESPA claims. Courts have rejected RICO claims when a plaintiff attempts to reformulate conduct as mail fraud when it would otherwise not be fraudulent in the absence of a statutory violation that is not defined as racketeering activity under RICO. See Smith v. Jackson, 84 F.3d 1213, 1217 (9th Cir. 1996). While RESPA violations do not constitute racketeering activity, 18 U.S.C. § 1961(1), a person can engage in mail fraud based on fraudulent appraisals without the operation of RESPA. Thus, KB Home's reliance on Smith is misplaced.

KB Home fairs no better when it relies on decisions dealing with issues of exclusivity. See Adkins v. Mireles, 526 F.3d 531, 542 (9th Cir. 2008) (holding that claims arguably based

- 5 -

1  on unfair labor practices could not be brought under RICO because they fell within the
2  exclusive jurisdiction of the National Labor Relations Board); Norman v. Niagara Mohawk
3  Power Corp., 873 F.2d 634, 637 (2d Cir. 1989) (finding a RICO claim barred because the
4  Energy Reorganization Act, 42 U.S.C. § 5851, provided an exclusive remedy). KB Home
5  fails to point to any RESPA provision that creates exclusive jurisdiction or remedies. We
6  deny KB Home's motion to dismiss with respect to the effect of RESPA.

### 2. The Private Securities Litigation Reform Act

8  Next, KB Home argues that plaintiffs' RICO claims are barred by the Private
9  Securities Litigation Reform Act ("PSLRA"), Pub. L. No. 104-67, § 107, 109 Stat. 737, 758
10 (1995). The PSLRA amended RICO's civil remedy, in relevant part, such that "no person
11 may rely upon any conduct that would have been actionable as fraud in the purchase or sale
12 of securities to establish" a RICO violation. 18 U.S.C. § 1964(c). According to KB Home,
13 plaintiffs' allegations that defendants inflated appraisals in order to sell homes at above-
14 market prices and then sold the resulting under-secured loans to investors in the secondary
15 market describe a scheme or artifice to defraud in connection with the sale of a security
16 actionable under the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Securities
17 Exchange Commission Rule 10b-5, 17 C.F.R. § 240.10b-5. Indeed, it contends that
18 defendants' alleged arrangement to inflate appraisals and then write under-secured home
19 loans would only make sense if they were able to sell the loans to unsuspecting investors.

20 In response, plaintiffs do not dispute that home loans constitute securities, but they
21 maintain that defendants' alleged conduct would not be actionable as securities fraud because
22 plaintiffs did not buy or sell any securities. Because the PSLRA bars the use of actionable
23 conduct, however, it does not matter whether plaintiffs themselves could bring securities
24 fraud claims. Howard v. Am. Online, Inc., 208 F.3d 741, 749 (9th Cir. 2000). Plaintiffs also
25 maintain that defendants' arrangement to inflate appraisals was not sufficiently connected
26 with the sale of home loans in the secondary market. We disagree. Plaintiffs allege that
27 defendants' secondary market sales benefitted their arrangement by providing profits in
28 which they shared. This is sufficient for their alleged arrangement to be in connection with

- 6 -

1 the sale of a security because "it is enough that the scheme to defraud and the sale of
2 securities coincide." S.E.C. v. Zanford, 535 U.S. 813, 822, 122 S. Ct. 1899, 1904 (2002).
3 Nevertheless, KB Home's argument that the PSLRA bars plaintiffs' RICO claims as
4 a matter of law is incomplete. In order to state a securities fraud claim under 15 U.S.C.
5 § 78j(b) and Rule 10b-5, a plaintiff must be able to show that he relied on the defendant's
6 deceptive acts. Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc., 552 U.S. 148, 159,
7 128 S. Ct. 761, 769 (2008). Allegations that a defendant merely participated in a scheme to
8 defraud are insufficient. Id. at 159-61, 770. Because KB Home does not contend that the
9 secondary market investors in question relied on its own deceptive acts, we deny its motion
10 to dismiss with respect on the PSLRA.

**3. RICO Standing**

12 Countrywide/Landsafe contends that plaintiffs cannot show either injury or causation,
13 both of which are necessary to bring a civil RICO claim. 18 U.S.C. § 1964(c). RICO
14 standing requires an injury to one's business or property, "but for" causation, and proximate
15 causation. Bridge, 553 U.S. at __, 128 S. Ct. at 2141-42. Proximate causation is a flexible
16 concept that demands "some direct relation between the injury asserted and the injurious
17 conduct alleged." Id. at __, 2142. This direct-relation requirement prevents recovery by
18 remote parties, which avoids difficulties with attributing damages between RICO violations
19 and independent causes, lessens the risk of multiple recoveries, and recognizes that directly
20 injured victims will vindicate their rights. Id.

21 Except with respect to the Patrons, Countrywide/Landsafe's contention that plaintiffs
22 cannot show that they were injured by overpaying for their homes is derivative of its
23 contention that plaintiffs cannot show causation. The Patrons allege that they paid less than
24 their home was worth. Obviously, they cannot bring RICO claims premised on a nonexistent
25 injury. We grant defendants' motions to dismiss on the Patrons' RICO claims.

26 Countrywide/Landsafe raises a series of arguments related to causation. Generally,
27 it contends that plaintiffs' allegations are facially implausible, and thus fail to state a claim
28 under Rule 8(a)(2), Fed. R. Civ. P., because it would be a ludicrous lending policy to write

under-secured loans. See Ashcroft v. Iqbal, __ U.S. __, 129 S. Ct. 1937, 1949 (2009). As KB Home all but concedes, however, an arrangement that results in under-secured loans is plausible if the loans can be sold at a profit in the secondary market.

Country/Landsafe also contends that plaintiffs cannot show "but for" causation because they were unconditionally obligated to purchase their homes at the contract prices. In response, plaintiffs assert that they could cancel their purchase contracts in the absence of loan approval and that their loans would not have been approved at the contract prices without inflated appraisals. The parties agree that the relevant section in the purchase contracts stated both that the buyer's obligation to purchase was not contingent on his obtaining loan approval and that either the seller or the buyer could cancel the agreement if the buyer failed to obtain written notification of unconditional loan approval within thirty days of the buyer signing the contract. The thirty-day window apparently coincided with the date on which the buyer's deposit would become non-refundable, and the same section contemplated a cancellation occurring both before and after this date. Countrywide/Landsafe maintains that the buyer could not have cancelled the contract after the first thirty days because the buyer's obligation to purchase was not contingent upon loan approval. Plaintiffs contend that the general significance of the section was to ensure that their deposits became non-refundable at a certain time.

We cannot discern what could or could not happen after thirty days as a matter of law based solely on the language offered. The fact that an obligation is not contingent on a certain event does not mean that it cannot be cancelled if the event does not occur. In any case, we will not interpret the purchase contracts in isolation on a motion to dismiss. It is at least plausible that plaintiffs had the option to cancel their agreements if they did not receive unconditional loan approval. Plaintiffs' allegations that they would not have completed their purchases at the contract prices if defendants had not arranged for inflated appraisals are also plausible.

Countrywide/Landsafe's primary causation argument focuses on reliance. It contends that plaintiffs cannot prove reliance as a matter of law, and that this is fatal to their RICO

- 8 -

1  claims. Based on a decision of the Arizona Court of Appeals, Kuehn v. Stanley, 208 Ariz.
2  124, 91 P.3d 346 (Ct. App. 2004), it asserts that home buyers in Arizona cannot rely on
3  appraisals prepared for the benefit of a lender when they are contractually bound to complete
4  home purchases. The plaintiffs in Kuehn failed to raise a triable issue with respect to reliance
5  at the summary judgment stage on claims against an appraiser and a lender for negligent
6  misrepresentation and consumer fraud, which both require a degree of reliance. Id. at 128-
7  29, 350-51. The Kuehn plaintiffs had waived any claim that they could show reliance based
8  on breaching the purchase contract, renegotiating the contract, or invoking a mortgage
9  contingency clause, because they did not raise these options before the trial court and they
10 did not dispute that the lender would have granted the loan in question even if the appraisal
11 had shown a lower amount. Id. at 129-30, 351-52. Given the uncertainty surrounding
12 plaintiffs' purchase contracts, Kuehn does not prevent them from proving reliance as a matter
13 of law.

14 In response, plaintiffs do not dispute that they do not plead reliance. But they contend
15 that reliance is not a required element of a RICO claim based on mail fraud. They also point
16 out that Countrywide/Landsafe mentions the RICO proximate causation requirement only
17 in passing. Plaintiffs maintain that they have sufficiently alleged proximate causation
18 because defendants' arrangement to inflate appraisals was a direct cause of their injuries and
19 a "substantial factor in the sequence of responsible causation." Oki Semiconductor Co. v.
20 Wells Fargo Bank, 298 F.3d 768, 773 (9th Cir. 2002); cf. Hemi Group v. City of New York,
21 __ U.S.__, __, 130 S. Ct. 983, 991 (2010) (finding intentional conduct insufficient where
22 plaintiff was injured indirectly). In its reply, Countrywide/Landsafe does not address
23 plaintiffs' proximate causation argument aside from reasserting that reliance at some level
24 is required to state a RICO claim based on mail fraud. The parties all agree that the United
25 States Supreme Court's decision in Bridge resolves the question of whether a RICO plaintiff
26 bringing a claim based on mail fraud must plead reliance at some level.

27 In Bridge, the Court held that plaintiff auction bidders could recover on a RICO claim
28 based on mail fraud against another group of bidders who were able to make impermissible

multiple bids through misrepresentations relied on by the auctioneer, even though the plaintiffs did not rely on the misrepresentations themselves. 553 U.S. at __, 128 S. Ct. at 2145. The Court found that first-person reliance is not an element of a RICO claim based on mail fraud, nor is it a prerequisite to establish proximate causation. Id. In the process, the Court suggested that misrepresentations can only cause harm if someone relies on them and stated that "none of this is to say that a RICO plaintiff who alleges injury 'by reason of' a pattern of mail fraud can prevail without showing that <u>someone</u> relied on the defendant's misrepresentations." Id. at __, 2144.

Countrywide/Landsafe contends that this language requires plaintiffs to plead reliance at some level. But the Court in <u>Bridge</u> did not adopt such a rule at the pleading stage:

> [I]t may well be that a RICO plaintiff alleging injury by reason of mail fraud must establish at least third-party reliance in order to prove causation. But the fact that proof of reliance is often used to prove an element of the plaintiff's cause of action, such as the element of causation, does not transform reliance itself into an element of the cause of action.

Id. (quotation omitted). Because <u>Bridge</u> does not require plaintiffs to plead reliance and Countrywide/Landsafe does not offer a cogent argument for why they must otherwise do so to show causation under the circumstances of this case, we deny Countrywide/Landsafe's motion to dismiss with respect to causation.

**4. Pattern of Racketeering Activity and Rule 9(b), Fed. R. Civ. P.**

Countrywide/Landsafe also challenges plaintiffs' allegations that defendants engaged in a pattern of racketeering activity. At a minimum, a civil RICO plaintiff must allege a continuous pattern of at least two related predicate acts of racketeering within ten years. <u>Allwaste, Inc. v. Hecht</u>, 65 F.3d 1523, 1527 (9th Cir. 1995). The requisite continuity may be shown through either a closed-ended substantial period of past conduct or an open-ended pattern of conduct with a threat of repetition. Id. While isolated or sporadic acts fail to satisfy the continuity requirement, acts that constitute an ongoing entity's regular way of doing business are sufficient. Id. at 1527-29.

Countrywide/Landsafe asserts that plaintiffs do not allege a continuous pattern of mail fraud. In connection with their allegations that defendants developed a scheme to defraud

- 10 -

1    based on appraisal inflation and executed it through the mail, plaintiffs specifically allege at
2    least three mailings. They allege that Nieto received a letter from Countrywide Home Loans
3    on or about April 21, 2006 indicating that Landsafe would appraise his home. They allege
4    that he also received a good faith estimate from Countrywide Home Loans through the mail
5    on or about the same day. And they allege that Countrywide Home Loans sent the Lewises
6    an appraisal through the mail on or about September 27, 2006. Plaintiffs allege a number of
7    other mailings and uses of interstate wires more generally. Each mailing incidental to an
8    essential part of the scheme qualifies as a predicate act of racketeering. Bridge, 553 U.S. at
9    __, 128 S. Ct. at 2138. Countrywide/Landsafe mentions in passing that each mailing did not
10   include a misrepresentation, but mailings do not need to contain false information. Id.

11   Plaintiffs' alleged predicate acts encompass only five months, which is likely not long
12   enough for closed-ended continuity. Although plaintiffs come close to alleging only isolated
13   and sporadic activity, at this stage they have sufficiently alleged acts indicative of a
14   continuing threat.

15   In connection with the pattern requirement, defendants maintain that plaintiffs fail to
16   meet the heightened pleading standard for circumstances constituting fraud. Rule 9(b), Fed.
17   R. Civ. P., "requires the identification of the circumstances constituting fraud so that the
18   defendant can prepare an adequate answer from the allegations." Odom v. Microsoft Corp.,
19   486 F.3d 541, 553 (9th Cir. 2007). Along with the above mailings, plaintiffs detail the
20   contents of, and circumstances surrounding, their allegedly fraudulent appraisals with
21   particularity. Even without the anonymous and confidential witness statements, which are
22   unreliable, plaintiffs' allegations are sufficiently specific to put defendants on notice of
23   particular misconduct. KB Home allegedly developed a short list of appraisers willing to
24   return desired home values, referred home buyers to Countrywide, and contributed pending
25   sales information to facilitate the inflated appraisals. Countrywide allegedly participated by
26   offering its lending services and procuring inflated appraisals through a single employee at
27   Landsafe. And Landsafe allegedly assigned the appraisers using KB Home's list. We deny
28

1  defendants' motions to dismiss with respect to pleading a pattern of racketeering activity and
2  fraud.

### 5. RICO Enterprise

4  Defendants challenge plaintiffs' enterprise allegations as well. A RICO enterprise
5  "includes any individual, partnership, corporation, association, or other legal entity, and any
6  union or group of individuals associated in fact although not a legal entity." 18 U.S.C.
7  § 1961(4). Plaintiffs allege two associated-in-fact enterprises in the alternative, one made
8  up of KB Home and Countrywide/Landsafe, and the other made up of Countrywide and its
9  Landsafe subsidiaries. The criteria for an associated-in-fact enterprise are "a group of
10 persons associated together for a common purpose of engaging in a course of conduct,"
11 "evidence of an ongoing organization, formal or informal," and "evidence that the various
12 associates function as a continuing unit." Odom, 486 F.3d at 552 (quoting United States v.
13 Turkette, 452 U.S. 576, 583, 101 S. Ct. 2524, 2528 (1981)). Plaintiffs adequately allege that
14 defendants formed a cohesive ongoing unit with specific roles for each entity and a common
15 purpose to complete home sales and provide appraisals and loans.

16 Countrywide/Landsafe contends that the criteria for an enterprise should include an
17 additional requirement that the enterprise's common purpose be fraudulent. It concedes that
18 this is not the rule in the Ninth Circuit. In Odom, the United States Court of Appeals for the
19 Ninth Circuit stated that it did not believe that it was at liberty to add to the above criteria
20 from Turkette. 486 F.3d at 553. We conclude that plaintiffs do not need to plead a
21 fraudulent common purpose.

22 To be liable under RICO, a defendant must also be separate and distinct from the
23 enterprise. In re Countrywide Fin. Corp. Mortgage Mktg. & Sales Practices Litig., 601 F.
24 Supp. 2d 1201, 1212 (S.D. Cal. 2009). Countrywide/Landsafe contends that Countrywide
25 and its Landsafe subsidiaries are not sufficiently distinct to form plaintiffs' alternative
26 Countrywide enterprise. Plaintiffs allege that the Landsafe subsidiaries had a distinct role
27 and allowed the Countrywide enterprise to operate more effectively by removing the checks
28 and balances normally provided by independent appraisal entities. In In re Countrywide, the

1  United States District Court for the Southern District of California found similar allegations
2  against Countrywide and Landsafe sufficient to satisfy the "something more" test for
3  pleading an enterprise comprised of a parent and its subsidiaries. Id. at 1214. We agree here,
4  and we deny defendants' motions to dismiss on plaintiffs' enterprise allegations.

### 6. RICO Conspiracy

6  Defendants challenge plaintiffs' claims that they conspired to violate § 1962(c) in
7  violation of § 1962(d) on the basis that plaintiffs do not adequately plead a violation of
8  § 1962(c). Because plaintiffs' § 1962(c) allegations are adequate, we deny defendants'
9  motions to dismiss on plaintiffs' RICO conspiracy claims.

### IV. California's Unfair Competition Law

11  Under California's UCL, a "person who has suffered injury in fact and has lost money
12  or property as a result of unfair competition" may seek injunctive relief including restitution.
13  Cal. Bus. & Prof. Code § 17204. Unfair competition includes "any unlawful, unfair or
14  fraudulent business act or practice." Id. § 17200. "With respect to the unlawful prong,
15  virtually any state, federal, or local law can serve as the predicate for an action." People ex
16  rel. Bill Lockyer v. Fremont Life Ins. Co., 104 Cal. App. 4th 508, 515 (Ct. App. 2002)
17  (quotation and emphasis omitted). Plaintiffs claim that KB Home and Countrywide, which
18  are both based in California, violated the UCL through actions and decisions that took place
19  in California.

20  Specifically, plaintiffs allege that KB Home and Countrywide engaged in business
21  acts or practices that were unlawful. As above, they claim that defendants violated RICO.
22  They claim that defendants violated RESPA through the exchange of referral fees and the
23  operation of a Countrywide-KB joint venture as an impermissible "affiliated business
24  arrangement." See 12 U.S.C. § 2607(c)(4). They also claim that defendants violated federal
25  regulations, 12 C.F.R. § 33.44-45, requiring appraisals in federally related transactions to
26  conform to the Uniform Standards of Professional Appraisal Practice. Moreover, they claim
27  that defendants violated the common law of unjust enrichment and an Arizona statute, A.R.S.
28  § 32-3633, which criminalizes the inducement or influence of appraisers to secure grossly

1 misleading or fraudulent appraisals. Plaintiffs also allege that defendants' acts or practices 2 were unfair and fraudulent under the UCL.

3 Defendants contend that plaintiffs cannot invoke the UCL because it does not apply 4 extraterritorially. KB Home relies on a California Court of Appeal decision construing the 5 UCL as not applying to non-California conduct that causes injury outside of California, in 6 part because California statutes are presumed to have no extraterritorial effect. Norwest 7 Mortage, Inc. v. Superior Court, 72 Cal. App. 4th 214, 222-25 (Ct. App. 1999). In response, 8 plaintiffs concede that the UCL does not apply extraterritorially and explain that they are 9 basing their UCL claims on defendants' conduct in their executive offices and facilities in 10 California, which allegedly injured plaintiffs in Arizona. Plaintiffs point out that the court 11 in Norwest also held that the UCL could apply to non-California residents who were injured 12 outside California by conduct occurring in California. Id. at 225 n.13. As the court in 13 Norwest recognized, however, applying the UCL under these circumstances implicates the 14 substantive law of multiple jurisdictions, which calls for a choice of law inquiry. Id. at 228.

15 Federal courts exercising diversity or supplemental jurisdiction apply the forum's 16 choice of law rules. Ins. Co. of N. Am. v. Fed. Express Corp., 189 F.3d 914, 919 (9th Cir. 17 1999); Paracor Fin., Inc. v. Gen. Elec. Capital Corp., 96 F.3d 1151, 1164 (9th Cir. 1996). 18 "Arizona courts apply the principles of the Restatement (Second) of Conflict of Laws (1971) 19 to determine the controlling law for multistate torts." Bates v. Superior Court, 156 Ariz. 46, 20 48, 749 P.2d 1367, 1369 (1988). Under the Restatement, we apply the substantive law of the 21 jurisdiction with the most significant relationship to both the occurrence and the parties. Id. 22 The relevant factors include the place where the injury occurred, the place where the conduct 23 causing the injury occurred, the parties' domicil, residence, nationality, place of 24 incorporation and place of business, and the place where the relationship between the parties 25 is centered. Restatement (Second) of Conflict of Laws § 145. We also look to the 26 Restatement's general principles, including the needs of interstate systems, the jurisdictions' 27 policies and interests, predictability, and ease in the determination of the law to be applied. 28 Id. § 6(2).

- 14 -

1         The first factor, place of injury, heavily favors Arizona law. Plaintiffs, Arizona home
2 owners, allege that they were injured in Arizona by overpaying for their homes and paying
3 for fraudulent appraisals. Although this factor is not as significant for economic injury as it
4 is for personal injury, it is still the most important factor. The Restatement suggests that the
5 place of injury is less important for unfair competition claims, but its reasoning is
6 inapplicable here because it contemplates a claim by a competitor without a discernable place
7 of injury. Id. § 145 cmt. f. Assuming, without deciding, that the conduct causing plaintiffs'
8 alleged injuries took place in California and not through the appraisals conducted in Arizona,
9 the second factor favors California law. The third factor is split between Arizona and
10 California because the parties have ties to both states. Because the parties' relationship
11 centers on Arizona real estate transactions, the fourth factor favors Arizona law. On balance,
12 the tort-specific factors plainly favor applying Arizona substantive law.

13         The general principles also favor Arizona law. While California has an interest in the
14 behavior of its businesses when it causes injuries in other states, Arizona has a strong interest
15 in the regulation of the Arizona real estate industry and the protection of Arizona home
16 buyers. And plaintiffs' remarkable proposal to apply an Arizona criminal statute through a
17 California civil cause of action would not promote predictability or ease in determination of
18 the law. Because we conclude that Arizona has the most substantial relationship to plaintiffs'
19 claims sounding in tort, we grant defendants' motions to dismiss on plaintiffs' UCL claims.

20         **V. Unjust Enrichment**

21         Defendants argue that plaintiffs cannot proceed with unjust enrichment claims against
22 KB Home and Countrywide because their relationships with plaintiffs are governed by valid
23 contracts. Plaintiffs do not dispute that Arizona law applies to their unjust enrichment
24 claims. To establish a claim for unjust enrichment, a plaintiff must show an enrichment
25 connected with an impoverishment and the absence of both justification and a legal remedy.
26 Trustmark Ins. Co. v. Bank One, Ariz., 202 Ariz. 535, 541, 48 P.3d 485, 492 (Ct. App. 2002).
27 Although a plaintiff may plead an unjust enrichment claim in the alternative where the
28

1  validity of a relevant contract is in doubt, he may not bring such a claim where a specific
2  contract governs the parties' relationship. See id. at 542-43, 492-93.
3      Plaintiffs do not dispute that they have valid purchase contracts with KB Home and
4  loan agreements with Countrywide. Instead, they maintain that their claims are not affected
5  by these contracts because the contracts lack express terms necessarily breached by
6  defendants' alleged conduct. However, Arizona contracts contain an implied covenant of
7  good faith and fair dealing, the essence of which "is that neither party will act to impair the
8  right of the other to receive the benefits which flow from their agreement or contractual
9  relationship." Rawlings v. Apodaca, 151 Ariz. 149, 153, 726 P.2d 565, 569 (1986). And a
10 party can breach this covenant without breaching an express term of the contract. United
11 Dairymen of Ariz. v. Schugg, 212 Ariz. 133, 137, 128 P.3d 756, 760 (Ct. App. 2006). Thus,
12 plaintiffs' unjust enrichment claims against KB Home and Countrywide clearly arise from
13 relationships governed by undisputed contracts. We grant defendants' motions to dismiss
14 on plaintiffs' unjust enrichment claims.

15     **IT IS THEREFORE ORDERED GRANTING IN PART** and **DENYING IN**
16 **PART** KB Home's and Countrywide/Landsafe's motions to dismiss (docs. 45 & 49). The
17 motions are granted on all claims by Fabian and Maria Patron, and on Nathaniel Johnson's,
18 Kristen Petrilli's, Abraham Nieto's, and Charles and Gloria Lewis's Unfair Competition Law
19 and unjust enrichment claims. The motions are denied on Nathaniel Johnson's, Kristen
20 Petrilli's, Abraham Nieto's, and Charles and Gloria Lewis's RICO claims.

21     **IT IS FURTHER ORDERED DENYING** as moot plaintiffs' motion to amend the
22 scheduling order (doc. 144).

23     DATED this 30th day of March, 2010.

*Frederick J. Martone*
Frederick J. Martone
United States District Judge

- 16 -